Adam E. Jones (OSB# 152429)
**FORSBERG & UMLAUF, P.S.**
901 Fifth Avenue, Suite 1400
Seattle, WA 98164
Telephone: 206.689.8500
Fax: 206.689.8501
Email:  ajones@foum.law

Brian A. Kelly (CA Bar# 124738) (*pro hac vice* pending)
**DUANE MORRIS LLP**
One Market Plaza, Spear Tower, Suite 2200
San Francisco, CA  94105-1127
Telephone: 415.957.3000
Fax: 415.957.3001
E-mail:  bakelly@duanemorris.com

Attorneys for Defendants
CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON AND CERTAIN LONDON MARKET
COMPANIES

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| In re:<br><br>KAISER GYPSUM COMPANY, INC. and HANSON PERMANENTE CEMENT, INC. (f/k/a Kaiser Cement Corporation),<br><br>Debtors. | Case No.: 16-03127-rld<br><br>**LONDON MARKET INSURERS' REPLY SUPPORTING MOTION TO TRANSFER VENUE** |
| KAISER GYPSUM COMPANY, INC. and HANSON PERMANENTE CEMENT, INC. (f/k/a Kaiser Cement Corporation),<br><br>Plaintiffs,<br><br>v.<br><br>AIU INSURANCE COMPANY et al.,<br><br>Defendants. | DATE OF HEARING: Nov. 14, 2016<br><br>TIME OF HEARING: 10:00 AM<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Kaiser Gypsum Company ("Kaiser Gypsum") and Hanson Permanente Cement ("Kaiser Cement", and collectively with Kaiser Gypsum, "Kaiser") are forum shopping. Kaiser filed this action in Oregon state court, and the next day it filed for bankruptcy in the Western District of North Carolina.

Kaiser asserts that it has a right to forum shop. Kaiser contends that Section 1404 (not Section 1412) applies to transfer motions, and then claims Section 1404 *always* bars transferring a case to the bankruptcy forum when the debtor filed a state-law case (with no diversity) one day before filing for bankruptcy. However, Kaiser's contentions regarding the appropriate transfer are without support in the law. Thus, in the alternative, Kaiser manufactures reasons why Oregon is the most efficient forum. However, these contentions are unsupported by the facts.

Section 1412—the statute applied by most courts—always allows transferring to the forum of the bankruptcy. Moreover, Kaiser's claim that the Oregon forum is most efficient is wrong. This is an insurance coverage action. Most relevant to this action is the interpretation of the insurance policies, which Kaiser has previously contended are subject to California, not Oregon law. The examination of any physical sites where pollution occurred, is not relevant, particularly here where Kaiser has not owned or operated the Oregon site for many decades. Litigating in Oregon simply adds expense. Almost every party in this case, including Kaiser, had to hire Oregon local counsel to litigate this action—in addition to the local counsel they hired to litigate the North Carolina bankruptcy. This expense imposes needless waste on the parties. In fact, Kaiser's sole reason for choosing Oregon state court is due to its desire to attempt to apply Oregon law to a dispute that should be governed by California law.

Accordingly, Defendants Certain Underwriters at Lloyd's, London and Certain London Market Companies ("London Market Insurers" or "LMI") request that the Court grant their motion to transfer venue to the Western District of North Carolina, ECF No. 3 ("Motion").

## I. ARGUMENT

### A. Section 1412 mandates that the Court transfer this case.

Section 1412 is the majority rule, and its application is compelled by the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

1

Kaiser argues that Section 1404, not Section 1412, should determine whether the Court grants the relief sought in the Motion. Opposition, ECF No. 28 at 6–7. But Kaiser omits that "the majority of courts, including courts in this district, have held that § 1412 applies to such proceedings" and that the "minority view . . . [is] generally disfavored." *Reid Ashman Mfg. v. Swanson Semiconductor Serv., L.L.C.*, Case No. 06-cv-04693, 2008 WL 425638, 2008 U.S. Dist. LEXIS 14748 at *5 (N.D. Cal. Feb. 14, 2008); *N. Parent*, 221 B.R. 609, 630 n.19 (Bankr. D. Mass. 1998); *A.B. Real Estate v. Bruno's, Inc. (In re Bruno's, Inc.)*, 227 B.R. 311, 322–23 & n.39 (Bankr. N.D. Ala. 1998) (citing nine cases using the majority rule); 1 Collier on Bankruptcy ¶ 4.05 (stating that Section 1412 applies to related-to cases; stating that the minority approach of applying Section 1404 "is dubious, at least when section 1404 is considered to be the only applicable section, as opposed to a holding that both sections 1404(a) and 1412 are applicable"). This minority view is contrary to the Bankruptcy Rules, which specify that Section 1412 applies to *all* adversary proceedings when considering transfer. Fed. R. Bankr. P. 7087 ("[T]he court may transfer an adversary proceeding or any part thereof to another district pursuant to 28 U.S.C. § 1412 . . . ."); *N. Parent*, 221 B.R. at 630 n.19; *Bruno's,* 227 B.R. at 323. Hence, it applies to the transfer of this adversary proceeding. As set forth in the Motion, Section 1412 mandates transfer to the Western District of North Carolina.

**B.     A transfer to the Western District of North Carolina is in the interests of justice and convenience because it is the most efficient forum for litigating this case.**

An analysis of the facts of this case show that the Western District of North Carolina is the most efficient forum. Moreover, Kaiser has not rebutted the presumption that all adversary proceedings should be litigated in the forum of the bankruptcy. This action does not involve a single Oregon party. Further, the insurance policies at issue in this action were not negotiated or underwritten in Oregon, and were issued to a California entity. Indeed, over the course of a decade and a half coverage dispute between the same parties to this action, Kaiser and all of the same insurers in the prior coverage action *agreed* that Kaiser's insurance policies were subject to California law. As a consequence of these facts and applicable law, any interest that Oregon has in

1716462 / 1111.0001

adjudicating this dispute is diminished and should be afforded little weight. Finally, Kaiser's choice of forum receives little deference because it is not an Oregon entity.

### 1. The Western District of North Carolina is the best forum for efficiently litigating this case.

The mandate for efficient litigation requires a matter of this size to be transferred to the District where Kaiser's bankruptcy case is pending.

Adversary proceedings involving multimillion dollar claims "will potentially have a significant impact on the bankruptcy estate[,] . . . [so] the economics of estate administration are clearly implicated, and . . . [it] weighs in favor of transfer [to the bankruptcy forum]." *McGillis/Eckman Invs. - Billings, LLC v. Sportsman's Warehouse, Inc.*, Case No. 10-cv-26, 2010 WL 3123266, 2010 U.S. Dist. LEXIS 80810 at *17–18 (D. Mont. June 30, 2010), *adopting magistrate judge's findings and recommendations*, 2010 WL 3153416, 2010 U.S. Dist. LEXIS 80809, (D. Mont. Aug. 9, 2010); *see also Bunsow v. Davis*, Case No. 12-ap-3113, 2012 Bankr. LEXIS 5280 at *8 (Bankr. N.D. Cal. Oct. 31, 2012) ("[T]he bankruptcy court presiding over the Dewey chapter 11 case understands much better than this court the extent to which it is important to the effective administration of that case that Defendants' indemnity claims be resolved promptly."). The same is true here: the court in North Carolina is in the best position to understand and implement what it determines to be the most effective administration to resolve all disputes relating to Kaiser's estate. Here, Kaiser is apparently seeking hundreds of millions of dollars from its insurers, so this action will potentially have a significant impact on the bankruptcy estate, and thus should be litigated in North Carolina. *See* Complaint at ¶¶ 33, 52 (alleging that the estimated cleanup costs for one site are $342 million and that "Kaiser has already incurred financial losses of more than $350,000").

Oregon offers no compelling efficiency or convenience. This is an insurance coverage action, which requires the presiding court to interpret the policies and determine whether they provide coverage for the underlying environmental liabilities. There are no percipient witnesses— whether in Oregon or elsewhere—for these policy interpretation questions because the policies were negotiated outside the U.S. and in other states by out-of-state entities, and issued or

3

subscribed by out-of-state entities, for various periods between 1940 and 1988. Complaint at ¶ 35; Declaration of Brian A. Kelly in Support of Reply at ¶ 4 ("Kelly Dec."). The vast majority of relevant witnesses will be out-of-state, especially relevant experts. So it makes little difference whether a "fact witness with knowledge of the Site's historical operations" may be located in Oregon, Declaration of Charles E. McChesney, ECF No. 29 at ¶ 14 ("McChesney Dec."), because the vast majority of the witnesses will be elsewhere. Kelly Dec. at ¶ 4. Indeed, Kaiser's complaint confirms that it ceased operations at the Oregon site in 1978 and ceased operations at the Washington site by 1985. Complaint at ¶¶ 13, 29. Kaiser's counsel managing this case—both in-house and outside—are located in Pennsylvania. Kelly Dec., Ex. A, Deposition of Charles E. McChesney ("McChesney Deposition") at 7:13–8:08; Opposition at 1 (identifying Kaiser's counsel as K&L Gates attorneys in Pennsylvania); *see also* Kelly Dec., Ex. A. McChesney Deposition at 2:7–2:10 (identifying Kaiser's counsel in Kaiser's bankruptcy case as Jones Day attorneys in Texas). Moreover, the relevant documents are primarily stored outside Oregon. Kelly Dec., Ex. A, McChesney Deposition at 156:8–156:23 (testifying that documents are located in Pittsburgh, Oakland, Sacramento, San Diego, Los Angeles, Dallas, Portland, and Seattle). Any remaining records located in Oregon can easily be transported to North Carolina. *See In re B.L. of Miami, Inc.*, 294 B.R. 325, 332–33 (Bankr. D. Nev. 2003) (stating that "in today's electronic age", the "location of original documentation [is] entitled to little weight in choosing between two forums"). Finally, neither Kaiser's principal place of business nor its place of incorporation is in Oregon; in fact, during the time period relevant to the insurance policies at issue in this action, Kaiser had its principal place of business in California, and Kaiser Cement was first incorporated in California. Kelly Dec., Ex. B, Kaiser Cement Corporation's 2004 Supplemental at KINS 152215; *id.*, Ex. C, Kaiser Gypsum Company's 2004 Supplemental Responses at KINS 152277.

Transferring this adversary proceeding would save the parties', including the estate's, resources because it would reduce legal fees. *Cf. TIG Ins. Co. v. Smolker (In re TIG Ins. Co.)*, 264 B.R. 661, 668 (Bankr. C.D. Cal. 2001) (denying transfer because it would require the parties "to retain and educate new or additional counsel" in the bankruptcy forum). If this action were to proceed in Oregon, all parties to this case—including Kaiser—must employ multiple law firms.

Transferring to the Western District of North Carolina will allow the parties to forego Oregon counsel, thus saving resources and making litigation of this action more efficient and convenient.

Finally, it is irrelevant that the Bankruptcy Court for the Western District of North Carolina cannot enter final orders and cannot hold jury trials because neither can this Court. *Bunsow*, 2012 Bankr. LEXIS 5280 at *8 ("[T]hat the bankruptcy court cannot conduct a jury trial is not controlling."). The question of whether the state court's ability to hold jury trials should affect the venue, as Kaiser argues (Opposition at 6, 12–13) must be addressed following a motion for remand, and should not be taken into account when considering the Motion.

### 2. Any arguments relating to remand should be addressed after transfer.

***This Court should not make any decision relating to remand*** and instead leave that decision for the Western District of North Carolina.

That court "is in the best position to determine the issues underlying the motion to remand, abstain, or dismiss." *Thomas v. Lorch, Wedlo, Inc. (In re Wedlo, Inc.)*, 212 B.R. 678, 679 (Bankr. M.D. Ala. 1996) (granting motion to transfer to the home court and declining to adjudicate the plaintiff's motion to remand); *Bunsow*, 2012 Bankr. LEXIS 5280 at *7 ("I determine that Plaintiff's arguments for remand are not necessarily persuasive and that the decision whether to abstain or remand should be decided by the [home court, where the case is being transferred]."); *see also City & Borough of Juneau v. Beardsley (In re Fountain Vill. Dev.)*, Case No. 09-bk-39718, 2014 Bankr. LEXIS 4088 at *15–16 *19 & n.42 (Bankr. D. Alaska Sept. 16, 2014) (granting motion to transfer to bankruptcy forum and declining to adjudicate the plaintiff's motion to remand; stating: "Other courts, faced with simultaneous motions to transfer venue of a removed action and to remand the action, have found that the action should be transferred to the 'home' court, where the bankruptcy was filed, to permit that court to decide the issue of remand"); *Cornerstone Dental, PLLC v. Smart Dental Care, LLC*, Case No. 07-ap-09002, 2008 Bankr. LEXIS 1122 at *6 (Bankr. D. Idaho Mar. 31, 2008) (granting motion to transfer to bankruptcy forum and declining to adjudicate the plaintiff's motion to remand; stating: "this Court agrees that the home court is best positioned to make, and should make, the decision regarding remand").

The cases cited by Kaiser, *Ni Fuel Co. v. Jackson*, 257 B.R. 600 (N.D. Okla. 2000), and *Suntrust Bank v. Ferrell (In re Pluma, Inc.)*, 2000 Bankr. LEXIS 1973, 2000 WL 33673752 (Bankr. M.D.N.C. Sept. 15, 2000), are inapposite. *Ni Fuel* is inapposite because that court was forced to first determine whether it had jurisdiction over the removed claims. *Id*. at 608–09. The party opposing removal had argued that certain of the removed claims were completely outside the District Court's jurisdiction. *Id*. That issue does not exist here, as all the parties have agreed related-to jurisdiction exists over all the claims asserted in Kaiser's Complaint. Opposition at 6. *Pluma* actually supports Movants. In that case, the court, after both a motion to transfer and a motion for abstention and remand had been filed, granted the motion to transfer. *Pluma*, 2000 Bankr. Lexis. 1973 at *4. Only after the case had been transferred did the transferee court consider the motion for abstention and remand. *Id*. at *4–15.

### 3. The presumption that an adversary proceeding should be transferred to the bankruptcy forum has not been rebutted.

Kaiser's arguments regarding the home court presumption are unsupported by persuasive cases from this Circuit. Kaiser theorizes that the presumption should receive less weight when: (1) the case is non-core; (2) a non-debtor invokes it; and (3) a case is trying to be transferred *to* the bankruptcy forum, rather than away from it. Opposition at 15–16.

None of these theories are valid in the Ninth Circuit. Ninth Circuit courts routinely apply the presumption and transfer non-core, related-to cases to the home bankruptcy forum when a non-debtor moves to transfer—even when the debtor opposes transfer. *See, e.g.*, *Tapia v. Davol, Inc.*, Case No. 15-cv-179, 2016 U.S. Dist. LEXIS 95493 at *3, *9–10, *13 (S.D. Cal. July 21, 2016) (transferring over debtor's opposition); *Bunsow*, 2012 Bankr. LEXIS 5280 at *2–3, *7–8 (transferring over debtor's opposition); *Jackson*, 2013 U.S. Dist. LEXIS 50454 at *6, *8–10, *13 (granting non-debtor's motion to transfer).

Ninth Circuit courts also apply the home court presumption to transfer cases to the bankruptcy forum. *See McGillis/Eckman Invs. - Billings, LLC*, 2010 U.S. Dist. LEXIS 80810 at *15–16, *18, *20; *Reid-Ashman Mfg.*, 2008 U.S. Dist. LEXIS 14748 at *7; *see also In re Fountain Vill. Dev.*, 2014 Bankr. LEXIS 4088 at *14, *19.

6

The two Ninth Circuit cases relied upon by Kaiser, *In re TIG Ins. Co.*, 264 B.R. 661, and *Owen v. Goodwin*, Case No. 12-cv-3037, 2012 WL 3945770, 2012 U.S. Dist. LEXIS 128419 (E.D. Wash. Sept. 10, 2012), are not persuasive. *TIG* is not at all similar to this case, and its discussion of transfer was *dicta*. *TIG*, 264 B.R. at 667. Importantly, in *TIG*, the facts were the polar opposite of this case. First, in *TIG*, the action had been extensively litigated in State Court for four years prior to the bankruptcy filing—including summary judgment motions and appeals, with a trial date of two months away—so there were real efficiency gains in continuing litigation there. *See id.* at 663–64, 667. This case has yet to be litigated; Answers to Kaiser's Complaint have yet to be filed. Second, unlike here, "all of the parties and all of the percipient witnesses" in *TIG* were located near the original forum. *Id.* at 668. Here, none of the parties and few, if any, witnesses are located in Oregon. As noted above, Kaiser neither owned nor operated the Oregon site since 1978. Third, in *TIG*, some parties were individuals who were less able to afford litigation in the foreign forum. *Id.* Here, Oregon would be convenient for none of the parties, even Kaiser, whose bankruptcy case and administrative offices are all elsewhere. Finally, in *TIG*, the parties would have been required to retain new counsel to litigate in the new forum. *Id.* Here, the parties already have North Carolina lawyers, and will continue to do so, and it is only litigating in Oregon that requires them to obtain additional counsel.

As for *Owen*, Kaiser incorrectly emphasizes the court's use of the word "remain." *Owen* did not enact a rule limiting the presumption to cases where a litigant tries to transfer out of the home court. ***Instead, it states that "the 'home court presumption' [means] that related actions should be heard in the same venue as the bankruptcy*.**" *Owen*, 2012 U.S. Dist. LEXIS 128419 at *4–5 (emphasis added). This view is entirely consistent with Movants' contention that this case should be moved to the Western District of North Carolina, where Kaiser's bankruptcy case is pending.[1]

---

[1] Other cases relied upon by Kaiser had similarly inapposite facts. *See Irwin v. Beloit Corp. (In re Harnischfeger Indus.)*, 246 B.R. 421, 427, 443 (Bankr. N.D. Ala. 2000) (case litigated for over 1.5 years before transfer was sought and had many witnesses near the original forum); *Longhorn Ptnrs. Pipeline L.P. v. KM Liquids Terminals, L.L.C.*, 408 B.R. 90, 94 (Bankr. S.D. Tex. 2009) (case litigated for over 2 years before transfer was sought); *Hopkins v. Plant Insulation Co.*, 342 B.R. 703, 708 (D. Del. 2006) (case "brought by California citizens and a corporation

### 4. Any interest in Oregon's adjudicating this dispute is diminished.

Oregon's interest in having this dispute adjudicated in Oregon state court is diminished substantially because (i) of Kaiser's bankruptcy filing, (ii) none of the parties are Oregon entities, and (iii) the insurance policies involved in this this dispute have no connection to Oregon and should be interpreted in accordance with by California law, as even Kaiser acknowledges in prior coverage litigation between the same parties.

#### a. Kaiser's bankruptcy filing diminishes Oregon's interest.

A state's interest "in having local controversies determined locally is diminished" when that controversy "is related to a bankruptcy case." *McGillis/Eckman Invs. - Billings, LLC*, 2010 U.S. Dist. LEXIS 80809 at *3 (transferring the case to the bankruptcy forum); *Jackson*, 2013 U.S. Dist. LEXIS 50454 at *10, *13 (acknowledging that "[t]he 'local controversies' factor does weigh against transfer" but nevertheless transferring the case to the bankruptcy forum). For example, in *McGillis/Eckman*, 2010 U.S. Dist. LEXIS 80810 at *1–2, *3–4, *20, the court transferred a case similar to this one to the bankruptcy forum. In that case, the affected property was located in the transferring-court's state, but the parties were neither incorporated nor had their principal place of business in that state, and "none of the relevant contracts were signed in [that state] or by people residing in [that state]." *Id.*

#### b. This dispute should be governed by California law, not Oregon law.

Oregon's interest is further diminished because for the last 15 years, Kaiser has contended that California, not Oregon, law applied to Kaiser's insurance policies. As a result, courts have consistently applied California law to the interpretation of the same Kaiser insurance policies at issue in this action. *See, e.g., Kaiser Cement v. Ins. Co. of the State of Pennsylvania*, 215 Cal.App.4th 210 (2013); *London Market Insurers v. Superior Court*, 146 Cal.App.4th 648 (2007);

---

headquartered in California against two corporations headquartered in California"). *In re Cont'l Air Lines, Inc.*, 61 B.R. 758 (S.D. Tex. 1986) is inapposite because it addresses whether the home court presumption applies to claims that arise post-petition and are not dischargeable. *Id.* at 770. As neither condition exists here, this case too does not apply.

1716462 / 1111.0001

Kelly Dec., Ex. D, Kaiser Cement and Gypsum Corporation's Opening Phase II Trial Brief, March 13, 2015, at 8–9.

The policies at issue were entered into by Kaiser when it was located in California and covered Kaiser's nationwide operations. Kelly Dec., Ex. E, Policy No. 69700 at 353 (providing coverage for certain losses "arising out of each occurrence happening anywhere in the world"); *id.* at 353, 361, 365 (identifying Kaiser as having a California address; requiring that Kaiser give notice of occurrences on London Market Insurers at a California address; requiring service of process in New York; and identifying California as the primary location where taxes on the policy were paid); *id.*, Ex. F., Policy No. 834/58548/84 at 485, 490 (same, except not providing information on tax payments). Indeed, as Kaiser has repeatedly asserted that California law applied to the interpretation of the same insurance policies at issue in this action, Kaiser should be judicially estopped from contending otherwise. *Hampton Tree Farms v. Jewett*, 320 Ore. 599, 612–13 & n.8 (Or. 1995) (stating that a litigant "is bound by choice of a substantive right in earlier judicial proceeding and, thus, is precluded from making wholly inconsistent claim in a subsequent judicial proceeding").

### c. The Oregon statute does not abrogate Kaiser's acknowledgement that California law applies to its insurance policies.

Despite Kaiser's consistent position over the last decade and a half, it now claims Oregon law applies to the insurance policies due to the Oregon Environmental Cleanup Assistance Act ("OECAA"). Opposition at 3, 11–12, 15. This Act states that "Oregon law shall be applied in all cases where the contaminated property to which the action relates is located within the State of Oregon." Or. Rev. Stat. 465.480(2)(a). However, courts have held that when, as is the case with nearly all, if not all, of Kaiser's policies, the dispute focuses on the interpretation of insurance policies issued and negotiated in California, California has a greater interest in resolving the dispute than Oregon, regardless of an allegedly-contaminated site in Oregon. *See, e.g.*, *Sulzer Pumps (US) Inc. v. Superior Court*, No. B222280, 2010 WL 2000369, at *3-6 (Cal. Ct. App. May 25, 2010) (unpublished).

Although the Court need not reach this issue because Kaiser should be judicially estopped from asserting that Oregon law applies, not only is this argument directly contrary to Kaiser's judicial admissions, it is also wrong for at least two reasons. First, Oregon cannot constitutionally regulate contracts affecting nationwide operations that are entered into by non-Oregon citizens outside Oregon. That would violate the dormant Commerce Clause. *See Healy v. Beer Inst.*, 491 U.S. 324, 336 ("[T]he Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." (quotation mark omitted)); *Aetna Life Ins. Co. v. Dunken*, 266 U.S. 389, 391, 399–400 (1924) (holding unconstitutional a Texas statute mandating the application of Texas law to policies insuring current Texas citizens when the policy was originally issued outside Texas to a then–non-Texas citizen).

No court appears to have litigated the question of whether the OECAA can constitutionally require that Oregon law be applied to an insurance policy covering nationwide liabilities that was entered into by non-Oregon entities outside of Oregon. However, the Supreme Court has held that a similar law was unconstitutional as applied because "[t]he [state] statute was incapable of being constitutionally applied to [the insurance policy] since the effect of such application would be to regulate business outside th[at state]." *Aetna Life Ins. Co. v. Dunken*, 266 U.S. at 399. One recent decision acknowledges the parties' dispute over the OECAA and the governing law. *IBC Mfg. Co. v. Berkshire Hathaway Specialty Ins. Co.*, Case No. 3:16-cv-00908-SI, 2016 U.S. Dist. LEXIS 115240 at *12–13 n.3 (D. Or. Aug. 29, 2016) (one party contending that Tennessee law governs all policies issued to Tennessee insureds; other party contending that Oregon law applied due to the OECAA). But that court did not resolve the issue and instead dismissed the action, in deference to a parallel litigation on the same claims in a different state. *Id.* at *15 (allowing litigation to proceed in Tennessee).

Second, the OECAA was passed in 1999 and cannot constitutionally alter the substance of the insurance policies—which all predate the OECAA by at least a decade—because that would violate the Contracts Clause. *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (stating that the Contracts Clause is violated when a statute "substantially impair[s]" a

10

contract for a reason that cannot survive strict scrutiny); *see also* Complaint at ¶ 35 (stating that the policies cover various periods between 1940 and 1988); Or. Rev. Stat. 465.480, History; 1999 Ore. SB 1205. Thus the OECAA cannot affect such pre-existing contracts.

Kaiser's cited cases are materially distinguishable. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495 (9th Cir. 2000) never says that a state's interest in deciding local controversies is a "crucial factor." Opposition at 11. Instead, *Jones* says that "the court may consider" which state is most familiar with the governing law. *Jones*, 211 F.3d at 498. Moreover, *Jones* did not involve a bankruptcy, and the original forum was the location where the contracts were negotiated and executed and that the most of the relevant witnesses resided. *Id.* at 499. Similarly, in *A.B. Real Estate v. Bruno's, Inc. (In re Bruno's, Inc.)*, 227 B.R. 311, 330 (Bankr. N.D. Ala. 1998) a debtor chose to litigate in the forum where both it and its adversary's principal offices were located. *Home Indem. Co. v. Stimson Lumber Co.*, 229 F. Supp. 2d 1075, 1083 (D. Or. 2001) was a non-bankruptcy case applying Section 1404 where the defendant was a company incorporated in the original forum with its headquarters also located there. Because Section 1404 does not apply here, the reasoning of that case is not on point.

### 5.  Kaiser's choice of forum is entitled to little deference.

Kaiser argues that its choice of forum is entitled to great deference. Opposition at 14–15. Supporting this argument are inapplicable or materially distinguishable cases. *In re Bruno's, Inc.* and *Home Indem. Co.* are inapplicable for the reasons already discussed. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2001) was a non-bankruptcy case involving a defendant who moved to dismiss for *forum non conveniens* in an effort to force the U.S. resident plaintiff to litigate in England. *Wiwa*, 226 F.2d at 101, 107. *Maya, LLC v. Cytodyn of N.M., Inc. (In re Cytodyn of N.M., Inc.)*, 374 B.R. (Bankr. C.D. Cal. 2007) was a case that was litigated for over one year, with the debtor filing for bankruptcy (likely in bad faith) the week before the scheduled trial date. *In re Cytodyn of N.M., Inc.*, 374 B.R. 733 at 735, 737, 741.

Thus, these cases do not rebut the Ninth Circuit's rule, which was explained in the Motion: the plaintiff's choice of forum receives little, if any, deference when the plaintiff is not located in that forum. Motion at 6, 9; *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1157 (S.D. Cal. 2005)

("[I]t is equally appropriate to give less deference to a foreign plaintiff's forum choice where transfer is sought pursuant to § 1404(a)."); *Longhorn Ptnrs. Pipeline L.P.*, 408 B.R. at 102 (recognizing "that a party's choice of forum should be given little if any weight in a venue analysis"); *see also Reid-Ashman Mfg.*, 2008 U.S. Dist. LEXIS 14748 at *7; *Metz v. United States Life Ins. Co.*, 674 F. Supp. 2d 1141, 1146 (C.D. Cal. 2009).

**C.    Even if Section 1404 were to apply, the case still must be transferred.**

Under Section 1404, this case still must be transferred for two reasons: (i) Kaiser consented to litigation in the Western District of North Carolina; and (ii) the requirement that this case might have been brought there does not apply.

First, the Court can transfer the case "to any district . . . to which all parties have consented." 28 U.S.C. § 1404(a). Consent can be express or implied. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948 (2015) (holding that a bankruptcy statute requiring "the consent of all the parties" is satisfied by "implied consent"). A debtor, by filing bankruptcy, implicitly consents to litigating suits in the bankruptcy forum. 28 U.S.C. § 1409(a) ("[A] proceeding . . . arising in or related to a case under title 11 may be commenced in the district court in which such case is pending."); *Bunsow*, 2012 Bankr. LEXIS 5280 at *4–5. Here, Kaiser implicitly consented to suits in the Western District of North Carolina by filing its bankruptcy action there. *See* Kelly Dec., Ex. A, McChesney Deposition at 51:6–51:25 (testifying that Kaiser "reincorporated in North Carolina . . . in order to create the opportunity to file bankruptcy in North Carolina").

Second, the requirement that this case "might have been brought" in the Western District of North Carolina is inapplicable. The might-have-been-brought clause in Section 1404 does "not act as an absolute bar to transfer when the surrounding circumstances favor transfer to best serve convenience and/or the interests of justice, even when the plaintiff could not as a matter of right have brought the exact same case in the transferee district." *See, e.g.*, *Encyclopaedia Britannica, Inc. v. Magellan Navigation, Inc.*, 512 F. Supp. 2d 1169, 1172–74 (Bankr. W.D. Wis. 2007) (discussing several Supreme Court decisions supporting this rule). Indeed, "in construing [this clause, courts] consider whether a suggested interpretation would discriminatorily enable parties

opposed to transfer, by means of their own acts or omissions, to prevent a transfer otherwise proper and warranted by convenience and justice." *Van Dusen v. Barrack,* 376 U.S. 612, 623 (1964).

Kaiser's proposed interpretation would grant a right to forum shoppers that would prevent otherwise proper transfers. Debtors could file their state-law claims in one jurisdiction and then, the next day, file their bankruptcy petition in another jurisdiction (as Kaiser did here), thereby preventing the District with the responsibility for administering the debtor's assets from administering the adversary proceeding where the existence of such assets is determined. If there is no federal claim or diversity, Kaiser's proposed interpretation would forbid transferring the litigation to the bankruptcy forum—even if the bankruptcy forum would be more efficient. Such a result would clearly be contrary to the intent of Congress in creating related-to jurisdiction for Bankruptcy Courts, which is explicitly set forth in 28 U.S.C. § 157. Section 1404 cannot be interpreted in this way.

Even if the Court disagrees with this interpretation of Section 1404, this argument supports applying Section 1412. *E.g., Dunlap v. Friedman's, Inc.,* 331 B.R. 674, 678 (S.D. W. Va. 2005) (holding that Section 1412 governs a transfer to the bankruptcy forum because "section 1404 would, in perhaps a large number of cases, thwart transfer . . . . [and thus] would dilute the well-settled presumption that 'related to' proceedings should be litigated in the 'home court'"); *Brown v. Fargo,* 463 B.R. 332, 337–38 (M.D.N.C. 2011) (same); *Marquette Transp. Co. v. Trinity Marine Prods.,* Case No. 06-cv-0826, 2006 U.S. Dist. LEXIS 60402 at *23–24 (E.D. La. Aug. 11, 2006) (same); *Baker v. Muscletech Research & Dev., Inc.,* Case No. 06-cv-492, 2006 WL 1663748, 2006 U.S. Dist. LEXIS 38925 at *5–7 (E.D. Wis. June 9, 2006) (same).)

## II.    CONCLUSION

For the foregoing reasons, the Court should transfer venue of this action to the Western District of North Carolina.

Dated: November 9, 2016            **FORSBERG & UMLAUF, P.S.**


By: _/s/ Adam E. Jones_
Adam E. Jones (OSB# 152429)

13

## <u>CERTIFICATE OF SERVICE</u>

On the date given below I caused to be served the foregoing ***LONDON MARKET INSURERS' REPLY SUPPORTING MOTION TO TRANSFER*** on all counsel of record via CM/ECF.

**SIGNED** this 9th day of November, 2016, at Seattle, Washington.


*/s/ Christina Young-Robinson*
Christina Young-Robinson

Adam E. Jones (OSB# 152429)
**FORSBERG & UMLAUF, P.S.**
901 Fifth Avenue, Suite 1400
Seattle, WA 98164
Telephone: 206.689.8500
Fax: 206.689.8501
Email: ajones@foum.law

Brian A. Kelly (SBN 124738) (*pro hac vice* pending)
**DUANE MORRIS LLP**
One Market Plaza, Spear Tower, Suite 2200
San Francisco, CA 94105-1127
Telephone: 415.957.3000
Fax: 415.957.3001
E-mail: bakelly@duanemorris.com

Attorneys for Defendants
CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON AND CERTAIN LONDON MARKET
COMPANIES

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| In re:<br><br>KAISER GYPSUM COMPANY, INC. and HANSON PERMANENTE CEMENT, INC. (f/k/a Kaiser Cement Corporation),<br><br>    Debtors. | Case No.: 16-03127-rld<br><br>**DECLARATION OF BRIAN A. KELLY IN SUPPORT OF LONDON MARKET INSURERS' REPLY SUPPORTING MOTION TO TRANSFER VENUE** |
| KAISER GYPSUM COMPANY, INC. and HANSON PERMANENTE CEMENT, INC. (f/k/a Kaiser Cement Corporation),<br><br>    Plaintiffs,<br><br>    v.<br><br>AIU INSURANCE COMPANY et al.,<br><br>    Defendants. | DATE OF HEARING: Nov. 14, 2016<br><br>TIME OF HEARING: 10:00 AM<br><br>DEMAND FOR JURY TRIAL |

1

I, Brian A. Kelly, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am an attorney duly licensed to practice in all of the courts of the State of California and am a partner of Duane Morris LLP, attorney of record for Defendants Certain Underwriters at Lloyd's, London and Certain London Market Companies ("London Market Insurers"). I also serve as attorney of record for London Market Insurers in other actions involving Plaintiffs Kaiser Gypsum Company ("Kaiser Gypsum") and Hanson Permanente Cement ("Kaiser Cement"; collectively with Kaiser Gypsum, "Kaiser"), including Kaiser's bankruptcy case in the Bankruptcy Court for the Western District of North Carolina and an insurance coverage action in California. I also serve as trial attorney for London Market Insurers in connection with a declaratory relief action filed in 2001 in Los Angeles Superior Court in California, relating to insurance coverage disputes arising from Kaiser's asbestos bodily injury claims ("ABIC") and resulted in a Final Judgment entered by the trial court on September 13, 2016 (hereafter "California Insurance Coverage Action").

2.     I am over the age of 18 years old and have personal knowledge of all matters stated herein. If called as a witness in this matter, I could and would competently testify thereto.

3.     This declaration is submitted in support of London Market Insurers' Reply Supporting Motion to Transfer Venue.

4.     In insurance coverage litigation, one of the more significant disputes to be resolved relates to policy interpretation—determining whether the policies cover the claimed losses. For example, the California Insurance Coverage Action that involved ABIC focused heavily on the meaning of various provisions in Kaiser's primary and excess insurance policies. Most of the policies at issue in the California Insurance Coverage Action are now also at issue in this action. During the course of the California Insurance Coverage Action, which lasted over 15 years, the focus of the lawsuit related to the insurance policies and their interpretation. In the California Insurance Coverage Action, the insurers and Kaiser asserted that these same insurance policies that are now at issue in this Oregon action filed by Kaiser were subject to interpretation under California law—even though the ABIC arose in many different states and involved underlying lawsuits throughout the country. Based upon my involvement as lead counsel with responsibility

for discovery and trial over more than a decade, I am familiar with Kaiser's insurance policies and its history. Based upon my familiarity, all of Kaiser's policies placed in the London insurance market identify Kaiser with an address in California. To my knowledge, and based upon a review of Kaiser's allegations in this action, none of Kaiser's insurers is based in Oregon. To my knowledge, there are no known percipient witnesses who reside in Oregon who were involved in the negotiation or underwriting of the policies at issue in this action or who can testify on the meaning of London Market Insurers' insurance policies subscribed in favor of Kaiser. These policies were subscribed many decades ago, with policies allegedly incepting as early as 1940.

5. Attached as Exhibit A is a true and correct copy of excerpts of the transcript for the deposition of Charles E. McChesney, which was taken in the course of Kaiser's bankruptcy case in the Bankruptcy Court for the Western District of North Carolina.

6. Attached as Exhibit B is a true and correct copy of excerpts of Kaiser Cement's 2004 Supplemental Responses to Plaintiffs' Standard Interrogatories to All Defendants from California litigation.

7. Attached as Exhibit C is a true and correct copy of excerpts of Kaiser Gypsum's 2004 Supplemental Responses to Plaintiffs' Standard Interrogatories to All Defendants from California litigation.

8. Attached as Exhibit D is a true and correct copy of Kaiser's Opening Phase II Trial Brief in the California Insurance Coverage Action.

9. Attached as Exhibits E and F are true and correct copies of two exemplar London Market Insurers' Policies that were included in a policy stipulation between parties to the Asbestos Coverage Action in California that was marked as Trial Exhibit 152. The excerpted policies include pages 352–372 and 482–513 of Trial Exhibit 152.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 9, 2016.

/s/ Brian A. Kelly
Brian A. Kelly

**CERTIFICATE OF SERVICE**

On the date given below I caused to be served the foregoing ***DECLARATION OF BRIAN KELLY IN SUPPORT OF REPLY SUPPORTING MOTION TO TRANSFER VENUE*** on all counsel of record via CM/ECF.

**SIGNED** this 9th day of November, 2016, at Seattle, Washington.

/s/ Christina Young-Robinson
Christina Young-Robinson

# Exhibit A

1          UNITED STATES BANKRUPTCY COURT

2      FOR THE WESTERN DISTRICT OF NORTH CAROLINA

3                CHARLOTTE DIVISION

4                  - - - - -

5    In re:                ) Chapter 11
                           )
6    KAISER GYPSUM COMPANY, )
     INC., et al.          )
7                          ) Case No. 16-31602(JCW)
          Debtors.         )

8

                   - - - - -

9

10    DEPOSITION OF CHARLES E. McCHESNEY II, ESQ.

11   a 30(b)(6) witness for Kaiser Gypsum herein,

12   called by Certain Kaiser Gypsum Claimants, for

13   examination, taken pursuant to the Federal and

14   Bankruptcy Rules of Civil Procedure, by and

15   before Michelle L. Hall, a Registered Merit

16   Reporter and Notary Public in and for the

17   Commonwealth of Pennsylvania, at the law

18   offices of Jones Day, 4500 BNY Mellon Center,

19   500 Grant Street, Pittsburgh, Pennsylvania, on

20   Monday, October 24, 2016, at 9:34 a.m.

21                  - - - - -

22

23   Job no. 114552

24

25

1  CHARLES E. McCHESNEY II, ESQ.
2  COUNSEL PRESENT:
3  For the Certain Kaiser Gypsum Claimants:
4  Natalie Ramsey, Esquire
   Mark Fink, Esquire (via telephone)
5  MONTGOMERY McCRACKEN WALKER & RHOADS
   123 South Broad Street
6  Philadelphia, PA 19109
7  For the Debtors:
8  Basheer Ghorayeb, Esquire
   Dan Prieto, Esquire
9  JONES DAY
   2727 North Harwood Street
10 Dallas, TX 75201
11 For the Official Committe of Asbestos Personal
   Injury Claims:
12
13 Todd Phillips, Esquire
   Sally Sullivan, Esquire
   CAPLIN & DRYSDALE
14 One Thomas Circle, NW
   Washington, DC 20005
15
16 For the Future Claimants' Representative:
17 Sharon Zieg, Esquire
   Elizabeth Justison, Esquire
18 YOUNG CONAWAY STARGATT & TAYLOR
   1000 North King Street
19 Wilmington, DE 19801
20
21 For First State Insurance Company:
22 Craig Goldblatt, Esquire
   WILMERHALE
   1875 Pennsylvania Avenue, NW
23 Washington, DC 20006
24
25

1  CHARLES E. McCHESNEY II, ESQ.
2
3  I N D E X
4  - - - - -
5
6  WITNESS:  CHARLES E. McCHESNEY II, ESQ.
7
8  E X A M I N A T I O N:          PAGE
9
10 BY MS. RAMSEY              5
11 BY MR. GOLDBLATT           183
12
13 E X H I B I T S:
14
15 EXHIBIT 1  Notice of Intent to take      30
16    30(b)(6) Deposition
17 EXHIBIT 2  Amended Notice of Intent to    30
18    take 30(b)(6) Deposition
19 EXHIBIT 3  Declaration of Charles E.     35
20    McChesney II in Support of
21    First Day Pleadings
22 EXHIBIT 4  Debtors' Objection to Motion   44
23    of Certain Claimants to
24    Transfer Venue
25

1  EXHIBIT 5  Articles of Conversion of     48
2     Kaiser Gypsum Company, Inc., a
3     Washington corporation into
4     Kaiser Gypsum Company, Inc., a
5     North Carolina corporation
6  EXHIBIT 6  PowerPoint Project Daybreak   72
7     KGC000046 to KGC000060
8  EXHIBIT 7  E-mails between Dan Prieto    102
9     and Mark Fink.  Subject:
10    KG - Summaries
11 EXHIBIT 8  PowerPoint Project Daybreak  103
12    KGC000061 to KGC000077
13 EXHIBIT 9  Bank of America Bank         126
14    Statements Hanson Permanente
15    Cement, Inc., 7/29/16 to 8/31/16
16 EXHIBIT 10 Bank of America Merrill Lynch 126
17    Your Full Analysis Business
18    Checking for August 24, 2016,
19    to August 31, 2016
20 EXHIBIT 11 Spreadsheet KGC000045        164
21 EXHIBIT 12 Hanson Kaiser Pendings by    170
22    Disease and State
23 EXHIBIT 13 Spreadsheet                  173
24 EXHIBIT 14 Participating Parties to the 176
25    LDW Allocation

1  CHARLES E. McCHESNEY II, ESQ.
2  P R O C E E D I N G S
3  - - - - -
4  CHARLES E. McCHESNEY II, ESQ.
5  a 30(b)(6) witness for Kaiser Gypsum herein,
6  having been first duly sworn, was examined and
7  testified as follow
8  - - - - -
9  EXAMINATION
10 BY MS. RAMSEY:
11    Q.   Mr. McChesney, for the record, my
12 name is Natalie Ramsey.  I represent David
13 Hoff, Ronald and Shirlee Auen, and Richard and
14 Charlene Hoffmeister.  We have called ourselves
15 in the case the Certain Kaiser Gypsum
16 Claimants.  For today's purpose, I will call
17 them the Certain Claimants.  I'm going to be
18 asking you some questions this morning.
19        Have you ever been deposed before?
20    A.   No.
21    Q.   You are a lawyer by training though;
22 correct?
23    A.   I am.
24    Q.   Okay.  So I'm going to review the
25 deposition rules; although, you're probably

CHARLES E. McCHESNEY II, ESQ.

1  familiar with them.  The deposition is being
2  recorded.  For the benefit of the court
3  reporter, please respond orally to my
4  questions.  Please allow me to finish a
5  question before you begin to answer, and I will
6  try to allow you to finish your answer before I
7  ask another question.
8       If you don't understand a question,
9  please ask me to rephrase it, and I'm happy to
10  do that.  And if you do answer, I will assume
11  that you understood the question.
12      A.  (Witness nods).
13      Q.  If you remember later something that
14  you neglected to say in response to one of my
15  questions, please tell me, and complete your
16  answer at that point.  And we will take breaks
17  any time you like.
18      A.  Okay.
19      Q.  Are all of those instructions clear?
20      A.  Yes.
21      Q.  Okay.  Is there any reason today
22  that you are unable to answer the questions
23  truthfully, completely, and accurately?
24      A.  No.

CHARLES E. McCHESNEY II, ESQ.

1      Q.  No medication, drugs, anything else
2  that would interfere with your ability to be
3  deposed today?
4      A.  No.
5       MS. RAMSEY:  All right.  Shall
6  we do usual stipulations, except as to form,
7  all objections reserved?  Is that --
8       MR. GHORAYEB:  Just go by the
9  Rules, yes.  We will do objection to form.
10       MS. RAMSEY:  Okay.
11  BY MS. RAMSEY:
12      Q.  All right.  Mr. McChesney, can you
13  first start off, please, telling me a little
14  bit about yourself.  Where do you live?
15      A.  I live in Pennsylvania.
16      Q.  And where in Pennsylvania?
17      A.  Not in Pittsburgh.  I live in
18  Claysville, Pennsylvania.
19      Q.  And where is Claysville,
20  Pennsylvania?
21      A.  Southwest of Pittsburgh about 25
22  minutes.
23      Q.  Where do you work, sir?
24      A.  I work for Three Rivers Management

CHARLES E. McCHESNEY II, ESQ.

1  in, it's Scott Township.  It has a Pittsburgh
2  ZIP code.
3      Q.  And can you tell me the address of
4  Three Rivers Management.
5      A.  Sure.  It is Manor Oak One, Suite
6  200, 1910 Cochran Road, Pittsburgh,
7  Pennsylvania, 15220.
8      Q.  And how long have you worked for
9  Three Rivers Management?
10      A.  About 11 and a half years.
11      Q.  What did you do before you began
12  work there?
13      A.  I was in private practice.
14      Q.  And what kind of private practice
15  were you in?
16      A.  I was a litigator with K&L Gates, at
17  that time known as Kirkpatrick Lockhart.  Some
18  iteration thereof.
19      Q.  How long had you been with
20  Kirkpatrick & Lockhart?
21      A.  Since '99.
22      Q.  Did you graduate from law school in
23  '99?
24      A.  I did.

CHARLES E. McCHESNEY II, ESQ.

1      Q.  And where did you attend law school?
2      A.  Ohio State.
3      Q.  And is that your only advanced
4  degree?
5      A.  No.  I have a Master's in public
6  policy and public management from -- also from
7  Ohio State.
8      Q.  And when did that -- did you obtain
9  that degree?
10      A.  I graduated with that degree in
11  1998.
12      Q.  And did that Master's degree
13  immediately follow your college years?
14      A.  No.  I worked for several years
15  after college.
16      Q.  And what did you do after college
17  before you attended graduate school?
18      A.  It's a laundry list, if you want it.
19  Immediately after graduating from undergrad, I
20  worked in retail management with Kmart
21  Fashions.  And after that, ooh, I moved back to
22  where I graduated from undergrad, primarily
23  because my then-girlfriend, but now wife, was
24  not done with school yet, and worked a variety

Case 16-03127-rld    Doc 50    Filed 11/09/16

CHARLES E. McCHESNEY II, ESQ.

1   of jobs, none of which is particularly
2   meaningful to what I do today.
3
4       But, gosh.  I waited tables for a
5   period of time; worked in a goat cheese factory
6   for a period of time; and worked -- what else
7   did I do -- oh, I worked for, an account
8   manager for Rent-A-Center for a period of time.
9   I think I worked front desk nights at a hotel.
10  I did do that.  Yeah.
11      Q.   Thank you.
12      A.   That was a two-year stint of odd
13  jobs.
14      Q.   And during that two-year stint,
15  where did you live?
16      A.   I lived in Ithaca, New York.
17      Q.   And where did you go to college?
18      A.   Cornell.
19      Q.   And what was your degree at Cornell?
20      A.   I have a Bachelor of Arts in
21  economics.
22      Q.   Returning to your employment with
23  Three Rivers Management.
24      A.   Uh-huh.
25      Q.   What is your current position?

CHARLES E. McCHESNEY II, ESQ.

1
2       A.   I am chief legal counsel.
3       Q.   And as chief legal counsel, what are
4   your day-to-day responsibilities?
5       A.   I manage the other attorneys in the
6   office.  I am principally responsible for all
7   things legal related to our company operations.
8   I have some reporting duties and, you know,
9   manage litigations, outside counsel, et cetera.
10      Q.   And how long have you held that
11  position?
12      A.   Since 2010.
13      Q.   And before 2010, what was your
14  position?
15      A.   Immediately before 2010, I was
16  senior counsel, and before that, environmental
17  counsel.
18      Q.   How many attorneys does Three Rivers
19  Management employ?
20      A.   Currently, we have two attorneys and
21  a temporary attorney because one of our
22  attorneys is on disability.
23      Q.   And what are the titles of the other
24  two attorneys?
25      A.   Senior counsel and environmental

CHARLES E. McCHESNEY II, ESQ.

1
2   counsel.
3       Q.   Do you hold any other titles with
4   Three Rivers Management?
5       A.   I am an officer and a director of
6   Three Rivers Management.
7       Q.   In your capacity as an officer, what
8   titles do you hold?
9       A.   I'm vice president and secretary.
10      Q.   And as vice president of Three
11  Rivers Management, what are your
12  responsibilities?
13      A.   Largely similar to what I currently
14  described as my chief legal counsel duties.  In
15  addition, I would be called upon to advise the
16  Board on any kind of meaningful Board
17  resolution.  And as a Board member, I would
18  also be voting on those resolutions.
19      Q.   Okay.  So, how large is Three Rivers
20  Management?
21      A.   We're approximately 20 employees.
22      Q.   Okay.  And what does Three Rivers
23  Management do?
24      A.   Three Rivers Management manages
25  asbestos, environmental, non-asbestos, product

CHARLES E. McCHESNEY II, ESQ.

1
2   liability, real estate.  Essentially, legacy
3   liabilities for what we would call our
4   discontinued business operations, which are
5   mostly liabilities that arise out of business
6   that we no longer engage in.
7       Q.   And when you say, "we no longer
8   engage in," who are you referring to as "we"?
9       A.   So the parent company has a number
10  of subsidiaries who fit that bill.  They either
11  are operating companies that have certain
12  businesses that they no longer engage in, or we
13  have companies that ceased their business
14  operations years ago, but continue to have
15  these legacy liabilities.  Pursuant to
16  contract, Three Rivers manages those
17  liabilities on behalf of those companies.
18      Q.   Who is the parent corporation that
19  you're referring to?
20      A.   So, in the United States, it's
21  Lehigh Hanson, Inc.
22      Q.   Is there another parent corporation?
23      A.   There is, above Lehigh Hanson,
24  there's HeidelbergCement AG, which is a German
25  publicly traded company.

Case 16-03127-rld   Doc 50   Filed 11/09/16

CHARLES E. McCHESNEY II, ESQ.

1
2 Q. On a day-to-day basis, who are your
3 primary interactions with?
4 A. My primary interactions would be
5 with folks in my office. Rob Markwell is the
6 president of Three Rivers Management. He is
7 the director of our office. Kind of the top
8 guy in the office. I interact with the two
9 attorneys that report to me: Mary Wright, and
10 right now it's a temporary attorney named Tim
11 Bytner. I also interact with we have a number
12 of environmental professionals who manage
13 environmental sites. We have four of those. I
14 interact with those folks regularly. And then
15 also with our accounting group.
16 Q. And with respect to reporting to or
17 the parent corporation, who do you primarily
18 report to?
19 A. So, I typically report to the Three
20 Rivers Board. And there would be, we do have
21 periodic meetings with representatives of
22 Lehigh Hanson. But, I mean, those happen, we
23 have monthly hour-long calls, and then twice a
24 year we have in-person meetings.
25 Q. And do you attend those monthly

CHARLES E. McCHESNEY II, ESQ.

1
2 calls?
3 A. I do.
4 Q. And in-person meetings?
5 A. I do.
6 Q. Going back to your position as a
7 director for a moment, are you on any special
8 committees of the Board?
9 A. The Board does not have any special
10 committees.
11 Q. How many people are on the Board of
12 Three Rivers Management?
13 A. At present, I believe it's three.
14 Q. Can you give me their names, please.
15 A. Myself, Robert Markwell, and William
16 Venema.
17 Q. Does William Venema hold other
18 positions within Three Rivers Management?
19 A. He is a vice president.
20 Q. How many vice presidents are there?
21 A. I believe three.
22 Q. And other than you and Mr. Venema,
23 who would be the other?
24 A. Kathryn Mehta, M-E-H-T-A.
25 Q. In connection with your positions at

CHARLES E. McCHESNEY II, ESQ.

1
2 Three Rivers Management, are you familiar with
3 the asbestos and environmental legacy liability
4 of Kaiser Gypsum?
5 A. I am.
6 Q. And what has your involvement with
7 that legacy liability been?
8 A. I manage the -- or supervise the
9 attorney who is primarily responsible for
10 management of the asbestos liabilities. And I
11 am the assigned attorney to both the Lower
12 Duwamish and the St. Helens sites. Those are
13 environmental sites.
14 Q. When you say the attorney who is
15 primarily responsible for management of
16 asbestos liabilities, to whom do you refer?
17 A. That's Mary Wright.
18 Q. How long has Ms. Wright been with
19 Three Rivers Management?
20 A. I don't know for sure. It predates
21 my involvement with the company. I would say
22 she has been with Three Rivers, I want to say
23 2002 or 2003 on. And prior to that, she was in
24 private practice doing work for the company.
25 Or for Three Rivers.

CHARLES E. McCHESNEY II, ESQ.

1
2 Q. And what did Ms. Wright do in her
3 capacity as being responsible for overseeing
4 the asbestos liabilities of Kaiser Gypsum?
5 A. Mary Wright would have -- she would
6 have interacted directly with defense counsel,
7 and she would also have interacted with,
8 directly with the claims representatives with
9 the primary insurer, Truck Insurance Exchange.
10 And she would also interact with, we have
11 certain folks in our office who are responsible
12 for processing claims as they are received and
13 would ensure the claims are being timely
14 assigned to whoever the defense counsel would
15 be on a particular claim.
16 Q. Did Kaiser Gypsum -- and I'll refer
17 to Hanson Permanente as HPCI, if that's okay.
18 A. Okay.
19 Q. Did they use national coordinating
20 asbestos defense counsel, personal injury
21 defense counsel?
22 A. They did.
23 Q. And who was that?
24 A. That is Williams Kastner.
25 Q. And where is Williams Kastner

1   CHARLES E. McCHESNEY II, ESQ.
2   depositions and certify that the document
3   requests and searches for documents be
4   officers, so that would account for Mary Wright
5   and Amy Yi being officers within our
6   organization.
7       So, Dave VanBenschoten is actually a
8   tax guy. We typically make sure we have a tax
9   person as an assistant secretary on all of the
10  companies that we manage. That allows them to
11  sign tax documents. Mr. Wallmann is an
12  attorney in the Dallas office, and he typically
13  signs any corporate organization documents that
14  need to be filed with state secretaries of
15  state.
16      And then Miss Binkowski is actually
17  a -- is, I believe, our corporate treasurer in
18  Dallas for all of the Lehigh Hanson companies.
19  And it is typical for us to have her as an
20  officer on all of our Boards. And then the
21  remaining folks are out of our Pittsburgh
22  office. So that would be Mr. Markwell, Miss
23  Mehta, myself, and Mary Wright.
24      And Mr. Venema is general counsel of
25  Lehigh Hanson, and it's corporate practice for

1   CHARLES E. McCHESNEY II, ESQ.
2   us to have him be an officer of all companies
3   that are indirectly owned or directly owned by
4   Lehigh Hanson. That's how you get to nine.
5       Q.   Other than Mr. Venema, are there any
6   other of the officers of Kaiser Gypsum who also
7   are either officers of or on the Board of
8   Lehigh Hanson?
9       A.   I am not, as I sit here, sure who
10  the officers of Lehigh Hanson are and -- but I
11  do know Mr. Venema is an officer. I -- yeah.
12  And other than that, I'm not absolutely sure.
13      Q.   Turning to HPCI.
14      A.   Uh-huh.
15      Q.   Does it have employees?
16      A.   No. HPCI, just like Kaiser Gypsum,
17  has no employees. The officers and directors
18  are not employees of the company.
19      Q.   Okay. Can you identify the
20  directors of HPCI.
21      A.   The directors of HPCI are William
22  Venema, Robert Markwell, and myself.
23      Q.   And with respect to the officers of
24  HPCI, and please feel free to refer to your
25  Declaration if that's helpful, could you

1   CHARLES E. McCHESNEY II, ESQ.
2   identify the officers of HPCI.
3       A.   Yes. It's actually all of the same
4   officers I previously identified, with the
5   addition of John Hutchinson. John is also a
6   tax guy.
7       Q.   I'm going to hand you what I'm going
8   to ask be marked as CC-5.
9           (CC Exhibit No. 5 was marked
10  for identification.)
11      Q.   Are you familiar with this document?
12      A.   I am.
13      Q.   And can you describe it, please.
14      A.   Yeah. These are the Articles of
15  Conversion that converted Kaiser Gypsum from a
16  Washington corporation to a North Carolina
17  corporation.
18      Q.   And can you tell me when that was
19  accomplished.
20      A.   They were filed on May 23 of 2016.
21      Q.   And looking at this document, I see
22  that Mr. Wallmann was the individual who signed
23  the Articles of Conversion. I believe you
24  testified that Mr. Wallman is an attorney?
25      A.   He is.

1   CHARLES E. McCHESNEY II, ESQ.
2       Q.   Okay. And I believe that you
3   testified that he was located out of the Dallas
4   office?
5       A.   Correct. And I should qualify, when
6   I say Dallas, the actual address is Irving,
7   Texas, but we refer to it as Dallas.
8       Q.   Did you participate in the decision
9   to reincorporate Kaiser Gypsum in North
10  Carolina?
11      A.   I did.
12      Q.   Who first suggested reincorporating
13  Kaiser Gypsum in North Carolina?
14      A.   That would have been the subject of
15  conversations that we had with Jones Day.
16      Q.   Do you recall when those
17  conversations were initially commenced? Let me
18  rephrase.
19      Do you recall the first date on
20  which the suggestion of reincorporation was
21  raised?
22      A.   So, I do not.
23      Q.   Do you recall the rough time period
24  that would have been?
25      A.   I don't recall when we first

CHARLES E. McCHESNEY II, ESQ.

1        discussed it. I do know internally we
3 discussed conversion prior to May 23, but not a
4 whole lot prior.
5    Q. Other than conversations with Jones
6 Day, did you have any other conversations with
7 anyone concerning reincorporating Kaiser Gypsum
8 in North Carolina?
9    A. Yes. The Board of Kaiser Gypsum,
10 obviously, was consulted and voted in favor of
11 reincorporation.
12    Q. Do you know when that Board vote was
13 taken?
14    A. I do not recall exactly when.
15    Q. Would it have been relatively
16 shortly before the reincorporation was
17 accomplished?
18    A. Yes.
19    Q. Was there any discussion of
20 reincorporating Kaiser Gypsum in any location
21 other than in North Carolina?
22    A. There were -- so, there were
23 discussions with Jones Day regarding venue that
24 I think get close to privileged information.
25    MR. GHORAYEB: I'll object to

CHARLES E. McCHESNEY II, ESQ.

1 the extent that the discussions, she's asking
3 about Jones Day discussions, would only be
4 non-privileged that you would be allowed to
5 answer today.
6    Q. Without disclosing communications
7 with your counsel, do you have an understanding
8 of the reasons that Kaiser Gypsum was
9 reincorporated in North Carolina?
10    A. I do. Kaiser Gypsum was
11 reincorporated in North Carolina -- well,
12 "converted" I think is the technical term -- in
13 North Carolina in order to create the
14 opportunity to file bankruptcy in North
15 Carolina.
16    Q. Without revealing communications
17 with your counsel, do you have an understanding
18 of why it was considered desirable to have the
19 opportunity to file for bankruptcy in North
20 Carolina?
21    A. The North Carolina Court had recent
22 asbestos experience, or asbestos bankruptcy
23 experience, and that was the opportunity that
24 -- we were creating that opportunity for
25 ourselves.

CHARLES E. McCHESNEY II, ESQ.

1    Q. Do you have an understanding of
3 whether any other Bankruptcy Courts in other
4 districts have experienced recent experience
5 with asbestos bankruptcy matters?
6    A. I am aware that other jurisdictions
7 have experience with asbestos bankruptcies.
8    Q. Would Pennsylvania, and specifically
9 the Court in the Western District, the
10 Bankruptcy Court in the Western District of
11 Pennsylvania, be one of those Courts?
12    A. I -- so, I'm going to qualify my
13 answer because your prior request asked about
14 recent. I don't know how recently the Western
15 District of Pennsylvania has had asbestos
16 bankruptcy experience. I do know that the
17 Western District of Pennsylvania has asbestos
18 bankruptcy experience.
19    Q. With respect to the District of
20 Delaware, do you have an understanding of
21 whether it has recent asbestos bankruptcy
22 experience?
23    A. I -- it would be the same answer. I
24 understand that it has asbestos bankruptcy
25 experience, but I don't know how recent.

CHARLES E. McCHESNEY II, ESQ.

1    Q. I believe earlier you identified EFH
3 and Reichhold as two of the cases in which
4 Three Rivers Management had been faced with the
5 decision of whether to file Proof of Claim. Do
6 you know where those cases are pending?
7    A. I don't. I don't remember.
8    Q. Do you have an understanding of
9 whether the Northern District of California has
10 recent experience with asbestos bankruptcy
11 cases?
12    A. I do not.
13    Q. Do you have an understanding of
14 whether the Bankruptcy Courts in Texas have
15 recent experience with asbestos bankruptcy
16 matters?
17    A. I do not.
18    Q. Are you familiar, sitting here
19 today, with any bankruptcy, asbestos
20 bankruptcy, matters have been handled by any of
21 the Bankruptcy Courts in Texas?
22    A. I don't.
23    Q. And would your answer be the same
24 with respect to Delaware?
25    A. I know Delaware has experience with

Case 16-03127-rld   Doc 50   Filed 11/09/16

1   CHARLES E. McCHESNEY II, ESQ.
2   asbestos bankruptcies. But as far as recent or
3   specifically which bankruptcies, I don't.
4       Q. I apologize if I asked this before,
5   I'm not remembering my question if I did, or
6   your answer. Other than North Carolina, were
7   there other venues that were considered for
8   purposes of converting or your incorporation so
9   that an opportunity would be afforded to file
10  bankruptcy there? Do you understand my
11  question? That was kind of --
12      A. Yeah. Could you --
13      Q. Shall I try that again?
14      A. I thought you were going down one
15  path, and then you went down another one and I
16  got confused.
17      Q. Was there any discussion of either
18  reincorporating or converting the corporation
19  of Kaiser Gypsum to a state other than North
20  Carolina?
21      A. Other than conversations with Jones
22  Day --
23      Q. For right now, I'm just asking yes
24  or no. Was -- were there -- were there
25  discussions about other jurisdictions?

1   CHARLES E. McCHESNEY II, ESQ.
2       A. We had Jones Day analyze venue,
3   okay, and that's the subject of an extensive
4   legal analysis. So, I don't want to divulge
5   that because I believe that to be privileged.
6       Within the company, there would not
7   have been discussions about reincorporating
8   Kaiser Gypsum, other than discussions about
9   reincorporating in North Carolina that would
10  not have been effectively a regurgitation of
11  Jones Day's legal analysis; so --
12      MR. GHORAYEB: I mean, I'm
13  going to pose -- I would object to questions
14  about which venues, how many more than North
15  Carolina, as being privileged if it's
16  discussions with Jones Day or discussing the
17  advice that Jones Day gave you.
18      THE WITNESS: Right.
19  BY MS. RAMSEY:
20      Q. So, Mr. McChesney, I believe you
21  said that we asked Jones Day to analyze venue.
22  Who was the "we"?
23      A. Kaiser Gypsum.
24      Q. And what was the purpose of Kaiser
25  Gypsum asking Jones Day to analyze venue?

1   CHARLES E. McCHESNEY II, ESQ.
2       A. I -- so that -- can you repeat that
3   question? Because I want to make sure that I
4   heard you right.
5       Q. What was the purpose of Kaiser
6   Gypsum asking Jones Day to analyze venue?
7       A. So, I don't want to divulge
8   something privileged.
9       MR. GHORAYEB: And I would
10  instruct you only to answer it if you are able
11  to answer it without --
12      A. I don't think I can answer that
13  question without divulging privileged
14  conversations.
15      Q. Just to be clear --
16      A. Yes.
17      Q. -- what I'm asking is what you
18  asked -- what your thinking was in making the
19  request of Jones Day, not any advice that Jones
20  Day provided to you.
21      MR. GHORAYEB: Object on
22  privilege, to the extent the witness is also a
23  lawyer for some of these entities. I'm making
24  sure he's being clear, the answer is only
25  non-privileged information you have access to.

1   CHARLES E. McCHESNEY II, ESQ.
2       A. We requested that Jones Day do
3   certain legal analysis as part of the
4   consideration of bankruptcy as an option for
5   the company. Anything beyond that I think gets
6   into substantive legal advice that Jones Day
7   gave us.
8       Q. As part of the legal analysis that
9   you asked Jones Day to provide, I believe your
10  testimony is, though, that you specifically
11  asked for Jones Day to analyze venue.
12      A. I don't think that was my testimony.
13      Q. Okay. Can you tell me what your
14  testimony is.
15      A. My testimony is that we retained
16  Jones Day to advise the company with respect to
17  filing an asbestos bankruptcy as a potential
18  option, and those discussions beyond that would
19  have gone into strategic thinking, and Jones
20  Day's legal advice to and from us.
21      Q. Okay. Was there any discussion of
22  reincorporating HPCI, to the extent that you
23  can answer without disclosing confidential
24  communications with your counsel?
25      A. There were not any non-privileged

CHARLES E. McCHESNEY II, ESQ.

1      A.   Well, it was a sweep account up
2 until the filing.  So it didn't -- it would
3 never really have a balance.
4      Q.   I see.
5      A.   Because each 24-hour period it swept
6 up.
7      Q.   Was that the only bank account that
8 HPCI maintains?
9      A.   To my knowledge, yes.
10      Q.   With respect to the asbestos books
11 and records, where are those maintained?
12      A.   So, what do you mean by the asbestos
13 books and records?
14      Q.   The historical records regarding --
15 that would be asked for in asbestos litigation
16 such as content of asbestos and the product.
17      A.   Uh-huh.  Okay.
18      Q.   If they existed, sales and
19 distribution --
20      A.   So historic sales, plant documents,
21 you know, product documents, those types of
22 things?
23      Q.   Yes.
24      A.   So, there -- and to understand this,

---

CHARLES E. McCHESNEY II, ESQ.

1 this is going to be a lengthy explanation.
2      Q.   That's okay.
3      A.   There are different sets of those
4 documents.  There is the, in the broadest
5 sense, there are all of the corporate records
6 that existed at the time Kaiser Cement and
7 Kaiser Gypsum came into the Hanson family of
8 companies.
9      Q.   Okay.
10      A.   That would have been the earliest
11 that we have records of what records there
12 were.  Those are maintained in their native
13 state, with a very high-level index, and those
14 are -- those boxes are maintained by Iron
15 Mountain.  They are physically located in
16 several different locations.
17      As prep for this deposition, I had
18 Iron Mountain run a search of what we had.
19 They are not labeled Kaiser Gypsum and Kaiser
20 Cement or Kaiser Gypsum and Hanson Permanente
21 Cement.  They are all just labeled Hanson
22 Permanente Cement.
23      And with respect to the boxes that
24 are Kaiser asbestos related that are maintained

---

CHARLES E. McCHESNEY II, ESQ.

1 by the Pittsburgh office -- well, there are
2 some that have been created by the Pittsburgh
3 office in the history of asbestos litigation
4 and our management of it at TRMI -- sorry,
5 there's what we refer to Three Rivers as --
6 those would be -- those take a little more work
7 because they are classified by Iron Mountain as
8 being Pittsburgh boxes, and then we have our
9 own records database where we can search for
10 the ones that relate to Kaiser.
11      So those boxes, and there are --
12 it's more than 10,000, less than 13,000, and
13 that includes corporate operational records
14 since those early days.  I don't have any way
15 to quickly segregate that.  Those are located
16 in California.  There are some in Oakland;
17 there are some in Sacramento; there are some in
18 San Diego; and there are some in Los Angeles.
19      There are some in Dallas, Texas;
20 there are some in Pittsburgh, Pennsylvania;
21 there are some in Portland, Oregon; and there
22 are some in Seattle, Washington.  And that's
23 the broadest sense of Kaiser records.
24      With respect to historic sales,

---

CHARLES E. McCHESNEY II, ESQ.

1 plant operational, health and safety, product
2 information, there is a subset that was
3 generated from that broader set of documents.
4 Those were created based on a review of
5 documents by a national coordinating counsel
6 about 15 to 18 years ago.  Those are stored in
7 paper form in a warehouse in Oakland,
8 California, and we refer to those as the Graf,
9 G-R-A-F, documents because the company that
10 stores them is called Graf.
11      And then there is a subset that
12 we -- that our current national coordinating
13 counsel, Williams Kastner, I don't know what
14 criteria they used, but they took some of those
15 documents and digitized them and used them to
16 run searches.
17      Q.   Who was the former national
18 coordinating counsel 15 to 18 years ago that
19 first did the compilation?
20      A.   So, I'm not going to remember the
21 name because it was before my time with the
22 company, but prior to Williams Kastner, the
23 national coordinating counsel was Jackson
24 Wallace.  Williams Kastner got the job when

---

CHARLES E. McCHESNEY II, ESQ.

1  Jackson Wallace separated, and it was the
2  national coordinating counsel before Jackson
3  Wallace.  And I honestly don't -- I think they
4  were in California.
5        I know there was one early national
6  coordinating counsel that was in D.C., and I
7  know -- but I don't know which one ran -- did
8  that document pull.
9     Q.   Okay.  Would it be fair to describe
10    the documents, the Graf documents, as the
11    principal asbestos production file?
12    A.   So, not everything in that
13    collection is asbestos related.  But it would
14    relate to the era when the company was using
15    asbestos, so it would be information both about
16    asbestos and non-asbestos.  It is the
17    collection -- I believe the criteria was these
18    are documents that would potentially be
19    relevant in asbestos litigation.
20    Q.   With respect to the documents that
21    were compiled for to respond to production
22    requests by the pre-petition ACC, would they
23    have been pulled from these various locations
24    that you've just identified?

CHARLES E. McCHESNEY II, ESQ.

1     A.   No.  Most of the documents that we
2  pulled and generated to respond to the
3  pre-petition ACC's document requests would have
4  come out of corporate records.  And some of
5  them were not documents, but were interrogatory
6  responses where they were -- the responses were
7  developed based on review of existing
8  interrogatory responses in asbestos litigation.
9     Q.   Okay.
10    A.   Yeah, honestly, I don't think we
11    pulled anything from the Graf collection.
12    Q.   Okay.  Would they have been pulled
13    from the other locations, the four California
14    locations, the Dallas location, and the
15    Pittsburgh?
16    A.   I think some of the corporate
17    documents were called back from Iron Mountain,
18    but I don't know what Iron Mountain facility
19    was storing them.
20    Q.   Okay.  With respect to Williams
21    Kastner -- well, let me strike that.  Let me
22    start again.
23        Are you familiar with estimation
24    proceedings in asbestos bankruptcy cases?

CHARLES E. McCHESNEY II, ESQ.

1     A.   I would say I have a very limited,
2  but I'm not unfamiliar.
3     Q.   And in litigated estimation
4  proceedings, do you have an understanding of
5  the role of national asbestos coordinating
6  defense counsel?
7     A.   I don't.
8     Q.   Okay.  Do you have any understanding
9  that national coordinating defense counsel
10    would or would not be involved in an estimation
11    proceeding in a bankruptcy case?
12    A.   Based on my understanding of
13    estimation, I wouldn't really see a role for
14    them at all.
15    Q.   Would you be surprised to find that
16    they had been involved in other cases in
17    estimation proceedings?
18    A.   Given that I have no familiarity, I
19    wouldn't be surprised or unsurprised.
20    Q.   I just want to --
21    A.   Uh-huh.
22    Q.   -- close the loop to make sure that
23    I've covered some of this.
24        I think that you have previously

CHARLES E. McCHESNEY II, ESQ.

1  testified that you are not aware of any
2  corporate records that would reflect where
3  asbestos-containing Kaiser Gypsum wallboard
4  accessories or fiberboard products were sold;
5  is that correct?
6     A.   No.  I think you previously asked me
7  if there was a compilation that showed the
8  relative proportion of sales in different
9  jurisdictions.
10    Q.   Okay.
11    A.   I'm not aware of that information.
12    Q.   Okay.
13    A.   Information existing.  But I do
14    believe the Graf documents include sales
15    records for asbestos-containing and non-
16    asbestos-containing product sales in different
17    jurisdictions.
18        MS. RAMSEY:  We're going to
19    want to make a request for those documents.
20    Q.   Other than the Graf documents, are
21    there other records that you believe exist that
22    would show where Kaiser Gypsum products,
23    asbestos-containing products, were sold?
24    A.   The -- well, I don't know for sure

1    CHARLES E. McCHESNEY II, ESQ.
2        A.    No.
3        Q.    And you were there in court when
4    Mr. Gordon said that that deductible exposure
5    didn't itself cause the bankruptcy?
6        A.    Did in itself?
7        Q.    It did not in itself cause the
8    bankruptcy?
9        A.    Yeah, I don't think that deductible
10    exposure caused the bankruptcy.
11        Q.    Let me ask you this question.  As
12    you sit here, in light of what you know about
13    the likely participants in the bankruptcy, can
14    you identify any jurisdiction that would be
15    materially more convenient than North Carolina
16    for the parties' interest in the aggregate?
17        A.    No.
18            MR. GOLDBLATT:  Okay.  I have
19    nothing further.
20            MR. GHORAYEB:  Do you have
21    anything, counsel?
22            MS. SULLIVAN:  No.
23            MS. ZIEG:  No.
24            MS. JUSTISON:  No.
25            MR. GHORAYEB:  We reserve our

1    CHARLES E. McCHESNEY II, ESQ.
2    questions.
3            THE COURT REPORTER:  Are you
4    going to read or waive?
5            MR. GHORAYEB:  We will read.
6            (Signature not waived.)
7            (Whereupon, the above-entitled
8    matter was concluded at 3:07 p.m.)
9                - - - - -
10
11
12
13
14
15
16
17
18
19
20            _____
21            CHARLES E. McCHESNEY II, ESQ.
22
23    Subscribed and sworn to before me
24    this          day of          2016.
25    _____

1
2    NAME OF CASE:
3    DATE OF DEPOSITION:
4    NAME OF WITNESS:
5    Reason Codes:
6        1. To clarify the record.
        2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
25            _____

1
2    COMMONWEALTH OF PENNSYLVANIA)
    COUNTY OF ALLEGHENY       )
3
4        I, Michelle L. Hall, a Registered
    Merit Reporter and a Notary Public in and for
5    the Commonwealth of Pennsylvania, do hereby
    certify that the witness, CHARLES E. McCHESNEY
6    II, ESQ., was by me first duly sworn to testify
    the truth, the whole truth, and nothing but the
7    truth; that the foregoing deposition was taken
    at the time and place stated herein; and that
8    the said deposition was recorded
    stenographically by me and then reduced to
9    typewriting under my direction, and constitutes
    a true record of the testimony given by said
10    witness, all to the best of my skill and
    ability.
11
12        I further certify that the inspection,
    reading and signing of said deposition were not
13    waived by counsel for the respective parties
    and by the witness and if after 30 days the
14    transcript has not been signed by said witness
    that the witness received notification and has
15    failed to respond and the deposition may then
    be used as though signed.
16        I further certify that I am not a
    relative, or employee of either counsel, and
17    that I am in no way interested, directly or
    indirectly, in this action.
18
19        IN WITNESS WHEREOF, I have hereunto
    set my hand and affixed my seal of office this
20    26th day of October, 2016.
21
22
23            --------------------------
            Michelle L. Hall, RMR
24
            --------------------------
25

# Exhibit B

1  JOHN R. WALLACE, ESQ. (State Bar No. 85709)
   BRUCE D. ROGIE, ESQ. (State Bar No. 54431)
2  JACKSON & WALLACE LLP
   55 Francisco Street, 6th Floor
3  San Francisco, CA  94133
   (415) 982-6300
4
5  Attorneys For Defendant
   KAISER CEMENT CORPORATION
6
7
8          SUPERIOR COURT OF THE STATE OF CALIFORNIA
9             FOR THE COUNTY OF SAN FRANCISCO
10
11 IN RE:  SAN FRANCISCO COUNTY        )    No. 828684
   COMPLEX ASBESTOS LITIGATION         )
12                                     )    KAISER CEMENT CORPORATION'S
                                       )    2004 SUPPLEMENTAL RESPONSES
13                                     )    TO PLAINTIFFS' STANDARD
                                       )    INTERROGATORIES TO ALL
14                                     )    DEFENDANTS
                                       )
15                                     )
                                       )
16                                     )
                                       )
17 _____ )
18                   **PREFACE**
19     These Interrogatories are to be answered pursuant to San Francisco Superior Court General

20 Order No. 129.

21     Unless otherwise specifically set forth, the time frame for response to these Interrogatories is

22 from 1930 until 1985; except where otherwise specifically set forth, each Interrogatory and each

23 Response are intended and should be construed as including and being limited to such time frame.

24 Where expressly stated with reference to the date and circumstances justifying use of such date, the

25 responding party may limit any such response to dates subsequent to 1930, but which in no event

26

27

28

RCVD I&W
NOV 1 0 2004

KINS 152207

Case 16-03127-rld    Doc 50    Filed 11/09/16

are later than the inception of the responding party, including the inception of any predecessor in interest.

Unless otherwise specifically set forth, the geographic scope for response to these Interrogatories by domestic corporations is the United States. Hospitals and other health care entity defendants shall provide responses related only to that defendant's physical facilities and shall not be required to disclose any information related to the furnishing of services to patients.

## DEFINITIONS

1.    "ASBESTOS-CONTAINING PRODUCT(S)" shall mean a product(s) which THIS DEFENDANT knows or believes to have contained any amount of the mineral asbestos at any time.

2.    "COMPANY" means any private enterprise including corporations, partnerships, joint ventures, and sole proprietorships. For purposes of Interrogatory No. 19, the term "COMPANY" includes organizations, associations or groups of manufacturers, miners, distributors, importers, labelers, suppliers and/or sellers of asbestos-containing products, of which the responding defendant was a member.

3.    A "CONTRACT UNIT" shall mean a branch, division, subsidiary or other affiliated entity of a DEFENDANT which has been or is now engaged in installation, disturbing or handling and/or removal of RAW ASBESTOS and/or ASBESTOS-CONTAINING PRODUCTS.

4.    "DOCUMENT(S)" or "WRITING(S)" shall include all writings as defined by Section 250 of the California Evidence Code.

5.    "GEOGRAPHIC AREA" means the 46 counties of Northern California (Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Fresno, Glenn,

2

1596233.1

KINS 152208

Humboldt, Kern, Kings, Lake, Lassen, Marin, Mariposa, Mendocino, Merced, Modoc, Mono, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo, Yuba) and military facilities/installations in the State of California, or the following shipyards: Bethlehem Shipbuilding, San Pedro; California Shipbuilding, Terminal Island; Consolidated Steel Shipyard, Wilmington; Los Angeles Shipbuilding and Dry Dock aka L.A. Ship, San Pedro; National Steel and Shipbuilding Corporation, San Diego; Todd Shipyards Corporation, San Pedro; Triple "A" Machine, San Diego; Western Pipe and Steel Company, Los Angeles and San Pedro Divisions; Naval Air Station, North Island; Thirty-second Street Naval Repair Facility, San Diego; Long Beach Naval Shipyard; and San Diego Destroyer Base.

6. A request to "IDENTIFY" a "WRITING" or "DOCUMENT" or study shall mean a request to either attach such an exhibit to your answers to these Interrogatories, or to describe such with sufficient particularity that it may be made the subject of a request for production of documents. YOUR description should include an indication of: (a) the author; (b) addressee(s); (c) date of origin; (d) the nature of the writing or document (e.g., letter, telephone memorandum, audio tape recording, photograph, etc.); and (e) its present location, name and present address of custodian thereof.

7. A request to "IDENTIFY" an oral communication shall mean a request to describe the communication with particularity, and shall include the following information; (a) the identity of all parties to the communication; (b) the identity of the person whom you contend initiated the communication; (c) the identity of all persons present at the time of the communication; and (d) the

3

1596233.1

KINS 152209

time, date and place of the communication.

8. A request to "IDENTIFY" or to state the "IDENTITY" of a person or individual means to state his or her name, the place of employment, job title, present business or present or last known home address, years of employment and last known telephone number if not employed by DEFENDANT.

9. A request to "IDENTIFY" the product shall mean a request to describe the product, the material or compound by the following means: (1) by nickname or slang name used in your industry and/or occupation; (2) by the name under which it is sold in othe marketplace (trade name); (3) by its generic name; and (4) by manufacturer.

10. "MARKETING" or "MARKETED" shall mean the mining, supply, sale, labeling, distribution, importing, processing or manufacture of RAW ASBESTOS and/or ASBESTOS-CONTAINING PRODUCT(S).

11. A request to describe the "NATURE" of a product means to describe the: (a) color; (b) texture; (c) form (i.e., powder, liquid, paste, solid, board, cloth, blanket, wire insulation, etc.); (d) physical dimensions, if solid (length, width and height); (e) the type of shipping package and shipping package dimensions if not solid; (f) type of asbestos fiber used in the composition of the product (e.g., chrysotile, amosite, crocidolite); (g) the intended use or function of such product as recommended by this DEFENDANT as the miner, producer, supplier, contractor, manufacturer, distributor, owner or seller; and (h) the type of worksite in which it was intended to be used (e.g., shipyard, refinery, commercial building construction, manufacturing plant, home, power generating plant, etc.).

12. "PREMISES" includes, but is not limited to, buildings, structures in a refinery,

4

KINS 152210

boilers, generators, tract housing, commercial buildings and other such structures.

13.    "RAW ASBESTOS" means asbestos fiber mined or milled, either packaged or in bulk, not compounded with other substances and essentially pure with the exception of naturally occurring trace amounts of other substances.

14.    "THIS DEFENDANT" or "DEFENDANT" shall mean the named defendant herein, all of its divisions and subsidiaries in which it holds a controlling interest, and all "alternate entities" as defined and identified by name in any complaint pending against YOU as of the date of your answers.

15.    "YOU" and "YOUR" refer to the DEFENDANT who is named above as responding party.

## PRELIMINARY STATEMENT

Hanson Permanent Cement, Inc. f/k/a Kaiser Cement Corporation ("Kaiser Cement") submits this preliminary statement to memorialize certain steps taken to implement the standard discovery regimen adopted by the revised General Orders filed November 15, 1996, governing "asbestos-related" personal injury and wrongful death cases filed in San Francisco Superior Court. Under the terms of General Order No. 129, all defendants must respond to the Plaintiffs' Standard Interrogatories to All Defendants without objection, even where those interrogatories appear objectionable under the rules defined by California statutes and appellate precedent. The General Orders do contemplate that plaintiffs' counsel must meet and confer with the defendants and consider a specific defendant's concerns with the standard interrogatories as applied to that defendant's factual and litigation circumstances. In Kaiser Cement's case, that process proved sufficiently successful so that Kaiser Cement did not believe it necessary to file a motion seeking

5

1596233.1

judicial relief from the burdensomeness that would arise in Kaiser Cement's circumstances from responding to the literal terms of the discovery.

During a "meet and confer session," that was held on May 15, 1997, agreements were reached on the interpretation of numerous specific provisions of the subject standard interrogatories. The agreements were subsequently concurred in by plaintiffs' counsel that did not attend the May 15, 1997 meeting. Kaiser Cement's non-pursuit of its burdensome objections remain contingent on the continued realization of the agreements reached at the May 15, 1997, meeting.

Kaiser Cement also stated other objections to the subject Plaintiffs' Standard Interrogatories during the course of the proceedings leading to their adoption. Those objections concerned both the concept of using standard interrogatories for discovery unrelated to the resolution of cases or controversies before the Court, objections to the procedures underlying the development and adoption of the standard interrogatories, and objections to specific aspects of the interrogatories on grounds other than burdensomeness, all of which objections were either accepted or implicitly rejected through adoption of the final standard interrogatories. Kaiser Cement hereby makes express on the record that by serving its responses to Plaintiffs' Standard Interrogatories To All Defendants, Kaiser Cement neither intends to nor does it waive its right to press those objections at an appropriate future opportunity, both in context of specific cases before the Superior Court and on appellate review.

Kaiser Cement objects to Plaintiffs' Standard Interrogatories To All Defendants to the extent that they call for information protected by the attorney-client privilege or work-product doctrine.

This preliminary Statement and the objections contained herein are incorporated into each of

6

KINS 152212

the responses set forth below.

## KAISER CEMENT'S RESPONSES TO INTERROGATORIES

Kaiser Cement has not manufactured or sold products which contained chrysotile asbestos as a component since 1976. Accordingly, Kaiser Cement's Responses to Plaintiffs' Standard Interrogatories to All Defendants are based almost entirely on its ongoing review of documents presently available to Kaiser Cement. The information in these discovery requests involves events that occurred many years prior and is, therefore, difficult or impossible to secure or reconstruct. These interrogatory responses reflect Kaiser Cement's knowledge at this time and supersede any previous interrogatory answers. Kaiser Cement reserves the right to further supplement these responses in the event that more complete information becomes available.

All responses contained herein are based only upon such information and documents which are presently available to and specifically known to Kaiser Cement. It is anticipated that further discovery, independent investigation, legal research, and analysis will supply additional facts, add meaning to the known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to additions to, changes in, and variations from the responses herein set forth.

## INTERROGATORIES

### INTERROGATORY NO. 1:

IDENTIFY the person verifying these answers on YOUR behalf.

### ANSWER:

Carroll LaGraffe, Kaiser Cement Company Inc., 2680 Bishop Drive, Suite 225, San Ramon, California 94583, (510) 328-1800.

7

1596233.1

KINS 152213

Case 16-03127-rld    Doc 50    Filed 11/09/16

**INTERROGATORY NO. 2:**

State the date of first employment with YOU, and the dates and titles of each job position the person verifying these interrogatories has held while employed by YOU.

**ANSWER:**

February 1, 2001. Legal Assistant, Assistant Secretary and Records Custodian.

**INTERROGATORY NO. 3:**

State whether or not YOU are a corporation, and if so, state:

A.   YOUR correct corporate name;

B.   YOUR state of incorporation;

C.   The date of YOUR incorporation;

D.   The address of YOUR principal place of business;

E   Whether or not YOU have ever held a certificate of authority to do business in the State of California, and if so, the inclusive dates of any certificate;

F.   If YOU are wholly owned or the majority interest of YOUR company is owned by another business entity, state the entity's name and principal place of business;

G.   Whether YOU have any business offices in California, and, if so, YOUR principal place of business in California.

**ANSWER:**

Kaiser Cement is a corporation.

A.   Hanson Permanente Cement, Inc., f/k/a Kaiser Cement Corporation (hereinafter "Kaiser Cement").

B.   Arizona.

8

1596233.1

**KINS 152214**

C.     Kaiser Cement was first incorporated in California in 1932; it later became a Delaware corporation; it became an Arizona corporation in 1989.

D.     Kaiser Cement's principal place of business is 2680 Bishop Drive, Suite 225, San Ramon, California 94583, (510) 328-1800.

E.     Yes, 1939 to present.

F.     Kaiser Cement is indirectly owned through other corporate entities by Hanson PLC, which is organized under the laws of the United Kingdom and has its principle place of business in the United Kingdom.

G.     2680 Bishop Drive, Suite 225, San Ramon, California 94583, (510) 328-1800.

**INTERROGATORY NO. 4:**

Have YOU ever been identified, known, or done business under any other name in the State of California?

**ANSWER:**

Yes.

**INTERROGATORY NO. 5:**

If your answer to Interrogatory No. 4 is in the affirmative, please state such name or names and the time period during which THIS DEFENDANT was so known or identified.

**ANSWER:**

Kaiser Cement did business under the name Permanente Corporation between 1939 and 1943; Permanente Cement Company between 1943 and 1964; Kaiser Cement & Gypsum Company between 1964 and 1979; Kaiser Cement Corporation between 1979 and 1999; and Hanson Permanente Cement, Inc. since 1999.

9

1596233.1

KINS 152215

Case 16-03127-rld    Doc 50    Filed 11/09/16

C.    State the dates, port and pier involved for each occasion;

D.    Either (1) attach all DOCUMENTS evidencing the information sought in this Interrogatory and its subparts to your answers to these Interrogatories, or (2) attach disks containing such data, or (3) describe such DOCUMENTS with sufficient particularity that they may be made the subject of a request for production of documents.

**ANSWER:**

Kaiser Cement has no knowledge that it transported raw asbestos or products that contained chrysotile asbestos through ports in the Geographic Area.

Dated: November _ℓＯ_ ,2004

JACKSON & WALLACE LLP

By _____

Attorneys for Defendant
Kaiser Cement Corporation

57

1596233.1

KINS 152263

Case 16-03127-rld   Doc 50   Filed 11/09/16

## VERIFICATION

[original signed verification, to follow]

*In Re:* San Francisco County
<u>Complex Asbestos Litigation</u>
SFSC 828684

---

KAISER CEMENT CORPORATION'S 2004 SUPPLEMENTAL RESPONSES TO
PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS

KINS 152264

## VERIFICATION

I, CARROLL LaGRAFFE, declare as follows:

I am the Assistant Secretary of Kaiser Cement Corporation, a defendant in these proceedings and am authorized to verify these responses on behalf of Kaiser Cement Corporation. I have reviewed Defendant Kaiser Cement Corporation's 2004 Supplemental Responses to Plaintiff's Standard Interrogatories to All Defendants, and I am informed and believe that these responses are true and correct to the best of my knowledge at this time.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ____ day of November, 2004, at San Ramon, California.

CARROLL LaGRAFFE

58

1596233.1

KINS 152265

## PROOF OF SERVICE BY MAIL
(Code Civ. Proc., §§ 1013, 2015.5)

### STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I, the undersigned, declare as follows:

I am over 18 years of age and not a party to the within action; my business address is 55 Francisco Street, 6th Floor, San Francisco, California 94133; I am employed in San Francisco County, California.

I am readily familiar with my employer's practices for collection and processing of correspondence for mailing with the United States Postal Service. On the date shown below, I served a copy, with all exhibits, of the following document(s):

**KAISER CEMENT CORPORATION'S 2004 SUPPLEMENTAL RESPONSES TO PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS**

on the interested parties in the above-referenced case by following ordinary business practices and placing for collection and mailing at 55 Francisco Street, San Francisco on the date shown below, a true copy of the above-referenced document(s), enclosed in a sealed envelope; in the ordinary course of business, the above document(s) would have been deposited for first-class delivery with the United States Postal Service the same day they were placed for deposit, with postage thereon fully prepaid.

The foregoing envelope(s) was/were addressed as follows:

  [SEE ATTACHED SERVICE LIST]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on November 12, 2004.

_Colleen Kottage_
Colleen Kottage

V:\0400\~:InReComplex\KCgs12ffRssp2004-Verify + POS.wpd

KAISER CEMENT CORPORATION'S 2004 SUPPLEMENTAL RESPONSES TO
PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS

KINS 152266

## SERVICE LIST

**Street Address:**
Bruce L. Ahnfeldt, Esq.
Law Offices of Bruce L. Ahnfeldt
1005 Jefferson Street
Napa, CA 94559
Phone: (707) 224-6547    Fax: (707) 224-2518

**Mail Address:**
LAW OFFICES OF BRUCE L. AHNFELDT
P.O. Box 6078
Napa, CA 94581
**

**Street Address:**
BRAYTON ✤ PURCELL
222 Rush Landing Road
Novato, CA 94948-6169

Phone: (415) 898-1555    Fax: (415) 898-1247

**Mail Address:**
BRAYTON ✤ PURCELL
P.O. BOX 6169
NOVATO, CA 94948-6169
**

CLAPPER & PATTI
Marina Office Plaza
2330 Marinship Way, Ste. 140
Sausalito, CA 94965

Phone: (415) 332-4262    Fax: (415) 331-5387
**

LAW OFFICES OF
CHRISTOPHER E. GRELL
360 - 22nd Street, Suite 320
Oakland, CA 94612

Phone: (510) 832-2980    Fax: (510) 832-2986
**

PAUL, HANLEY & HARLEY LLP
1608 Fourth Street, Suite 300
Berkeley, California 94710

Phone: (510) 559-9980    Fax: (510)559-9970
**

KAZAN, McCLAIN, ABRAMS,
  FERNANDEZ, LYONS & FARRISE
171 - Twelfth Street, Suite 300
Oakland, CA 94607

Phone: (510) 465-7728    Fax: (510) 835-4913
**

LEVIN SIMES & KAISER LLP
One Bush Street, 14th Floor
San Francisco, CA 94104

Phone: (415) 646-7160    Fax: (415) 981-1270
**

LEWIS & SCHOLNICK
555 South Flower Street, Suite 4520
Los Angeles, CA 90071-2300

Phone: (213) 627-0800    Fax: (213) 627-7262
**

HOBIN, SHINGLER & SIMON LLP
1011 "A" Street
Antioch, CA 94509-2323

Phone: (925) 757-7585    Fax: (925) 757-0153
**

VISSE & YANEZ, L.L.P.
1375 Sutter Street, Suite 120
San Francisco, CA 94109

Phone: (415) 441-1707    Fax: (415) 441-2045
**

THE WARTNICK LAW FIRM
650 California Street, 15th Floor
San Francisco, CA 94108

Phone: (415) 986-5566    Fax: (415) 986-5896
**

HAROWITZ & TIGERMAN LLP
One Bush Street, 14th Floor
San Francisco, CA 94104

Phone: (415) 788-1588    Fax: (415) 788-1598
**

V:\0400\\~InReComplex\KCgo129Resp2004-Verify+POS.wpd

---

KAISER CEMENT CORPORATION'S 2004 SUPPLEMENTAL RESPONSES TO
PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS

KINS 152267

## VERIFICATION

I, CARROLL LaGRAFFE, declare as follows:

I am the Assistant Secretary of Kaiser Cement Corporation, a defendant in these

proceedings and am authorized to verify these responses on behalf of Kaiser Cement Corporation I

have reviewed Defendant Kaiser Cement Corporation's 2004 Supplemental Responses to Plaintiff's

Standard Interrogatories to All Defendants, and I am informed and believe that these responses are

true and correct to the best of my knowledge at this time.

I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

Executed this *15th* day of November, 2004, at San Ramon, California.

CARROLL LaGRAFFE

58

KAISER CEMENT CORPORATION'S 2004 SUPPLEMENTAL RESPONSES TO
PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS

1596233.1

KINS 152268

# Exhibit C

1   JOHN R. WALLACE, ESQ. (State Bar No. 85709)
    BRUCE D. ROGIE, ESQ. (State Bar No. 54431)
2   JACKSON & WALLACE LLP
    55 Francisco Street, 6th Floor
3   San Francisco, CA 94133
    (415) 982-6300
4
5   Attorneys For Defendant
    KAISER GYPSUM COMPANY
6
7
8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                   FOR THE COUNTY OF SAN FRANCISCO
10
11  IN RE: SAN FRANCISCO COUNTY          )   No. 828684
    COMPLEX ASBESTOS LITIGATION          )
12                                       )   **KAISER GYPSUM COMPANY'S**
                                         )   **2004 SUPPLEMENTAL RESPONSES**
13                                       )   **TO PLAINTIFFS' STANDARD**
                                         )   **INTERROGATORIES TO ALL**
14                                       )   **DEFENDANTS**
                                         )
15                                       )
                                         )
16                                       )
                                         )
17  ─────────────────────────────────────
18                            **PREFACE**
19       These Interrogatories are to be answered pursuant to San Francisco Superior Court General
20  Order No. 129.
21       Unless otherwise specifically set forth, the time frame for response to these Interrogatories is
22  from 1930 until 1985; except where otherwise specifically set forth, each Interrogatory and each
23  Response are intended and should be construed as including and being limited to such time frame.
24
25  Where expressly stated with reference to the date and circumstances justifying use of such date, the
26  responding party may limit any such response to dates subsequent to 1930, but which in no event are
27
28

RCVD J&W

NOV 1 0 2004

KINS 152269

later than the inception of the responding party, including the inception of any predecessor in interest.

Unless otherwise specifically set forth, the geographic scope for response to these Interrogatories by domestic corporations is the United States. Hospitals and other health care entity defendants shall provide responses related only to that defendant's physical facilities and shall not be required to disclose any information related to the furnishing of services to patients.

## DEFINITIONS

1.    "ASBESTOS-CONTAINING PRODUCT(S)" shall mean a product(s) which THIS DEFENDANT knows or believes to have contained any amount of the mineral asbestos at any time.

2.    "COMPANY" means any private enterprise including corporations, partnerships, joint ventures, and sole proprietorships. For purposes of Interrogatory No. 19, the term "COMPANY" includes organizations, associations or groups of manufacturers, miners, distributors, importers, labelers, suppliers and/or sellers of asbestos-containing products, of which the responding defendant was a member.

3.    A "CONTRACT UNIT" shall mean a branch, division, subsidiary or other affiliated entity of a DEFENDANT which has been or is now engaged in installation, disturbing or handling and/or removal of RAW ASBESTOS and/or ASBESTOS-CONTAINING PRODUCTS.

4.    "DOCUMENT(S)" or "WRITING(S)" shall include all writings as defined by Section 250 of the California Evidence Code.

5.    "GEOGRAPHIC AREA" means the 46 counties of Northern California (Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kern, Kings, Lake, Lassen, Marin, Mariposa, Mendocino, Merced, Modoc, Mono,

2

1596308.1

KINS 152270

Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, San Mateo,

Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama,

Trinity, Tulare, Tuolumne, Yolo, Yuba) and military facilities/installations in the State of California,

or the following shipyards: Bethlehem Shipbuilding, San Pedro; California Shipbuilding, Terminal

Island; Consolidated Steel Shipyard, Wilmington; Los Angeles Shipbuilding and Dry Dock aka L.A.

Ship, San Pedro; National Steel and Shipbuilding Corporation, San Diego; Todd Shipyards

Corporation, San Pedro; Triple "A" Machine, San Diego; Western Pipe and Steel Company, Los

Angeles and San Pedro Divisions; Naval Air Station, North Island; Thirty-second Street Naval

Repair Facility, San Diego; Long Beach Naval Shipyard; and San Diego Destroyer Base.

     6.    A request to "IDENTIFY" a "WRITING" or "DOCUMENT" or study shall mean a

request to either attach such an exhibit to your answers to these Interrogatories, or to describe such

with sufficient particularity that it may be made the subject of a request for production of documents.

YOUR description should include an indication of: (a) the author; (b) addressee(s); (c) date of

origin; (d) the nature of the writing or document (e.g., letter, telephone memorandum, audio tape

recording, photograph, etc.); and (e) its present location, name and present address of custodian

thereof.

     7.    A request to "IDENTIFY" an oral communication shall mean a request to describe

the communication with particularity, and shall include the following information; (a) the identity of

all parties to the communication; (b) the identity of the person whom you contend initiated the

communication; (c) the identity of all persons present at the time of the communication; and (d) the

time, date and place of the communication.

     8.    A request to "IDENTIFY" or to state the "IDENTITY" of a person or individual

3

1596308.1

KINS 152271

means to state his or her name, the place of employment, job title, present business or present or last known home address, years of employment and last known telephone number if not employed by DEFENDANT.

9.    A request to "IDENTIFY" the product shall mean a request to describe the product, the material or compound by the following means: (1) by nickname or slang name used in your industry and/or occupation; (2) by the name under which it is sold in the marketplace (trade name); (3) by its generic name; and (4) by manufacturer.

10.    "MARKETING" or "MARKETED" shall mean the mining, supply, sale, labeling, distribution, importing, processing or manufacture of RAW ASBESTOS and/or ASBESTOS-CONTAINING PRODUCT(S).

11.    A request to describe the "NATURE" of a product means to describe the: (a) color; (b) texture; (c) form (i.e., powder, liquid, paste, solid, board, cloth, blanket, wire insulation, etc.); (d) physical dimensions, if solid (length, width and height); (e) the type of shipping package and shipping package dimensions if not solid; (f) type of asbestos fiber used in the composition of the product (e.g., chrysotile, amosite, crocidolite); (g) the intended use or function of such product as recommended by this DEFENDANT as the miner, producer, supplier, contractor, manufacturer, distributor, owner or seller; and (h) the type of worksite in which it was intended to be used (e.g., shipyard, refinery, commercial building construction, manufacturing plant, home, power generating plant, etc.).

12.    "PREMISES" includes, but is not limited to, buildings, structures in a refinery, boilers, generators, tract housing, commercial buildings and other such structures.

13.    "RAW ASBESTOS" means asbestos fiber mined or milled, either packaged or in

4

bulk, not compounded with other substances and essentially pure with the exception of naturally occurring trace amounts of other substances.

14. "THIS DEFENDANT" or "DEFENDANT" shall mean the named defendant herein, all of its divisions and subsidiaries in which it holds a controlling interest, and all "alternate entities" as defined and identified by name in any complaint pending against YOU as of the date of your answers.

15. "YOU" and "YOUR" refer to the DEFENDANT who is named above as responding party.

## PRELIMINARY STATEMENT

Kaiser Gypsum Company, Inc. ("Kaiser Gypsum") submits this preliminary statement to memorialize certain steps taken to implement the standard discovery regimen adopted by the revised General Orders filed November 15, 1996, governing "asbestos-related" personal injury and wrongful death cases filed in San Francisco Superior Court. Under the terms of General Order No. 129, all defendants must respond to the Plaintiffs' Standard Interrogatories to All Defendants without objection, even where those interrogatories appear objectionable under the rules defined by California statutes and appellate precedent. The General Orders do contemplate that plaintiffs' counsel must meet and confer with the defendants and consider a specific defendant's concerns with the standard interrogatories as applied to that defendant's factual and litigation circumstances. In Kaiser Gypsum's case, that process proved sufficiently successful so that Kaiser Gypsum did not believe it necessary to file a motion seeking judicial relief from the burdensomeness that would arise in Kaiser Gypsum's circumstances from responding to the literal terms of the discovery.

During a "meet and confer session," that was held on May 15, 1997, agreements were

5

KINS 152273

reached on the interpretation of numerous specific provisions of the subject standard interrogatories. The agreements were subsequently concurred in by plaintiffs' counsel that did not attend the May 15, 1997 meeting. Kaiser Gypsum's non-pursuit of its burdensome objections remain contingent on the continued realization of the agreements reached at the May 15, 1997, meeting.

Kaiser Gypsum also stated other objections to the subject Plaintiffs' Standard Interrogatories during the course of the proceedings leading to their adoption. Those objections concerned both the concept of using standard interrogatories for discovery unrelated to the resolution of cases or controversies before the Court, objections to the procedures underlying the development and adoption of the standard interrogatories, and objections to specific aspects of the interrogatories on grounds other than burdensomeness, all of which objections were either accepted or implicitly rejected through adoption of the final standard interrogatories. Kaiser Gypsum hereby makes express on the record that by serving its responses to Plaintiffs' Standard Interrogatories To All Defendants, Kaiser Gypsum neither intends to nor does it waive its right to press those objections at an appropriate future opportunity, both in context of specific cases before the Superior Court and on appellate review.

Kaiser Gypsum objects to Plaintiffs' Standard Interrogatories To All Defendants to the extent that they call for information protected by the attorney-client privilege or work-product doctrine.

This preliminary Statement and the objections contained herein are incorporated into each of the responses set forth below.

## KAISER GYPSUM'S RESPONSES TO INTERROGATORIES

Kaiser Gypsum was formed in 1952 and ceased all manufacturing operations in 1978. Kaiser Gypsum has not manufactured products that contained chrysotile asbestos as a constituent since

6

1596308.1

KINS 152274

early 1976. Thus, all Kaiser Gypsum sales of products that contained chrysotile asbestos occurred between 1952 and 1976. Therefore, Kaiser Gypsum's Responses to Plaintiff's Standard Interrogatories to All Defendants are based almost entirely on its ongoing review of documents presently available to Kaiser Gypsum. The information in these discovery requests involves events that occurred many years prior and is, therefore, difficult or impossible to secure or reconstruct. These interrogatory responses reflect Kaiser Gypsum's knowledge at this time and supersede any previous interrogatory answers. Kaiser Gypsum reserves the right to further supplement these responses in the event that more complete information becomes available.

All responses contained herein are based only upon such information and documents which are presently available to and specifically known to Kaiser Gypsum. It is anticipated that further discovery, independent investigation, legal research, and analysis will supply additional facts, add meaning to the known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to additions to, changes in, and variations from the responses herein set forth.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

IDENTIFY the person verifying these answers on YOUR behalf.

**ANSWER:**

Carroll LaGraffe, Kaiser Gypsum Company Inc., 2680 Bishop Drive, Suite 225, San Ramon, California 94583, (510) 328-1800.

**INTERROGATORY NO. 2:**

State the date of first employment with YOU, and the dates and titles of each job position the

7

1596308.1

KINS 152275

person verifying these interrogatories has held while employed by YOU.

**ANSWER:**

February 1, 2001. Legal Assistant, Assistant Secretary and Records Custodian.

**INTERROGATORY NO. 3:**

State whether or not YOU are a corporation, and if so, state:

A.    YOUR correct corporate name;

B.    YOUR state of incorporation;

C.    The date of YOUR incorporation;

D.    The address of YOUR principal place of business;

E    Whether or not YOU have ever held a certificate of authority to do business in the State of California, and if so, the inclusive dates of any certificate;

F.    If YOU are wholly owned or the majority interest of YOUR company is owned by another business entity, state the entity's name and principal place of business;

G.    Whether YOU have any business offices in California, and, if so, YOUR principal place of business in California.

**ANSWER:**

Kaiser Gypsum is a corporation.

A.    Kaiser Gypsum Company, Inc.

B.    Washington.

C.    On June 19, 1952, Permanente Cement Company (later known as Kaiser Cement Corporation) formed a wholly owned subsidiary named Kaiser Gypsum Company, a California Corporation. On December 1, 1952, Kaiser Gypsum Company, a California Company, was merged

8

KINS 152276

into Pacific Coast Cement Company, another subsidiary of Permanente Cement Company, and the name was changed to Kaiser Gypsum Company, Inc. (hereinafter Kaiser Gypsum).

      D.     Kaiser Gypsum's principal place of business is 2680 Bishop Drive, Suite 225, San Ramon, California 94583, (510) 328-1800.

      E.     Kaiser Gypsum has held a certificate of authority to do business in California from 1952 to present.

      F.     Kaiser Gypsum is a wholly owned subsidiary of Hanson Permanente Cement, Inc. f/k/a Kaiser Cement Corporation, whose principle place of business is located at 2680 Bishop Drive, Suite 225, San Ramon, California 94583.

      G.     Kaiser Gypsum's principle place of business in California is 2680 Bishop Drive, Suite 225, San Ramon, California 94583, (510) 328-1800.

**INTERROGATORY NO. 4:**

Have YOU ever been identified, known, or done business under any other name in the State of California?

**ANSWER:**

See response to Interrogatory No. 3.C. above as if fully incorporated herein.

**INTERROGATORY NO. 5:**

If your answer to Interrogatory No. 4 is in the affirmative, please state such name or names and the time period during which THIS DEFENDANT was so known or identified.

**ANSWER:**

See response to Interrogatory No. 3.C. above as if fully incorporated herein.

**INTERROGATORY NO. 6:**

9

1596308.1

KINS 152277

1    Berth 154; Terminal 1, Berth 3; Encinal Terminal; San Francisco; 9th Avenue Pier, Oakland; and

2    Berth 0, 7th Street, Oakland.

3    Dated: November _10_, 2004

4
5                                JACKSON & WALLACE LLP

6
7    By _____

8                                Attorneys for Defendant
9                                Kaiser Gypsum Company, Inc.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27                                        89

1596308.1

KINS 152357

KINS 152358

1
2
3
4       <u>VERIFICATION</u>
5
6       [original signed verification, to follow]
7
8
9
10
11      *In Re:* San Francisco County
        <u>Complex Asbestos Litigation</u>
12      SPSC 828684
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KAISER GYPSUM COMPANY'S 2004 SUPPLEMENTAL RESPONSES TO
PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS

## VERIFICATION

I, CARROLL LaGRAFFE, declare as follows:

I am the Assistant Secretary of Kaiser Gypsum Company, Inc., a defendant in these proceedings and am authorized to verify these responses on behalf of Kaiser Gypsum Company, Inc. I have reviewed Defendant Kaiser Gypsum Company, Inc.'s 2004 Supplemental Responses to Plaintiff's Standard Interrogatories to All Defendants, and I am informed and believe that these responses are true and correct to the best of my knowledge at this time.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ____ day of November, 2004, at San Ramon, California.


_____
CARROLL LaGRAFFE

90

KAISER GYPSUM COMPANY, INC.'S 2004 SUPPLEMENTAL RESPONSES TO
PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS

1596308.1

KINS 152359

## PROOF OF SERVICE BY MAIL
(Code Civ. Proc., §§ 1013, 2015.5)

### STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I, the undersigned, declare as follows:

I am over 18 years of age and not a party to the within action; my business address is 55 Francisco Street, 6th Floor, San Francisco, California 94133; I am employed in San Francisco County, California.

I am readily familiar with my employer's practices for collection and processing of correspondence for mailing with the United States Postal Service. On the date shown below, I served a copy, with all exhibits, of the following document(s):

**KAISER GYPSUM COMPANY'S 2004 SUPPLEMENTAL RESPONSES TO PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS**

on the interested parties in the above-referenced case by following ordinary business practices and placing for collection and mailing at 55 Francisco Street, San Francisco on the date shown below, a true copy of the above-referenced document(s), enclosed in a sealed envelope; in the ordinary course of business, the above document(s) would have been deposited for first-class delivery with the United States Postal Service the same day they were placed for deposit, with postage thereon fully prepaid.

The foregoing envelope(s) was/were addressed as follows:

[SEE ATTACHED SERVICE LIST]

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on November 12, 2004.

*Colleen Kottage*

———————————————
Colleen Kottage

V:\D4X0\~InReComplex\KGyo129Rcsp2004-Verify+POS.wpd

---

KAISER GYPSUM COMPANY'S 2004 SUPPLEMENTAL RESPONSES TO
PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS

KINS 152360

SERVICE LIST

Street Address:
Bruce L. Ahnfeldt, Esq.
Law Offices of Bruce L. Ahnfeldt
1005 Jefferson Street
Napa, CA 94559
Phone: (707) 224-6547    Fax: (707) 224-2518

Mail Address:
Law Offices of Bruce L. Ahnfeldt
P.O. Box 6078
Napa, CA 94581
*

Street Address:
BRAYTON ❖ PURCELL
222 Rush Landing Road
Novato, CA 94948-6169

Phone: (415) 898-1555    Fax: (415) 898-1247

Mail Address:
BRAYTON ❖ PURCELL
P.O. BOX 6169
NOVATO, CA 94948-6169
**

CLAPPER & PATTI
Marina Office Plaza
2330 Marinship Way, Ste. 140
Sausalito, CA 94965
Phone: (415) 332-4262    Fax: (415) 331-5387
**

LAW OFFICES OF
CHRISTOPHER E. GRELL
360 - 22nd Street, Suite 320
Oakland, CA 94612

Phone: (510) 832-2980    Fax: (510) 832-2986
**

PAUL, HANLEY & HARLEY LLP
1608 Fourth Street, Suite 300
Berkeley, California 94710

Phone: (510) 559-9980    Fax: (510)559-9970
**

KAZAN, McCLAIN, ABRAMS,
  FERNANDEZ, LYONS & FARRISE
171 - Twelfth Street, Suite 300
Oakland, CA 94607

Phone: (510) 465-7728    Fax: (510) 835-4913
**

LEVIN SIMES & KAISER LLP
One Bush Street, 14th Floor
San Francisco, CA 94104

Phone: (415) 646-7160    Fax: (415) 981-1270
**

LEWIS & SCHOLNICK
555 South Flower Street, Suite 4520
Los Angeles, CA 90071-2300

Phone: (213) 627-0800    Fax: (213) 627-7262
**

HOBIN, SHINGLER & SIMON LLP
1011 "A" Street
Antioch, CA 94509-2323

Phone: (925) 757-7585    Fax: (925) 757-0153
**

VISSE & YANEZ, L.L.P.
1375 Sutter Street, Suite 120
San Francisco, CA 94109

Phone: (415) 441-1707    Fax: (415) 441-2045
**

THE WARTNICK LAW FIRM
650 California Street, 15th Floor
San Francisco, CA 94108

Phone: (415) 986-5566    Fax: (415) 986-5896
**

HAROWITZ & TIGERMAN LLP
One Bush Street, 14th Floor
San Francisco, CA 94104

Phone: (415) 788-1588    Fax: (415) 788-1598
**

V:\0400\ - InReComplex\KGgo129Resp2004-Verify+POS.wpd

---

KAISER GYPSUM COMPANY'S 2004 SUPPLEMENTAL RESPONSES TO
PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS

KINS 152361

## VERIFICATION

I, CARROLL LaGRAFFE, declare as follows:

I am the Assistant Secretary of Kaiser Gypsum Company, Inc., a defendant in these proceedings and am authorized to verify these responses on behalf of Kaiser Gypsum Company, Inc. I have reviewed Defendant Kaiser Gypsum Company, Inc.'s 2004 Supplemental Responses to Plaintiff's Standard Interrogatories to All Defendants, and I am informed and believe that these responses are true and correct to the best of my knowledge at this time.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 15th day of November, 2004, at San Ramon, California.

CARROLL LaGRAFFE

90

Case 16-03127-rld    Doc 50    Filed 11/09/16

# Exhibit D


E-SERVICE
56919822
Mar 13 2015
03:34PM
File & ServeXpress

1  Philip E. Cook (State Bar No. 149067)
       pcook@cooklawfirm.la
2  Ann E. Grant (State Bar No. 157522)
       agrant@cooklawfirm.la
3  THE COOK LAW FIRM, P.C.
   707 Wilshire Boulevard, Suite 3600
4  Los Angeles, CA  90017
   Telephone: (213) 988-6100
5  Facsimile: (213) 988-6099

6  David W. Steuber (State Bar No. 58398)
       dsteuber@jonesday.com
7  Jason C. Wright (State Bar No. 261471)
       jcwright@jonesday.com
8  JONES DAY
   555 South Flower Street, 50th Floor
9  Los Angeles, CA  90071-2300
   Telephone: (213) 489-3939
10 Facsimile: (213) 243-2539

11 Attorneys for Defendants and Cross-Complainants
   KAISER CEMENT AND GYPSUM
12 CORPORATION and KAISER GYPSUM
   COMPANY
13

14              SUPERIOR COURT OF THE STATE OF CALIFORNIA

15                   FOR THE COUNTY OF LOS ANGELES

16                          CENTRAL CIVIL WEST

17

18 TRUCK INSURANCE EXCHANGE,                Case No. BC249550

19            Plaintiff,                    Assigned for all purposes to
                                            Honorable Kenneth R. Freeman
20      vs.                                 Department 310-CCW

21 KAISER CEMENT AND GYPSUM                 **KAISER CEMENT AND GYPSUM
   CORPORATION,                             CORPORATION'S OPENING
22                                          PHASE II TRIAL BRIEF**
            Defendant.
23                                          Complaint Filed:   Apr. 30, 2001
                                            Trial Date:        Apr. 27, 2015
24 AND RELATED CROSS-ACTION.

25

26

27

28

────────────────────────────────────────
              KAISER'S PHASE II OPENING TRIAL BRIEF

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................1

II.   FACTS .....................................................................................................2

      A.    Truck's Policies ..........................................................................2

      B.    Truck Files This Lawsuit to Avoid Its Obligations ......................4

      C.    Truck Moves for Summary Judgment and Stops Indemnifying Kaiser ...............5

      D.    Truck Wipes the Slate Clean and Devises a New Coverage Scheme to Minimize Its Liability ...............6

III.  ANALYSIS................................................................................................7

      A.    Kaiser Has the Right to Select a Truck Policy to Pay "All Sums."...........7

      B.    Equitable Contribution Does Not Apply Here.............................9

            1.    Truck Cannot Rely on Equity to Obviate the Legal Obligations to which It Is Bound Contractually ...............10

            2.    "Contribution" Is Solely an Equitable Claim Between or Among Insurers................12

            3.    Truck's Allocation of 1974 Policy Payments to Other Truck Policies Prejudices Kaiser...............13

      C.    Truck Is Judicially Estopped From Allocating a Loss Paid Under the 1974 Policy to Any Other Truck Policy ...............14

IV.   CONCLUSION..........................................................................................18

KAISER'S PHASE II OPENING TRIAL BRIEF

Page

CASES

*Aerojet-General Corp. v. Transport Indemnity Co.*
(1997) 17 Cal.4th 38 ...................................................................................5, 8, 11

*Armstrong World Industries v. Aetna Casualty & Surety Co.*
(1996) 45 Cal.App.4th 1 .....................................................................................*passim*

*California Food Serv. Corp. v. Great American Ins. Co.*
(1982) 130 Cal.App.3d 892 ........................................................................13

*Dart Industries, Inc. v. Commercial Union Ins. Co.*
(2002) 28 Cal.4th 1059 ..........................................................................10, 11

*Dickson, Carlson & Campillo v. Pole*
(2000) 83 Cal.App.4th 436 ...........................................................................11

*Fireman's Fund Ins. Co. v. Maryland Casualty Co.,*
(1998) 65 Cal.App.4th 1279 .........................................................................12

*Golden Eagle Ins. Co. v. Foremost Ins. Co.*
(1993) 20 Cal.App.4th 1372 .........................................................................13

*Kaiser Cement and Gypsum Corp. v. Ins. Co. of the State of Penn.*
(2013) 215 Cal.App.4th 210 .............................................................7, 9, 17, 18

*Lodi v. Lodi*
(1985) 173 Cal.App.3d 629 .........................................................................13

*London Market Insurers v. Superior Court*
(2007) 146 Cal.App.4th 648 .......................................................................5, 16

*Maryland Casualty Co. v. Nationwide Ins. Co.*
(1998) 65 Cal.App.4th 21 ...........................................................................13

*Montrose Chem. Corp. v. Admiral Ins. Co.*
(1995) 10 Cal.4th 645 ...............................................................................8

*Owens v. County of Los Angeles*
(2013) 220 Cal.App.4th 107 ........................................................................15

ii

*Paulfrey v. Blue Chip Stamps*
    (1983) 150 Cal.App.3d 187 ................................................................................13

*Rohr Industries, Inc. v. First State Ins. Co.*
    (1997) 59 Cal.App.4th 1480 .................................................................................8

*Signal Cos., Inc. v. Harbor Ins. Co.*
    (1980) 27 Cal.3d 359 ..........................................................................................12

*State v. Continental Ins. Co.*
    (2009) 170 Cal.App.4th 160 ..............................................................................8, 9

*Stonelight Tile, Inc. v. California Ins. Guarantee Assn.*
    (2007) 150 Cal.App.4th 19 ...................................................................................8

**STATUTES**

Cal. Civ. Proc. Code, § 1432 .......................................................................................12

**OTHER AUTHORITIES**

16 COUCH ON INSURANCE, "Contribution & Apportionment,"
    § 62:142 ..............................................................................................................13

2 Pomeroy, EQUITY JURISPRUDENCE (5th ed. 1941) § 385.........................................11

iii

# I. INTRODUCTION

From the time that *Armstrong World Industries v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 was decided almost a decade ago, California law has expressly recognized a policyholder's right to select any policy that is triggered by a claim for continuing injury, and to enforce that policy's promise to pay "all sums" covered by the policy. "*All* sums."

In August 2004, Kaiser Cement and Gypsum Corporation (and its subsidiary Kaiser Gypsum Company, Inc., together "Kaiser") selected the 1974 Truck Insurance Exchange ("Truck") primary policy to pay "all sums" required for any asbestos bodily injury claim ("ABIC") alleging a date of first exposure ("DOFE") before January 1, 1975, up to that policy's limit of $500,000 per claim. "*All* sums."

Yet Truck waited 3 years to recognize Kaiser's selection of the 1974 policy. And now, in Phase II of this case, Truck seeks to circumvent its obligation to pay "all sums" under its 1974 policy by internally allocating the payments it makes under that policy to the other 18 policies it sold to Kaiser. Policies that Kaiser has not selected to respond at this time. Policies that Kaiser has elected to keep for future liabilities, rather than exhaust now. And yet Truck seeks relief from the Court in Phase II that will ignore Kaiser's choice of the 1974 Truck policy and that will allow Truck to pay only "some sums" under the 1974 policy.

Certainly, in recognizing an insured's right to select a triggered policy, California law also recognizes Truck's right to seek contribution from other insurers whose policies are triggered. But the equitable considerations that apply to contribution for a loss between insurers do not relieve Truck of its contractual obligation to fully indemnify Kaiser under the selected policy, up to its limits. Truck's attempt to spread indemnity paid under its 1974 policy to its policies with aggregate limits will result in the exhaustion of those aggregate limit policies and, for the later policy years, leave Kaiser exposed to ABIC without any insurer who has a duty to defend, and leave Kaiser much narrower coverage than Kaiser has under the existing Truck policies. Truck's efforts to allocate to its own policies for its own financial gain, and to Kaiser's significant detriment, must be denied.

1

## II. FACTS

### A. Truck's Policies

Truck issued primary comprehensive general liability policies to Kaiser covering the period from December 31, 1964 through April 1, 1983.[1] Each of those policies provide coverage for bodily injury up to "per occurrence" limits of liability.[2] Some of the policies contain aggregate limits; others do not:

- The policies in effect from December 31, 1964 to January 30, 1971 have a $100,000 per person limit, a $300,000 per occurrence limit and a $300,000 *annual aggregate* limit for all bodily injury products liability claims.[3]

- The policies in effect from January 30, 1971 to April 1, 1980 have per occurrence limits of $500,000 for bodily injury with *no annual or other aggregate* limits for products liability claims.[4]

- And the policies in effect from April 1, 1980 to April 1, 1983 have per occurrence limits of $500,000 for bodily injury and $1,500,000 *annual aggregate* limits for products liability claims.[5]

When the first ABIC were filed in the late 1970s, Kaiser turned to Truck, who was then its current primary insurer.[6] Truck initially allocated ABIC to a single policy year, but by the late 1980s it began to spread each ABIC payment across all of its policy years.[7] Truck chose to treat

---

[1] Trial Ex. 106 [Corrected Stipulated Facts re (1) Truck "Per Occurrence" Deductible Billings, and (2) Truck Equitable Allocation, filed Jun. 11, 2014] ("Stipulated Facts (Set 1)"), ¶ 6.

[2] *Id.*, ¶ 6.

[3] *Id.*, ¶ 6.a.

[4] *Id.*, ¶ 6.b.

[5] *Id.*, ¶ 6.c.

[6] *Id.*, ¶ 7; see Trial Ex. 24 [Sept. 13, 1988 letter from M. Youngman to "All Primary Carriers"].

[7] Truck's initial motive for internally allocating ABIC loss was driven by its reinsurance recovery. See Trial Ex. 17 [Mar. 4, 1987 internal Truck memorandum from E. Morris to J. Davis]. As the issue of internal ABIC allocation became more "complicated," Truck eventually spread ABIC loss across all triggered policy years. Stipulated Facts (Set One), ¶ 15; see Trial Ex. 21 [Apr. 26, 1988 internal Truck memorandum from J. Davis to R. Kitto]. This approach ultimately became the "billing convention" under which Truck billed deductibles to Kaiser. E.g., Trial Ex. 16 [Mar. 5, 1986 letter from E. Morris to John F. Sullivan], p. 1 (based upon Truck's reinsurance arrangement, "[t]he per occurrence deductible language in the [Truck] policy is interpreted as *a premium determination device* and the stated deductible does not apply to each

2

1  all ABIC as a single occurrence to maximize its recovery from Truck's reinsurers.[8] As a result,

2  while Truck spread each ABIC payment across all policy years, it charged Kaiser only a single

3  deductible for each of those years.[9] The parties found this "non-binding" billing convention

4  mutually beneficial and continued it through the 1990s.[10] And all the while Truck, because it had

5  issued policies without aggregate limits, told Kaiser it would always be on the risk, was in it for

6  the "long haul," and *would be "unable to" exhaust* its policy limits.[11]

7       Kaiser was also insured by three other primary carriers:  Fireman's Fund Insurance

8  Company ("Fireman's Fund") from 1947 through 1964; The Home Indemnity Company

9

---

10  individual asbestos-related bodily injury claim"), italics added.

11  [8] If each ABIC were counted as a separate occurrence for reinsurance purposes, Truck's indemnity payments for ABIC would not likely have implicated its reinsurers' obligations

12  because, at the time, most ABIC were settled for small amounts. (See Patterson Depo. [5/20/14] at 29:13-30:5; Trial Ex. 10 [Sept. 2, 1982 letter from D. Comport to Kincaid law firm].) To avoid

13  that outcome and maximize its reinsurance recovery, Truck urged its reinsurers to treat each ABIC as a single occurrence. (Trial Ex. 4 [Aug. 4, 1981 letter from D. Comport to John F.

14  Sullivan Co.]; Patterson Depo. [5/20/2014] at 37:7-10 (testifying that Truck's reinsurance proceeds would be "maximized" if asbestos liabilities arose from a single occurrence rather than

15  each claim being an occurrence).) The reinsurers eventually agreed. (Trial Ex. 316 [Nov. 15, 1982 letter from D. Comport to Lord, Bissel & Brook]; Trial Ex. 12 [Mar. 28, 1983 letter from

16  D. Comport to John F. Sullivan Co.]; see generally Kaiser's Phase I Opening Trial Brief, filed June 16, 2014, at 5:6-6:4 (and evidence cited).)

17  [9] Trial Ex. 106 [Stipulated Facts (Set One)], ¶¶ 14-15.

18  [10] Trial Ex. 106 [Stipulated Facts (Set One)], ¶ 16; Patterson Depo. [5/20/14] at 35:6-16 (testifying that the billing convention was reached as an interim agreement in light of the various

19  uncertainties in how to apply the policy to ABIC); Trial Ex. 40 [June 21, 1991 letter from C. Pagter to G. Najarian], p. 2 ("Kaiser hereby reserves its right to further consider and, as may be

20  appropriate with respect to policy terms and conditions, to challenge the convention established by [Truck] of combining all asbestosis claims into one master claim per policy period.").

21  [11] Trial Ex. 360 [May 27, 1997 Truck inter-office correspondence from D. Patterson to F. Brooks] ("Truck had nine of nineteen years without aggregate limits and would be in this litigation for the

22  long haul"); Trial Ex. 333 [Aug. 23, 1994 letter from P. Miller to C. Pagter] ("since some of the Truck policies have no aggregate limits," Truck "would be unable to erode limits"); see also

23  Pagter Depo. [5/4/04] at 531:12-24, 533:23-534:17, 600:20-601:3; Pagter Depo. [6/7/04] at 670:11-671:14, 677:10-678:3.

24  It was not until November 1998 that Truck first told Kaiser that any of its policies would exhaust, and then Truck only claimed that ABIC had exhausted its earliest non-aggregate policies,

25  covering 1965 through 1970. See Trial Ex. 90 [Nov. 5, 1998 letter from D. Patterson to M. Wright]; Trial Ex. 91 [Jan. 18, 1999 internal Truck memorandum from P. Miller to

26  D. Patterson, cc'ing M. Wright]; Trial Ex. 337 [Jul. 30, 1999 internal Truck memorandum from P. Miller to D. Patterson]; Trial Ex. 339 [Feb. 22, 2000 internal Truck memorandum from

27  P. Miller to D. Patterson]. In response to this news, Kaiser never agreed that any of Truck's non-aggregate policies had, in fact, been exhausted. E.g., Trial Ex. 93 [Feb. 14, 2002 letter from

28  A. Chute to S. Hoyt].

3

**KAISER'S PHASE II OPENING TRIAL BRIEF**

("Home") from 1983 through 1985; and National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") from 1985 through 1987.[12] Truck and Kaiser settled with each of these insurers in the early 1990s.[13] In contrast with Truck's policies, which would not exhaust, the primary policies issued by Fireman's Fund, Home and National Union all contained aggregate limits; between 2001 and 2004, each of those policies eventually exhausted.[14]

## B. Truck Files This Lawsuit to Avoid Its Obligations.

In 2001, Truck made its first "about face." Contrary to its prior representations to Kaiser, Truck filed this lawsuit and claimed all its policies were exhausted. Truck argued that ABIC constituted a single occurrence, and Truck therefore had to exhaust only a single occurrence limit for each policy year.[15]

A few years later, starting July 1, 2004, Truck began allocating to Kaiser a pro rata share of each ABIC settlement, requiring Kaiser to fund approximately 70 percent of ABIC settlement payments.[16] Truck claimed it had the right to allocate to Kaiser the percentage of ABIC payments that related to those policy years containing aggregate limits, which Truck argued were exhausted.[17] But Truck's allocation of ABIC settlement payments to Kaiser was a blatant violation of California law, which requires an insurer to completely defend and indemnify its insured. In a letter the following month, Kaiser objected and expressly selected the 1974 or 1975 Truck policy years to respond to, and pay "all sums" required for, each ABIC:

> Truck . . . has unilaterally decided to allocate indemnification costs across primary policy limits, leaving Truck paying only 15-30% of indemnification costs for any given claim that triggers coverage under Truck's non-aggregate policies and the balance being billed to Kaiser.

---

[12] Trial Ex. 106 [Stipulated Facts (Set 1)], ¶¶ 3-5.

[13] *Id.*, ¶ 9 ("Coverage litigation . . . ended when Truck and Kaiser entered into three separate settlement agreements with Fireman's Fund, Home and National Union in late 1992 and early 1993."); see also Trial Ex. 114 [Sept. 23, 1991 Fourth Amended Complaint].

[14] *Id.*, ¶¶ 3-5.

[15] Trial Ex. 340 [Truck Original Complaint, filed Apr. 30, 2001], ¶¶ 6-8.

[16] Trial Ex. 140 [Stipulated Facts Re: Truck's Equitable Allocation Claims (Phase II), filed 8/28/2014] ("Stipulated Facts, (Set 2)"), ¶ K.

[17] Trial Ex. 98 [Aug. 31, 2004 letter from P. Cook to S. Hoyt].

4

* * *

Although Truck could potentially seek contribution from other primary carriers for the costs of indemnification ([Armstrong, 45 Cal. App. 4th] at 53), this contribution right does not allow recovery from the policyholder, even where other primary carriers' policies are exhausted. *American Continental Ins. Co. v. Amer. Cas. Ins. Co.*, 86 Cal. App. 4th 929 (2001); *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279 (1998); see also Armstrong, 45 Cal. App. 4th at 54 n.17. Rather, under the "all sums" language in Truck's triggered policies, Truck must pay all of the indemnity costs of ABIC, and Kaiser is "covered (up to the policy limits) for the full extent of its liability and need not pay a pro rata share." *Armstrong*, 45 Cal. App. 4th at 57.

* * *

Kaiser has the right under California law to select any triggered policy under which coverage will be provided. See Aerojet, 17 Cal. 4th at 71; Armstrong, 45 Cal. App. 4th at 54 n.15. Accordingly, Kaiser expects Truck to respond to ABIC under either the 1974-75 or 1975-76 years.[18]

Despite this clear selection, based on well-established California law, Truck ignored Kaiser's rights and allocated settlement payments to its insured for almost three years.

C.     **Truck Moves for Summary Judgment and Stops Indemnifying Kaiser.**

In 2004, Truck moved for summary adjudication , arguing that it had exhausted each of the limits for each of the 19 policy years it issued to Kaiser. (*London Market Insurers v. Superior Court* (2007) 146 Cal.App.4th 648, 652 ("LMI").) The trial court (Judge Carl J. West) granted Truck's motion in January 2006. (*Id.* at p. 654) Truck then withdrew all defense and indemnity for ABIC, forcing Kaiser to bear the entire burden.[19]

On January 9, 2007, the Court of Appeal reversed the trial court's order. (*LMI, supra*, 146 Cal.App.4th at pp. 652, 672-673.) On remand, the trial court ruled that each ABIC was a separate occurrence within the meaning of the Truck policies.[20] Truck resumed the defense and indemnity of ABIC, conceding that it had to reimburse Kaiser for over $77 million that Kaiser had wrongfully been forced to incur in defense and indemnity costs between July 1, 2004 and

---

[18] Trial Ex. 98 [Aug. 31, 2004 letter from P. Cook to S. Hoyt], italics added.

[19] Trial Ex. 106 [Stipulated Facts (Set 1)], ¶ 24.

[20] *Id.*, ¶¶ 25-26.

5

Case 16-03127-rld    Doc 50    Filed 11/09/16

September 1, 2007.[21]

### D. Truck Wipes the Slate Clean and Devises a New Coverage Scheme to Minimize Its Liability.

Having lost its attempt to avoid coverage entirely, and three years after Kaiser had selected the 1974 policy to respond to ABIC, Truck finally acknowledged Kaiser's rights under California law and agreed to adjust ABIC prospectively under the 1974 policy for any ABIC that triggered the policy.[22] At the same time, Truck *for the first time,* and *unilaterally,* departed from the parties' billing convention and reallocated all of the historical ABIC claims, even those resolved decades earlier, to the 1974 policy.[23] In essence, Truck erased everything done before and started over.

Truck took this new approach for a specific reason: With each ABIC having been ruled a separate occurrence, if Truck had to use all of its 19 policies' occurrence limits, it initially would have had to pay up to $8.3 million to resolve each ABIC (i.e., the separate occurrence limits in its 19 policy years). Once Truck's 10 aggregate limit policies exhausted, it would have had to pay up to $4.5 million for each ABIC (i.e., the separate occurrence limits in its 9 non-aggregate policy years, from 1971 through 1979), as long as ABIC continued to be filed.

To avoid that outcome, Truck wiped the slate clean and started a new scheme, under which it allocated all ABIC to the 1974 policy year, going back to the initial claims resolved in the early 1980s.[24] Truck's reallocation permitted Truck to assess over $9.5 million in deductibles it charged to Kaiser for ABIC that Truck had settled over the previous 24 years.[25] And with its reallocation, Truck took a new position—that the 1974 policy was the sole primary policy available for ABIC.[26] Truck argued that the excess insurers had to indemnify Kaiser for any ABIC settlement or judgment in excess of the $500,000 per occurrence limit in the 1974 policy.

---

[21] Trial Ex. 106 [Stipulated Facts (Set 1)], ¶ 27.

[22] Trial Ex. 101 [July 23, 2007 letter from C. Nelson to P. Cook].

[23] *Ibid.*; Trial Ex. 106 [Stipulated Facts (Set 1)], ¶ 28.

[24] Trial Ex. 101 [July 23, 2007 letter from C. Nelson to P. Cook].

[25] *Id.* at p. 3.

[26] *Id.*; Trial Ex. 362 [Truck Memorandum of Points and Authorities in Response/Opposition to Kaiser's Motion for Coverage Rights, filed May 12, 2008] at 18:9-19:6,

6

1    In 2008, Kaiser moved for a determination of its coverage rights, arguing that vertical

2    exhaustion applied because the 1974 first layer excess policy issued by The Insurance Company

3    of the State of Pennsylvania ("ICSOP") indemnified Kaiser once the "underlying" 1974 Truck

4    policy exhausted.[27] Truck sought the same result, but argued that its 1974 policy language made it

5    the only available primary policy; once its occurrence limit exhausted, ICSOP had to indemnify

6    Kaiser.[28] The trial court agreed with Truck.[29] When Kaiser re-filed the motion as one for

7    summary judgment in 2009, the trial court again adopted Truck's argument and ruled that the

8    1974 policy was the only available primary policy for each ABIC.[30]

9    ICSOP appealed, and Truck continued to advocate the same position. On June 3, 2011, the

10   Court of Appeal agreed with Truck, ruling that the 1974 policy was the only available Truck

11   policy for an ABIC that triggered it, and thus Truck's exposure for ABIC was limited to the

12   policy's $500,000 per occurrence limit. (*Kaiser Cement and Gypsum Corp. v. Ins. Co. of the State*

13   *of Penn.* (2013) 215 Cal.App.4th 210, 214 ("ICSOP").) The Supreme Court granted review on

14   August 24, 2011, but stayed the case pending a decision in another matter. On October 31, 2012,

15   the Supreme Court transferred the matter back to the Court of Appeal with instructions to vacate

16   its June 2011 decision and to reconsider it in light of *State of California v. Continental Ins. Co.*

17   (2012) 55 Cal.4th 186. On April 8, 2013, the Court of Appeal issued another decision, again

18   adopting Truck's contention that its 1974 policy was the only available Truck policy to cover

19   ABIC. (*ICSOP, supra*, 215 Cal.App.4th at p. 214).

20   **III.    ANALYSIS**

21   **A.    Kaiser Has the Right to Select a Truck Policy to Pay "All Sums."**

22   Coverage cases involving continuous loss, that triggered multiple, successive policy years,

23   spawned a new world for insurance law. The first question was what insurance policies applied:

---

[27] Trial Ex. 361 [Kaiser Motion to Determine Kaiser's Coverage Rights, filed April 11, 2008].

[28] Trial Ex. 362 [Truck Memorandum of Points and Authorities in Response/Opposition to Kaiser's Motion for Coverage Rights, filed May 12, 2008] at 18:9-19:6.

[29] Trial Ex. 363 [Court's Order re: Kaiser's Motion to Determine Coverage Rights, filed June 30, 2008].

[30] Trial Ex. 364 [Court's Order re: Kaiser's Motion for Summary Judgment, filed Dec. 4, 2009].

7

1 the policy issued when a person was exposed to asbestos; the policy issued when the plaintiff's

2 harm manifested; or every policy issued from the exposure forward. California courts chose the

3 last method, called continuous trigger. (*Montrose Chem. Corp. v. Admiral Ins. Co.* (1995) 10

4 Cal.4th 645, 678). The next question was what insurance policy indemnified a policyholder where

5 a claim triggered multiple policies. From the outset, California law uniformly, and without

6 exception, has enforced the "all sums" promise that permits a policyholder to pick any one of the

7 triggered policies, and to require the insurer to fully defend and indemnify up to policy limits,

8 regardless of whether other policies are triggered. (E.g., *Armstrong World Indus. v. Aetna*

9 *Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 57 ["We interpret [the "all sums" promise] to

10 mean that once coverage is triggered, the insurer's obligation to the policyholder is to cover the

11 policyholder's liability "in full" up to the policy limits. It is irrelevant that only part of the

12 asbestos-related disease developed during any single policy period or during a period in which the

13 manufacturer had no insurance."]; *Stonelight Tile, Inc. v. California Ins. Guarantee Assn.* (2007)

14 150 Cal.App.4th 19, 37 ["When a continuous loss is covered by multiple policies, the insured

15 may elect to seek indemnity under a single policy with adequate policy limits. If that policy

16 covers 'all sums' for which the insured is liable, as most CGL policies do, that insurer may be

17 held liable for the entire loss," with the right to "seek contribution from the other insurers on the

18 risk"].)

19      In its seminal decisions concerning continuous loss claims that trigger multiple policy

20 periods, our Supreme Court has made clear that an insurer may be held liable for the entire loss

21 up to the policy limits. (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645,

22 678; *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 55-57.) Other

23 insurers on the risk are separately and independently obligated to fully indemnify the insured.

24 (*Aerojet, supra,* 17 Cal.4th at p. 57, fn. 10, quoting *Montrose, supra,* 10 Cal.4th at pp. [636-87,

25 81, fn. 19], italics added.) Importantly, "all sums" is not joint and several liability; rather, each

26 insurer is severally liable on its own policy. (*State v. Continental Ins. Co.* (2009) 170 Cal.App.4th

27 160; see *Rohr Industries, Inc. v. First State Ins. Co.* (1997) 59 Cal.App.4th 1480, 1489.) Thus,

28 when there is a continuous loss spanning multiple policy periods, any insurer that covered any

8

1  policy period is liable for the *entire* loss. (*State v. Continental Ins. Co., supra,* [88 Cal. Rptr. at

2  p. 301].)

3      Here, the 1974 Truck policy requires Truck to indemnify Kaiser for "all sums" that Kaiser

4  becomes legally obligated to pay as a result of an "occurrence" that causes injury during the

5  period of the policy:

6          [Truck] . . . agrees . . . [t]o pay on behalf of the insured all sums
            which the insured shall become obligated to pay, as damages or
7          otherwise, by reason of the liability imposed upon him by law . . .
            or by reason of any other legal liability of the insured however
8          arising or created or alleged to have risen or to have been created
            because of . . . [p]ersonal injury, sickness, disease, including death .
9          . . including all loss arising therefrom.

10                          *       *       *

11         This policy applies only to occurrences during the policy period.

12                          *       *       *

13         [T]he word "occurrence"' means an event, or continuous or
            repeated exposure to conditions which results in personal injury or
14         property damage during the policy period. . . . Personal [i]njury
            means bodily injury, sickness or disease, including death at any
15         time resulting therefrom[.][31]

16  As the Court of Appeal already has ruled, this language means that the "all sums" approach

17  applies to Kaiser's coverage. (*ICSOP, supra*, 215 Cal.App.4th at p. 239; see Stipulated Facts

18  (Set 1), ¶ 36 ["The 'continuous trigger' and 'all sums' approach, as applied in *Aerojet* and

19  *Armstrong*, are the law of the case and support Kaiser's selection of the Truck 1974 policy, when

20  triggered, to respond to ABIC."].

21      **B.    Equitable Contribution Does Not Apply Here.**

22      Once an insurer is selected to pay "all sums," it may seek contribution from *other*

23  *insurers*. (*Armstrong, supra*, 45 Cal.App.4th at p. 52 ["A policyholder may obtain full

24  indemnification and defense from *one insurer*, leaving the targeted insurer to seek contribution

25  from *other insurers* covering the same loss"], italics added.) Truck relies on principles of

26  equitable contribution to argue that it can allocate indemnity payments from its 1974 policy to

27  _____

28  [31] (Trial Ex. 302 [Truck 1974 Policy, Insuring Agreement § I], p. 4, [Policy Period § IV], p. 8,
      [Condition III.(i)-(j)], pp. 13-14.)

                                    9

Truck's other policy years. Truck is wrong for several reasons.

First, contribution is a claim by one insurer against another insurer. The claim exists equitably between insurers because there is no contractual relationship between them. Of course, Truck and Kaiser have a contractual relationship that requires Truck to fully indemnify and defend Kaiser under the 1974 policy; Truck cannot escape its legal obligations based on some equitable notion.

Second, although Truck repeatedly has ignored it, California does not permit an insurer whose policy has been selected to pay "all sums" to allocate indemnity payments where it would result in a reduction of coverage for the insured. (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1080; *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1.) Allocation of a covered loss among insurers—whether under a policy's "Other Insurance" clause or equitable contribution—does not alter the selected insurer's duty to fully indemnify its insured. (*Armstrong, supra*, 45 Cal.App.4th at pp. 49-50.) No decisions since the *Montrose/Aerojet/Armstrong* line of cases have changed this fundamental principle of California insurance coverage law, nor do any decisions permit Truck to allocate in a manner that would reduce its obligation to fully defend and indemnify Kaiser for ABIC.

Third, allocation across Truck's aggregate and non-aggregate policies that Kaiser *has not* selected to respond to ABIC will prejudice Kaiser by reducing the insurance coverage it purchased from Truck. Specifically, it would leave Kaiser without an insurer having a duty to defend certain ABIC.

For all these reasons, the Court should not accept Truck's novel view of equitable contribution, and should not extend that claim to allow Truck to spread ABIC indemnity payments over its own 19 policy years.

### 1. Truck Cannot Rely on Equity to Obviate the Legal Obligations to which It Is Bound Contractually.

Truck's and Kaiser's legal relationship is defined, as Truck successfully argued to the Court of Appeal, by the 1974 policy. Kaiser has the right to select the 1974 policy to respond to ABIC and, under that contract, Truck must fully indemnify and defend Kaiser. Truck's argument

here in Phase II assumes that equity somehow can trump Truck's legal obligation to fully

indemnify Kaiser under the 1974 policy. Essentially, Truck claims that equitable principles allow

it to ignore Kaiser's choice of the 1974 policy and, over Kaiser's objection, instead decide that all

of its policies will equally respond to ABIC.

There is no support for Truck's approach. Quite the opposite: Our Supreme Court has

stated that the contribution principles that apply between insurers has no effect on, and cannot

derogate from the insurer's legal obligation to, the insured. (See *Armstrong, supra*, 45

Cal.App.4th at pp. 56-57 ["[A]pportionment among multiple insurers . . . has no bearing upon the

obligations of the insurers to the insured. . . . [O]nce coverage is triggered, the insurer's

obligation to the policyholder is to cover the policyholder's liability 'in full' up to policy

limits."]; *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1080

["'Apportionment among multiple insurers must be distinguished from apportionment between an

insurer and its insured. When multiple policies are triggered on a single claim, the insurers'

liability is apportioned pursuant to the 'other insurance' clauses of the policies or under the

equitable doctrine of contribution. That apportionment, however, has no bearing upon the

insurers' obligations to the policyholder. A pro rata allocation among insurers 'does not reduce

their respective obligations to their insured.' The insurers' contractual obligation to the

policyholder is to cover the full extent of the policyholder's liability (up to the policy limits)"],

quoting *Armstrong, supra*, citations omitted].)

In short, "fairness" and equitable doctrines play no part in deciding a policyholder's

rights; they are solely a matter of contract—not equity. (E.g., *Aerojet-General Corp. v. Transport

Indemnity Co.* (1997) 17 Cal.4th 38, 75.)[32]

---

[32] In any event, a party who seeks equity must do equity. (*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 445); 2 Pomeroy, EQUITY JURISPRUDENCE (5th ed. 1941) § 385, pp. 51-53. And there is nothing equitable about allowing Truck to allocate payments under its 1974 policy to its other 18 policy years and evade its obligation to pay "all sums." Nor does Truck seek this remedy with clean hands.

- For decades, *Truck* represented to Kaiser, during the time the parties operated under their billing convention, that because of its non-aggregate limit policies, Truck would be required to defend and indemnify Kaiser for the "long haul," and would be "unable to erode limits." (See fn. 8, *supra*.) Yet it reversed course, and filed this action.
- From 2004 through 2007, Truck ignored Kaiser's selection of the 1974 policy to respond

11

## 2. "Contribution" Is Solely an Equitable Claim Between or Among Insurers.

Trying to support its attempt to allocate payments made under its 1974 policy to other policies it issued to Kaiser, Truck claims that it is merely seeking "contribution" from the other policies it issued to Kaiser. But contribution, under California law, is necessarily an adjustment of rights between insurers. Indeed, the express language of each of the cases Truck cites makes it apparent that those cases address rights between or among insurers—and not an insurer's right to allocate to or among its own policies. Not surprisingly, Truck has cited no authority where a court ruled that an insurer can obtain contribution from itself.

In *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, the court explained the policy considerations that limit the application of equitable contribution *to co-insurers* for defense and indemnity coverage. Under the "all sums" approach, the insurer who issued the policy chosen by the insured must fully indemnify the insured. Because it would be an undue burden for a single insurer to bear the entire loss where other insurers' policies are triggered, equitable contribution permits reimbursement to the insurer that paid on the loss. (*Id.* at pp. 1293-1294.) The purpose of this rule of equity is to equalize the common burden shared by co-insurers, and to prevent one insurer from profiting at the expense of others. (*Ibid.*, citing Cal. Civ. Code, § 1432;[33] *Signal Cos., Inc. v. Harbor Ins. Co.* (1980) 27 Cal.3d 359, 369 ["The

---

to ABIC and pay "all sums," forcing Kaiser to bear the burden of risks covered by Truck's policies.

- In judicial submissions Truck argued that it had no other available and collectible insurance to satisfy Kaiser's claims, and the excess insurers were responsible once it paid its $500,000 limit. Yet it now reverses course again, arguing that it does indeed have other insurance—its own policies—and that the Court must allow it to allocate to those other policies, exhausting many of them and taking coverage away from Kaiser.

Truck has not done equity, but instead has repeatedly devised schemes to avoid its obligations for ABIC. To the extent that the Court finds that Truck somehow has equitable rights against Kaiser (beyond the rights and obligations spelled out in their contracts of insurance, and the burdens and benefits of those arms-length bargains), it should reject Truck's remedy because of Truck's inequitable conduct.

[33] Section 1432 makes clear that contribution under California law is a claim between different parties:

> [A] party to a joint, or joint and several obligation, who satisfies more than his share of the claim against all, may require a proportionate contribution from all the parties joined with him.

12

reciprocal rights and duties of several insurers who have covered the same event do not arise out of contract, for their agreements are not with each other[.] Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden."]; *Maryland Casualty Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 26-27; *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1390; *California Food Serv. Corp. v. Great American Ins. Co.* (1982) 130 Cal.App.3d at 892, 901-902; 16 COUCH ON INSURANCE, "Contribution & Apportionment," § 62:142, at pp. 611-612.)

In sum, despite Truck's deliberate misuse of the word "contribution" for what is actually "allocation," California law is clear: Contribution is solely an equitable claim between co-insurers, and does not apply to Truck's attempt, as a single insurer with multiple policies, to get "contribution" from itself.[34]

### 3. Truck's Allocation of 1974 Policy Payments to Other Truck Policies Prejudices Kaiser.

The duty of good faith and fair dealing is implied in every contract. In the insurance context, this means the insurer must give equal weight to the insured's interest as to the insurer's interests. *(Paulfrey v. Blue Chip Stamps* (1983) 150 Cal.App.3d 187, 192 ["In order for the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits contracted for, the governing standard is that the insurer must give at least as much consideration to the insured's interests as it does to its own."].) Here, Truck seeks to ignore Kaiser's selection of the 1974 policy and allocate indemnity payments to its other 18 years of coverage, many of which have aggregate limits (i.e., 1965-1970 and 1980-1983). In doing so, Truck will extinguish Kaiser's contractual rights under those 10 policy years with aggregate limits, even though Kaiser has decided not to use those policies it purchased, at this time, for ABIC that triggers the 1974 policy. And this prejudices Kaiser. In particular, Truck's proposed allocation would exhaust

---

[34] (See, e.g., *Lodi v. Lodi* (1985) 173 Cal.App.3d 629, 630 [affirming trial court's dismissal of a suit in which the plaintiff sued himself as defendant, notwithstanding the fact "no party sought dismissal or objected to entry of judgment as requested"; "in the arena of pleadings, the one at issue here is a slam-dunk frivolous complaint"].) With its tongue firmly in its cheek, the *Lodi* court also considered whether to award the defendant/respondent his costs of suit on appeal, "which he could thereafter recover from himself," but held instead that "we believe the equities are better served by requiring each party to bear his own costs on appeal." (*Id.* at p. 632.)

13

1    Kaiser's post-1979 Truck coverage and deprive Kaiser of coverage for claims that have a date of

2    first exposure ("DOFE") after 1979.

3           The concern is more than hypothetical. For instance, on January 30, 2015, Kaiser tendered

4    to Truck an ABIC claim alleging exposure to asbestos-containing products from 1981-2005.

5    Nolan Lamb v. Kaiser Gypsum Co., Inc., Contra Costa Superior Court, Case No. C15-00057

6    ["Nolan Lamb"].[35] In its February 2, 2015 reservation of rights letter for the Nolan Lamb claim,

7    Truck forebodingly explains that depending on the outcome of pending litigation (i.e., this Phase

8    II trial), it is possible that there may not be Truck coverage for either defense or indemnification

9    of the Nolan Lamb claim.[36]

10          Kaiser's expert for Phase II, Mr. Ross Mishkin, will explain at trial that the Nolan Lamb

11   claim only triggers insurance covering 1981 or later. If Kaiser has additional ABIC filed against it

12   that allege a DOFE after 1979, and the $4 million remaining aggregate Truck coverage for 1980-

13   1983 becomes exhausted (whether by further claims alleging a DOFE after 1979, which

14   Mr. Mishkin will explain is the trend in asbestos claims, or by Truck's internal allocation to those

15   policies), Kaiser would have no primary coverage for such claims—leaving it with no insurer that

16   has a duty to defend ABIC. Remaining excess coverage for the 1980-1983 policy years is

17   narrower than the coverage Truck's policies provide, which is one of the reasons that Kaiser has

18   not picked any of the 1980-1983 Truck policies to respond to ABIC that trigger the 1974 policy.

19          In sum, Truck's obligation to pay "all sums," and Kaiser's right to select which policy will

20   respond, would be rendered meaningless if Truck is permitted to spread losses from the non-

21   aggregate 1974 policy Kaiser has selected to Truck's aggregate policies, thereby dissipating them,

22   and evading completely its coverage obligations under them.

23   **C.     Truck Is Judicially Estopped From Allocating a Loss Paid Under the 1974**
              **Policy to Any Other Truck Policy.**
24
             Judicial estoppel is designed to maintain the integrity of the courts and to protect the
25
     parties from unfair strategies. The doctrine prohibits a party from asserting a position in a legal
26

27   _____
     [35] Trial Ex. 359 [Feb. 2, 2015 letter from M. Charbonnet to M. Wright].
28   [36] *Ibid.*

                                            14

1    proceeding that contradicts a position the party successfully asserted in the same or some other

2    earlier proceeding. (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 121.) It may be

3    found when (1) the same party has taken two positions; (2) the positions were taken in judicial or

4    quasi-judicial administrative proceedings; (3) the party was successful in asserting the first

5    position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are

6    totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud or

7    mistake. (*Ibid.*)

8            Over the years, and even during this litigation, Truck has repeatedly shifted positions to

9    optimize its financial interest. But now, the Court must draw the line and estop Truck from its

10    most recent attempt at financial gain. Beginning in the 1980s, and until the 2007 Court of Appeal

11    decision rejecting Truck's argument, Truck took the position that the production of asbestos-

12    containing products constituted a single occurrence.[37] It did so to maximize how much it

13    recovered from its reinsurers.[38] And beginning with the filing of this lawsuit, Truck also took the

14    position that its obligation was solely to exhaust the occurrence limit for each year in which it

15    issued a policy.[39]

16            Once the Court of Appeal rejected Truck's original position in 2007, and the trial court

17    determined on remand that each ABIC was a separate occurrence, Truck crafted a new position,

18    deliberately and unilaterally allocating all historical ABIC to the 1974 policy.[40] It then argued to

19    the trial court and Court of Appeal that the 1974 policy was the only Truck-issued policy

20    available to respond to ABIC.[41] Now, Truck changes course once again—arguing that its other

21    policies do, in fact, cover ABIC, despite Kaiser's selection of the 1974 policy. Truck should be

22

---

23    [37] Trial Ex. 106 [Stipulated Facts (Set 1)], ¶ 13; e.g., Trial Ex. 4 [Aug. 4, 1981 letter from D. Comport to John F. Sullivan Co.].

24    [38] See *supra*, fn. 8.

25    [39] Trial Ex. 340 [Truck's Original Complaint, filed Apr. 30, 2001], ¶¶ 7-8; Trial Ex. 366 [2004 Memorandum in Support of Truck's Motion for Summary Judgment] at pp. 9:8-14, 13:3-8, 23:11-14.

26    [40] Trial Ex. 101 [Jul. 23, 2007 letter from C. Nelson to P. Cook].

27    [41] Trial Ex. 364 [Dec. 4, 2009 Order re Kaiser's Motion for Summary Adjudication]; Trial

28    Ex. 365 [Truck's Feb. 5, 2011 Response to Brief of *Amicus Curiae* London Market Insurers ("Truck Response Brief")].

KAISER'S PHASE II OPENING TRIAL BRIEF

estopped from this most recent change in position, made for its own financial gain and to the significant detriment of its policyholder Kaiser.

In response to Kaiser's 2008 motion for a threshold determination concerning its coverage rights, Truck argued that under its 1974 policy language, no other Truck policy was available to respond to ABIC.[42] The trial court agreed with Truck; when the parties refiled the issue as one for summary judgment, the trial court again agreed with Truck. In a December 4, 2009 Order, Judge West ruled:

> The Court concludes . . . that the language of the Truck policy precludes a finding that there is 'other valid and collectable [sic] insurance' or 'other underlying collectable [sic] insurance' on other policies issued by Truck.[43]

Truck seized upon this ruling, incorporating it into its arguments on ICSOP's ensuing appeal. In February 2011, Truck filed an appellate brief responding to the arguments of *amici curiae* London Market Insurers ("LMI"), citing the trial court's ruling that the language of the 1974 Truck policy precluded a finding that Truck provided "other valid and collectable insurance."[44] Truck asserted that its single occurrence limit of $500,000 in the selected 1974 policy precluded a finding that other insurance was available or collectible:

> [T]he plain language of . . . the Truck Policy make[s] it patently apparent that . . . *there is no 'available,' 'collectible' or 'valid' other insurance issued by Truck* . . . .[45]

Truck repeated its assertion that there was no available and collectible primary insurance other than the selected 1974 Truck policy in its submission to the Court of Appeal:

- "the only limits available beyond those of the scheduled underlying policies are those that are *applicable*—in the situation presented here, where Truck's liability is unambiguously limited to a single 'per occurrence' limit, the limits of other underlying Truck policies are simply inapplicable."[46]

---

[42] Trial Ex. 362 [Truck Memorandum of Points and Authorities in Response/Opposition to Kaiser's Motion for Coverage Rights, filed May 12, 2008] at pp. 18:9-19:6.

[43] Trial Ex. 364 [Dec. 4, 2009 Order] at p. 14:1-4.

[44] Trial Ex. 365 [Truck Response Brief] at p. 15.

[45] *Id.* at p. 17, italics added.

[46] *Id.* at p. 13.

KAISER'S PHASE II OPENING TRIAL BRIEF

- "the only available, *collectible*, or *valid* underlying Truck insurance liability is satisfied for any single occurrence by the payment of its $500,000 per occurrence limit."[47]

- "the trial court necessarily looked to the Truck Policy selected by Kaiser to respond to *make that exact determination—whether in fact such 'valid and collectible' other insurance existed.* Then, and only then, the trial court interpreted the unambiguous language of the Truck Policy, which limits Truck's liability *per occurrence* (critically, not per year or per policy period) to a single occurrence limit of $500,000, to mean exactly what it says. Thus the trial court concluded, again referencing the limiting language in the ICSOP Policy, that a finding that Truck provided 'other valid and collectible insurance' was precluded."[48]

- "LMI's argument on page 10 of its Brief that the Court must look in isolation to the terms of the excess policy is nonsensical. While this may be correct as to the scope of the excess insurer's drop down duty, i.e., over scheduled and unscheduled underlying or just scheduled underlying, it is always ultimately necessary to look to the primary policy to determine exactly what primary (if any) is applicable, collectible or available."[49]

- "But the plain language of both the ICSOP Policy and the Truck Policy make it patently apparent that even if the horizontal exhaustion rule is applicable here, *there is no 'available,' 'collectible' or 'valid' other insurance issued by Truck* for ICSOP to turn to. As the trial court explained, the unambiguous language of the 1974 Truck Policy selected by Kaiser makes it clear that although it has no aggregate limits, Truck agreed to provide only a single limit for any one occurrence of $500,000, and no more."[50]

- "As discussed in Truck's Respondent's Brief, a 'per occurrence' limit means exactly that—Truck agreed to pay a maximum of $500,000 *per occurrence*, not per policy period, not per year. Thus, whether or not other Truck policies triggered by that claim are considered to be "underlying" insurance is irrelevant."[51]

On April 8, 2013, after review by the Supreme Court, the Court of Appeal again adopted

Truck's position and affirmed the trial court's determination that Truck's primary policy limits

---

[47] Trial Ex. 365 [Truck Response Brief], p. 14, fn. 4.

[48] *Id.* at p. 15 (referring to the December 4, 2009 trial court order, in which Judge West ruled) Trial Ex. 364 [Dec. 4, 2009 Trial Order] at p. 14:

> The Court concludes, for the reasons stated below, that the language of the Truck policy precludes a finding that there is "other valid and collectable [sic] insurance" or "other underlying collectable [sic] insurance" on other policies issued by Truck.

[49] *Id.* at p. 15.

[50] *Id.* at pp. 17-18, italics and bold added.

[51] *Id.* at p. 18.

**KAISER'S PHASE II OPENING TRIAL BRIEF**

1  could not be "stacked." (*ICSOP*, *supra*, 215 Cal.App.4th 210.) Siding with Truck, the Court of

2  Appeal based its decision on the language of Truck's 1974 policy, ruling that for any single

3  occurrence, Truck is liable up to the 1974 policy occurrence limit, and no more. (*Id.* at p. 303.)

4  Truck advocated that only its 1974 policy was available to Kaiser for a specific reason—

5  to limit how much it paid for ABIC. Under the ruling Truck successfully obtained that is now law

6  of the case, only the 1974 policy responds to an ABIC; once its $500,000 occurrence limit is

7  exhausted, the excess insurers must indemnify Kaiser. But in Phase II, Truck takes a 180-degree

8  turn, telling the Court that it has *other valid and collectible insurance* available for ABIC to

9  which it should be allowed to allocate payments it makes under the 1974 policy. Truck's

10  argument in Phase II cannot be reconciled with the successful argument Truck made in prior

11  proceedings; it flatly contradicts the trial court ruling upon which Truck relied when it

12  represented to the Court of Appeal that there was no other available Truck insurance. Judicial

13  estoppel prevents Truck from, once again, reversing course.

14  **IV.   CONCLUSION**

15  For all of the foregoing reasons, Kaiser respectfully requests that the Court reject Truck's

16  attempt to allocate indemnity payments it makes for ABIC against Kaiser to all of its other

17  triggered policies, and (1) enter judgment against Truck, and in favor of Kaiser and the other

18  defendants, on the declaratory relief sought by Truck in its First Cause of Action, paragraphs 39

19  and 40, and (2) expressly find that Truck's allegation in paragraph 47 of its Second Cause of

20  Action is false, and contrary to California law.

21  DATED: March 13, 2015                    Respectfully submitted,

22                                            THE COOK LAW FIRM, P.C.

23

24                                            By: _____
                                                  Philip E. Cook
25
                                              Attorneys for Defendants and Cross-
26                                            Complainants KAISER CEMENT AND
                                              GYPSUM CORPORATION and KAISER
27                                            GYPSUM COMPANY

28  LAI-383235050v2

**KAISER'S PHASE II OPENING TRIAL BRIEF**

## PROOF OF SERVICE

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 555 S. Flower Street, 50th Floor, Los Angeles, California, 90071.

On March 13, 2015, I served the foregoing documents described as:

### KAISER CEMENT AND GYPSUM CORPORATION'S
### OPENING PHASE II TRIAL BRIEF

☐ **(U.S. MAIL)** I placed true copies of the documents, enclosed in sealed envelopes, and caused such envelopes to be deposited in the mail at Los Angeles, California. The envelopes were mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ **(ELECTRONIC SERVICE)** Pursuant to Court Order establishing case website and authorizing service of documents, dated February 25, 2004, this document has been electronically served and shall be deemed served as of the date and time it is posted by LexisNexis File and Serve on its website (https://litigator.lexisnexis.com).

☐ **(FACSIMILE)** I caused the above-named document(s) to be transmitted by facsimile transmission on this date to the persons and facsimile numbers shown in the attached Service List following ordinary business practices in the United States at Los Angeles, California. The transmission was reported as complete without error and a transmission report was properly issued by the transmitting facsimile machine whose number is (213) 243-2539.

☐ **(OVERNIGHT DELIVERY)** I caused the documents to be delivered via Federal Express or similar overnight courier service, by depositing in a box or other facility regularly maintained by such overnight delivery service, or delivering such envelope to a courier or driver authorized by said overnight delivery service to receive documents, in an envelope designated by said overnight delivery service with delivery fees paid or provided for, addressed to the names and addresses shown in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 13, 2015, at Los Angeles, California.

Diane Finegan

Case 16-03127-rld    Doc 50    Filed 11/09/16

# Exhibit E

Certificate No. LI. **59700**

AS TO INSURANCE PROCURED FROM

# Landis Pelletier & Parrish Inc.

ASSURED

PERMANENTE CEMENT COMPANY

ET AL

Expires DECEMBER 31st, 1964

## NOTICE

You are requested to read this Certificate, and if incorrect, please return it immediately for alteration.

In Case of Loss or Damage Notify Us Immediately by Wire or Telephone

UNDERWRITERS
SERVICE, INC.
INSURANCE BROKERS AND ADVISORS
358 PINE STREET        SAN FRANCISCO 4
YUKON 6-0922

KINS 121133

MPF 005699

LMIPOLSTIP000310

**TRIAL EX. 152**
**Page 352**

# Certificate of Insurance

LL 69700 (L)

effected by

**LANDIS PELLETIER & PARRISH INC.**

through J. H. MINET & CO., LTD., LONDON, ENGLAND, with UNDERWRITERS AT LLOYD'S, LONDON (hereinafter called the "UNDERWRITERS")

In accordance with authorization granted by the Underwriters under evidence of authorization on file in the office of LANDIS PELLETIER & PARRISH INC., in accordance with which the Underwriters have bound themselves, each for his own part, and not one for another, in favor of PERMANENTE CEMENT COMPANY, ET AL (SEE ENDORSEMENT NO. 1)

(hereinafter called the "Assured")

Address: 300 LAKESIDE DRIVE, OAKLAND, CALIFORNIA

during the period commencing December 31st, 1961

and ending December 31st, 1964 both days at noon Standard Time, at Assured's address shown.

Hereon 69.9 % of the amount of the coverage and premium shown.

| AMOUNT | RATE | PREMIUM |
|---|---|---|
| $1,000,000.00 | AS SHOWN $ ON ENDORSE- $ MENT #2 | |
| STATE TAX | | $ " |
| STAMPING FEE | | $ " |
| FEDERAL TAX | | $ " |
| STAMP & SERVICE FEE | | $ " |
| TOTAL | | $ " |

Documentary Stamps in the amount of $_____
Calculated at _.01 .... cents for each dollar or fraction thereof of premium are affixed to the "first instrument of insurance" and any additional premium endorsement thereto retained in the office of LANDIS PELLETIER & PARRISH INC. The law provides for no Federal Tax refund once the insurance attaches.

On— UMBRELLA LIABILITY COVERAGE (AS PER FORM ATTACHED)

This insurance is effected with and bound by the individual Underwriters at Lloyd's, London each acting and contracting individually and not one for another, The undersigned is not one of the Underwriters or Assurers, but is acting solely as the Assured's representative in the negotiation of the insurance herein referred to, and in no event is the undersigned to be liable for any loss sustained by the Assured in connection with this undertaking.

In case any claim is made under this Certificate the Assured shall give immediate written or telegraphic notice of such claim together with full particulars thereof accompanied by all papers and documents having reference to same to Landis Pelletier & Parrish Inc., at the address shown hereon.

It is agreed that all premiums provided for herein are due and payable within Thirty (30) days from the attachment of this insurance.

If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this certificate shall become void, and all claims hereunder shall be forfeited.

This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms attached hereto which alter the certificate provisions stated above shall supersede such certificate provisions in so far as they are inconsistent therewith.

This certificate of insurance shall not be assigned either in whole or in part, without the written consent of Landis Pelletier & Parrish Inc., endorsed hereon.

This document is intended for use as evidence that insurance described herein has been effected, against which Underwriters' Policy(ies) will be duly issued. It is understood and agreed that this insurance is subject to all the terms, conditions and provisions of said Underwriters' Policy(ies) which shall, in the event of conflict herewith, be controlling.

This certificate shall not be valid unless signed by LANDIS PELLETIER & PARRISH INC.

E. & O. E.

DATED AT San Francisco, California , this 13 day of March , 19 62

LANDIS PELLETIER & PARRISH INC.

By _____

FORM A-3

LM100167

MPF 005584

LMIPOLSTIP000311

**TRIAL EX. 152**
**Page 353**

Case 16-03127-rld   Doc 50   Filed 11/09/16

# Certificate of Insurance

LL __69700__ (C)

effected by

## LANDIS PELLETIER & PARRISH INC.

through J. H. MINET & CO., LTD., LONDON, ENGLAND, with Certain Insurance Companies (hereinafter called the "UNDERWRITERS")

In accordance with authorization granted by the Underwriters under evidence of authorization on file in the office of LANDIS PELLETIER & PARRISH INC., in accordance with which the Underwriters have bound themselves, each for his own part, and not one for another, in favor of PERMANENTE CEMENT COMPANY, ET AL

(SEE ENDORSEMENT NO. 1)

(hereinafter called the "Assured")

Address: 300 LAKESIDE DRIVE, OAKLAND, CALIFORNIA

during the period commencing December 31st, 1961

and ending December 31st, 1964 both days at noon

Standard Time, at Assured's address shown.

| AMOUNT | RATE | PREMIUM |
|---|---|---|
| $1,000,000.00 | | AS SHOWN |
| | | ON ENDORSE- |
| | | MENT #2 |
| STATE TAX | S | |
| STAMPING FEE | S | |
| FEDERAL TAX | S | |
| STAMP & SERVICE FEE | S | |
| TOTAL | | |

Hereon 30.1% of the amount of the coverage and premium shown.

On UMBRELLA LIABILITY COVERAGE (AS PER FORM ATTACHED)

Documentary Stamps in the amount of $........ Calculated at $........cents for each dollar or fraction thereof of premium are affixed to the "First Instrument of Insurance" and any additional premium endorsement thereto retained in the office of LANDIS PELLETIER & PARRISH INC. the law provides for no Federal Tax refund note the insurance attaches.

It is understood and agreed that this Certificate shall run concurrently with and be subject to the same gross rate, terms, conditions and endorsements as more particularly set forth in and/or as may from time to time be added in Certificate Number 69700 (L) issued by Lloyd's Underwriters on the identical subject matter and risk.

This insurance is effected with and bound by the individual Insurance Companies each acting and contracting individually and not one for another. The undersigned is not one of the Underwriters or Assurers, but is acting solely as the Assured's representative in the negotiation of the insurance herein referred to, and in no event is the undersigned to be liable for any loss sustained by the Assured in connection with this undertaking.

In case any claim is made under this Certificate the Assured shall give immediate written or telegraphic notice of such claim together with full particulars thereof accompanied by all papers and documents having reference to same to Landis Pelletier & Parrish Inc., at the address shown hereon.

It is agreed that all premiums provided for herein are due and payable within Thirty (30) days from the attachment of this insurance.

If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this certificate shall become void, and all claims hereunder shall be forfeited.

This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms attached hereto which alter the certificate provisions stated above shall supersede such certificate provisions in so far as they are inconsistent therewith.

This certificate of insurance shall not be assigned either in whole or in part, without the written consent of Landis Pelletier & Parrish Inc., endorsed hereon.

This document is intended for use as evidence that insurance described herein has been effected, against which Underwriters' Policy(ies) will be duly issued. It is understood and agreed that this insurance is subject to all the terms, conditions and provisions of said Underwriters' Policy(ies) which shall, in the event of conflict herewith, be controlling.

This certificate shall not be valid unless signed by LANDIS PELLETIER & PARRISH INC.

E. & O. E.

DATED AT San Francisco, California , this 13 day of March , 19 62

LANDIS PELLETIER & PARRISH INC.

By _____

FORM A-3

LMI00169

MPF 005586

LMIPOLSTIP000312

**TRIAL EX. 152**
**Page 354**

Case 16-03127-rld   Doc 50   Filed 11/09/16

## UMBRELLA POLICY.

**Named Assured:**   As stated in Item 1 of the Declarations forming a part hereof and/or subsidiary, associated, affiliated companies or owned and controlled companies as now or hereafter constituted and of which prompt notice has been given to Underwriters. (Hereinafter called the "Named Assured").

### INSURING AGREEMENTS

**1.  COVERAGE —**

Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability

(a)  imposed upon the Assured by law,

or  (b)  assumed under contract or agreement by the Named Assured and/or officer, director, stockholder, partner or employee of the Named Assured, while acting in his capacity as such,

for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of:—

(i)   Personal Injuries, including death at any time resulting therefrom,

(ii)  Property Damage,

(iii) Advertising liability,

caused by or arising out of each occurrence happening anywhere in the world.

**II. LIMIT OF LIABILITY —**

Underwriters hereon shall only be liable for the ultimate net loss the excess of either

(a)   the limits of the underlying insurances as set out in the attached schedule in respect of each occurrence covered by said underlying insurances,

or  (b)  $25,000 ultimate net loss in respect of each occurrence not covered by said underlying insurances, (hereinafter called the "underlying limits");

and then only up to a further sum as stated in Item 2 (a) of the Declarations in all in respect of each occurrence — subject to a limit as stated in Item 2(b) of the Declarations in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.

In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurances by reason of losses paid thereunder, this policy shall

(1)  In the event of reduction pay the excess of the reduced underlying limit

(2)  In the event of exhaustion continue in force as underlying insurance.

The inclusion or addition hereunder of more than one Assured shall not operate to increase Underwriters' limit of liability

THIS POLICY IS SUBJECT TO THE FOLLOWING DEFINITIONS:

**1.  ASSURED —**

The unqualified word "Assured", wherever used in this policy, includes not only the Named Assured but also:—

(a)   any officer, director, stockholder, partner or employee of the Named Assured, while acting in his capacity as such, and any organization or proprietor with respect to real estate management for the Named Assured;

(b)   Any person, organization, trustee or estate to whom the Named Assured is obligated by virtue of a written contract or agreement to provide insurance such as is afforded by this policy, but only in respect of operations by or on behalf of the Named Assured or of facilities of the Named Assured or used by them;

(c)   any additional assured (not being the Named Assured under this policy) included in the Underlying insurances, subject to the provisions in Condition B; but not for broader coverage than is available to such additional Assured under any underlying insurances as set out in attached Schedule;

(d)   with respect to any automobile owned by the Named Assured or hired for use in behalf of the Named Assured, or to any aircraft owned by or hired for use in behalf of the Named Assured, any person while using such automobile or aircraft and any person or organization legally responsible for the use thereof, provided the actual use of the automobile or aircraft is with the permission of the Named Assured.  The insurance extended by this sub-division (d) with respect to any person or organization other than the Named Assured, shall not apply:—

THE PROVISIONS ON THE FOLLOWING PAGES OF THIS FORM ARE HEREBY REFERRED TO AND MADE A PART HEREOF

ATTACHED TO POLICY NO.  LL 69700                    OF THE UNDERWRITERS AT LLOYD'S & COMPANIES IN ENGLAND

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER
TRK 0457181

MPF 005634

LMIPOLSTIP000313

**TRIAL EX. 152**
**Page 355**

-2-

1.  to any person or organization, or to any agent or employee thereof, operating an automobile repair shop, public garage, sales agency, service station, or public parking place, with respect to any occurrence arising out of the operation thereof;

2.  to any manufacturer of aircraft, engines, or aviation accessories, or any aviation sales or service or repair organization or airport or hangar operator or their respective employees or agents with respect to any occurrence arising out of the operation thereof;

3.  with respect to any hired automobile or aircraft, to the owner thereof or any employee of such owner. This sub-division (d) shall not apply if it restricts the insurance granted under sub-division (c) above.

### 2. PERSONAL INJURIES –

The term "Personal Injuries" wherever used herein means bodily injury, mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation; also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any Advertising activities.

### 3. PROPERTY DAMAGE –

The term "Property Damage" wherever used herein shall mean loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured).

### 4. ADVERTISING LIABILITY –

The term "Advertising Liability" wherever used herein shall mean –

1)  Libel, slander or defamation;

2)  Any infringement of copyright or of title or of slogan;

3)  Piracy or unfair competition or idea misappropriation under an implied contract;

4)  Any invasion of right of privacy;

committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Named Assured's Advertising activities.

### 5. OCCURRENCE –

The term "Occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

### 6. ULTIMATE NET LOSS –

The term "Ultimate Net Loss" shall mean the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's or of any underlying insurer's permanent employees.

The Underwriters shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance.

### 7. AUTOMOBILE –

The term "Automobile", wherever used herein, shall mean a land motor vehicle, trailer or semi-trailer.

### 8. AIRCRAFT –

The term "Aircraft", wherever used herein, shall mean any heavier than air or lighter than air aircraft designed to transport persons or property.

### 9. PRODUCTS LIABILITY –

The term "Products Liability" means

(a)  Liability arising out of goods or products manufactured, sold, handled or distributed by the Named Assured or by others trading under his name if the occurrence occurs after possession of such goods or products has been relinquished to others by the Named Assured or by others trading under his name and if such occurrence occurs away from premises owned, rented or controlled by the Named Assured; provided such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for the use of others but not sold;

(b)  Liability arising out of operations, if the occurrence occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the Named Assured; provided operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further the following shall not be deemed to be "operations" within the meaning of this paragraph: (i) pick-up or delivery, except from or onto a railroad car, (ii) the maintenance of vehicles owned or used by or in behalf of the Assured, (iii) the existence of tools, uninstalled equipment and abandoned or unused materials.

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER
TRK 0457195

MPF 005638

LMIPOLSTIP000314

TRIAL EX. 152
Page 356

10. ANNUAL PERIOD —

The term "each Annual Period" shall mean each consecutive period of one year commencing from the inception date of this Policy.

THIS POLICY IS SUBJECT TO THE FOLLOWING EXCLUSIONS:

This policy shall not apply: —

(a)  to any obligation for which the Assured or any company as its insurer may be held liable under any Workmen's Compensation, unemployment compensation or disability benefits law provided, however, that this exclusion does not apply to liability of others assumed by the Named Assured under contract or agreement;

(b)  to claims made against the Assured:

    (i)  for repairing or replacing any defective product or products manufactured, sold or supplied by the Assured or any defective part or parts thereof nor for the cost of such repair or replacement;

    (ii)  for the loss of use of any such defective product or products or part or parts thereof;

    (iii)  for improper or inadequate performance, design or specification; but nothing herein contained shall be construed to exclude claims made against the Assured for personal injuries or property damage (other than damage to a product of the Assured) resulting from improper or inadequate performance, design or specification;

(c)  with respect to advertising activities, to claims made against the Assured for:

    (i)  failure of performance of contract, but this shall not relate to claims for unauthorized appropriation of ideas based upon alleged breach of an implied contract;

    (ii)  infringement of registered trade mark, service mark or trade name by use thereof as the registered trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans;

    (iii)  incorrect description of any article or commodity;

    (iv)  mistake in advertised prices;

(d)  except in respect of occurrences taking place in the United States of America, its territories or possessions, or Canada, to any liability of the Assured directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities, (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

Except insofar as coverage is available to the Assured in the underlying insurances as set out in the attached Schedule, this policy shall not apply:

(e)  to liability of any Assured hereunder for assault and battery committed by or at the direction of such Assured except liability for Personal Injury or Death resulting from any act alleged to be assault and battery committed for the purpose of preventing or eliminating danger in the operation of aircraft, or for the purpose of preventing personal injury or property damage; it being understood and agreed that this exclusion shall not apply to the liability of the Named Assured for personal injury to their employees, unless such liability is already excluded under Exclusion (a) above;

(f)  with respect to any aircraft owned by the Assured except liability of the Named Assured for aircraft not owned by them; it being understood and agreed that this exclusion shall not apply to the liability of the Named Assured for personal injury to their employees, unless such liability is already excluded under Exclusion (a) above;

(g)  with respect to any watercraft owned by the Assured, while away from premises owned, rented or controlled by the Assured, except liability of the Named Assured for watercraft not owned by them; it being understood and agreed that this exclusion shall not apply to the liability of the Named Assured for personal injury to their employees, unless such liability is already excluded under Exclusion (a) above;

(h)  to any employee with respect to injury to or the death of another employee of the same Employer injured in the course of such employment.

THIS POLICY IS SUBJECT TO THE FOLLOWING CONDITIONS: —

A.  PREMIUM. —

Unless otherwise provided for the premium for this Policy is a flat premium and is not subject to adjustment except as provided in Conditions B. and F.

B.  In the event of additional assureds being added to the coverage under the Underlying Insurances during currency hereof prompt notice shall be given to Underwriters hereon and if an additional premium has been charged for such addition on the Underlying Insurances, Underwriters shall be entitled to charge an appropriate additional premium hereon.

C.  PRIOR INSURANCE AND NON CUMULATION OF LIABILITY —

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Item 2 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

Subject to the foregoing paragraph and to all the other terms and conditions of this policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the Assured for liability in respect of such personal injury or property damage without payment of additional premium.

—3—

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER
TRK 0457186

MPF 005639

LMIPOLSTIP000315

**TRIAL EX. 152**
**Page 357**

D. SPECIAL CONDITIONS APPLICABLE TO OCCUPATIONAL DISEASE –

As regards personal injury (fatal or non-fatal) by occupational disease sustained by any employee of the Assured, this policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of liability and the renewal agreement, if any) as are contained in or as may be added to the underlying insurances prior to the happening of an occurrence for which claim is made hereunder.

E. INSPECTION AND AUDIT –

Underwriters shall be permitted at all reasonable times during the policy period to inspect the premises, plants, machinery and equipment used in connection with the Assured's business, trade or work, and to examine the Assured's books and records at any time during the currency hereof and within one year after final settlement of all claims so far as the books and records relate to any payments made on account of occurrences happening during the term of this policy.

F. CROSS LIABILITY –

In the event of claims being made by reason of personal injuries suffered by any employee or employees of one Assured hereunder for which another Assured hereunder is or may be liable, then this policy shall cover such Assured against whom a claim is made or may be made in the same manner as if separate policies had been issued to each Assured hereunder.

In the event of claims being made by reason of damage to property belonging to any Assured hereunder for which another Assured is, or may be, liable then this policy shall cover such Assured against whom a claim is made or may be made in the same manner as if separate policies had been issued to each Assured hereunder.

Nothing contained herein shall operate to increase Underwriters' limit of liability as set forth in Insuring Agreement II.

G. NOTICE OF OCCURRENCE –

Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable, is likely to involve this Policy, notice shall be sent as stated in Item 3 of the Declarations as soon as practicable, provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.

H. ASSISTANCE AND CO-OPERATION –

The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured but Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying Insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters, in which event the Assured and Underwriters shall co-operate in all things in the defense of such claim, suit or proceeding.

I. APPEALS –

In the event the Assured or the Assured's underlying Insurers elect not to appeal a judgment in excess of the underlying limits, Underwriters may elect to make such appeal at their cost and expense, and shall be liable for the taxable costs and disbursements and interest incidental thereto, but in no event shall the liability of Underwriters for ultimate net loss exceed the amount set forth in Insuring Agreement II for any one occurrence and in addition the cost and expense of such appeal.

J. LOSS PAYABLE –

Liability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying Insurer, shall have paid the amount of the underlying limits on account of such occurrence. The Assured shall make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve (12) months after the Assured's liability shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and Underwriters. If any subsequent payments shall be made by the Assured on account of the same occurrence, additional claims shall be made similarly from time to time. Such losses shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy.

K. BANKRUPTCY AND INSOLVENCY–

In the event of the bankruptcy or insolvency of the Assured or any entity comprising the Assured, the Underwriters shall not be relieved thereby of the payment of any claims hereunder because of such bankruptcy or insolvency.

L. OTHER INSURANCE –

If other valid and collectible insurance with any other Insurer is available to the Assured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this policy subject to the terms, conditions and limitations of other insurance.

M. SUBROGATION –

Inasmuch as this policy is "Excess Coverage", the Assured's right of recovery against any person or other entity cannot be exclusively subrogated to the Underwriters. It is, therefore, understood and agreed that in case of any payment hereunder, the Underwriters will act in concert with all other interests (including the Assured) concerned, in the exercise of such rights of recovery. The apportioning of any amounts which may be so recovered shall follow the principle that any Interest (including the Assured) that shall have pe'' an amount over and above any payment

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER
TRK 0457184

MPF 005637

LMIPOLSTIP000316

**TRIAL EX. 152**
**Page 358**

hereunder, shall first be reimbursed... up to the amount paid by them; the Underwriters are then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the Interests (including the Assured) of whom this coverage is in excess are entitled to claim the residue, if any. Expenses necessary to the recovery of any such amounts shall be apportioned between the Interests (including the Assured) concerned, in the ratio of their respective recoveries as finally settled.

### N. CHANGES –

Notice to or knowledge possessed by any person shall not effect a waiver or change in any part of this policy or estop Underwriters from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part hereof, signed by Underwriters.

### O. ASSIGNMENT –

Assignment of interest under this policy shall not bind Underwriters unless and until their consent is endorsed hereon.

### P. CANCELLATION –

This policy may be cancelled by the Named Assured or by the Underwriters or their representatives by sending by registered mail notice to the other party stating when, not less than thirty (30) days thereafter, cancellation shall be effective. The mailing of notice as aforesaid by Underwriters or their representatives to the Named Assured at the address shown in this policy shall be sufficient proof of notice, and the insurance under this policy shall end on the effective date and hour at cancellation stated in the notice. Delivery of such written notice either by the Named Assured or by the Underwriters or their representatives shall be equivalent to mailing.

If this policy shall be cancelled by the Named Assured the Underwriters shall retain the customary short rate proportion of the premium for the period this policy has been in force. If this policy shall be cancelled by the Underwriters the Underwriters shall retain the pro rata proportion of the premium for the period this policy has been in force. Notice of cancellation by the Underwriters shall be effective even though Underwriters make no payment or tender of return premium with such notice.

### Q. CURRENCY –

The premiums and losses under this policy are payable in the currency stated in Item 4 of the Declarations. Payment of Premium shall be made as stated in Item 5 of the Declarations.

### R. CONFLICTING STATUTES –

In the event that any provision of this policy is unenforceable by the Assured under the laws of any State or other jurisdiction wherein it is claimed that the Assured is liable for any injury covered hereby, because of non-compliance with any statute thereof, then this policy shall be enforceable by the Assured with the same effect as if it complied with such Statute.

### S. SERVICE OF SUIT CLAUSE –

It is agreed that in the event of the failure of Underwriters hereon to pay any amount claimed to be due hereunder, Underwriters hereon, at the request of the Assured, will submit to the jurisdiction of any Court of competent Jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made as stated in Item 6 of the Declarations, and that in any suit instituted against any one of them upon this policy, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal. The person or firm named in Item 6 are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured to give a written undertaking to the Assured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this policy of insurance, and hereby designate the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

### T. MAINTENANCE OF UNDERLYING INSURANCES –

It is a condition of this policy that the policy or policies referred to in the attached "Schedule of Underlying Insurances", shall be maintained in full effect during the currency of this policy, except for any reduction of the aggregate limit or limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this policy. Failure of the Assured to comply with the foregoing shall not invalidate this policy but in the event of such failure, the Underwriters shall only be liable to the same extent as they would have been had the Assured complied with the said condition.

(OVER)

PGS/SC    LRD.    May 1960
4.5.60.                               –5–

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER
TRK 0457188

MPF 005641

LMIPOLSTIP000317

**TRIAL EX. 152**
**Page 359**

<u>SCHEDULE OF UNDERLYING INSURANCE(S)</u>

1. COMPREHENSIVE GENERAL LIABILITY
   providing the following limits and coverages:
   Covering accidents or occurrences within the continental
   limits of the United States of America, its territories or
   possessions (other than Guam), or Canada. Claims
   occurring outside this territorial limitation, with the exception
   of certain communistic dominated or controlled countries,
   are covered if claim is made or suit on the merits of the
   claim is originally brought within the policy territorial
   limits cited above. Coverage is specifically assumed as
   respects the Assured's operations conducted at San Marcos
   Island, Mexico.

   BODILY INJURY..................$200,000.00 each person
                                  $300,000.00 each occurrence
                                  $300,000.00 Aggregate Products

   AUTOMOBILE PROPERTY DAMAGE..... $ 25,000.00 each occurrence

2. THIRD PARTY PROPERTY DAMAGE
   providing the following limits:

   PROPERTY DAMAGE............... $100,000.00 each occurrence
                                 $100,000.00 Aggregate

3. EMPLOYERS LIABILITY
   providing the following limit:

   Employers Liability in the
   United States of America except
   In Monopolistic States......... $500,000.00 any one accident

4. PROPERTY DAMAGE LIABILITY
   (except Automobile) as respects
   Watercraft owned by Pacific
   Building Materials Division of
   Glacier Dand and Gravel Company
   and other miscellaneous watercraft
   owned by the Assured,
   providing the following limit:

   PROPERTY DAMAGE............. $500,000.00 each accident and
                                          in the aggregate

5. FOREIGN COMPREHENSIVE GENERAL
   LIABILITY providing the following limits:

   BODILY INJURY................ $ 25,000.00 each person
                                 $25,000.00  each accident
                                 $ 25,000.00 Aggregate Products

Covering claims occurring in countries outside the continental limits
of the United States of America, its territories or possessions (other
than Guam), or Canada, providing that the claim or suit is originally
brought within these countries. Coverage is excluded in certain
communistic dominated or occupied countries, and at San Marcos Island,
Mexico, but operations on the Island of Guam are included within the
policy territorial definition.

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER
TRK 0457190

ATTACHING TO AND FORMING PART OF POLICY No. LL 69700

## DECLARATIONS.

ITEM 1.  Named Assured:  PERMANENTE CEMENT COMPANY, ET AL
(SEE ENDORSEMENT NO. 1)

ITEM 2.  Limit of Liability —as Insuring
Agreement 11

(a) Limit in all in respect of        $1,000,000.00
each occurrence

(b) Limit in the aggregate for        $1,000,000.00
each annual period where
applicable

ITEM 3.  Notice of Occurrence (Condition      LANDIS PELLETIER & PARRISH INC.
G) to:—                                       558 Sacramento Street
San Francisco, California

ITEM 4.  Currency (Condition Q)—       UNITED STATES OF AMERICA

ITEM 5.  Payment of Premium (Condition      LANDIS PELLETIER & PARRISH INC.
Q) to:—

ITEM 6.  Service of Process (Condition      MENDES & MOUNT
S) upon:—                                    27 William Street
New York, New York

LRD.  May, 1960

PGS/SC
4,5,60.

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER
IRK 0467192

MPF 005645

LMIPOLSTIP000319

**TRIAL EX. 152**
**Page 361**

NAME OF ASSURED................................PERMANENTE CEMENT COMPANY, ET AL.......................................

TYPE OF RISK..........................UMBRELLA LIABILITY COVERAGE...............................................

I. It is understood and agreed that the Named Assured as shown on Umbrella Policy Form is amended to read as follows:

> NAMED ASSURED: As stated in Item 1 of the Declarations forming a part hereof and wherever used, includes any subsidiary of the Named Assured and any other Company of which it is assumes active management, provided that new acquisition are engaged in the same type of endeavor.

II. It is understood and agreed that exclusion (g) of the Certificate to which this endorsement attaches is amended to read as follows:

> (g) with respect to the following Watercraft:
>
> 1. SS "PERMANENTE CEMENT"
> 2. SS "PERMANENTE SILVERBOW"
> 3. SS "HARRY LUNDEBERG"
> 4. SS "OCEAN CARRIER"

III. a) It is understood and agreed that the United States of America (Department of the Navy) is added as an additional Assured with respect to the Named Assured's operations conducted on Cabras Island situated in Apra Harbor, Island of Guam.

b) It is further understood and agreed that Oahu Railway & Land Company & Oahu Railway Terminal Warehousing Company, Ltd. are added as additional Assureds as respects lease of land adjacent to Pier 32, Honolulu, Hawaii.

c) It is further agreed that the inclusion of the above additional Assureds does not increase Underwriters' limit of liability.

IV. It is understood and agreed that the "Definitions" as shown on Page 2 of the form attached hereto, paragraph (d) 3, is amended to read as follows:

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF POLICY/CERTIFICATE No.

................LL. 69700................OF THE UNDERWRITERS AT LLOYD'S, LONDON.

(CONTRACT.........................................)

EFFECTIVE DATE OF THIS ENDORSEMENT:

.....................December 31st , 19 61

LANDIS PELLETIER & PARRISH INC.
*Managing General Agents*

By........................................

L-111
DRAKE'S OFFSET

LM100177

MPF 005594

LMIPOLSTIP000320

**TRIAL EX. 152**
**Page 362**

NAME OF ASSURED............PERMANENTE CEMENT COMPANIE, ET. AL.........................

TYPE OF RISK................UMBRELLA LIABILITY COVERAGE................................

3. With respect to any hired automobile or aircraft, to the owner thereof or any employee of such owner, unless the Named Assured has contracted or during the currency of this Certificate may contract under written contract usual or incidental to such Named Assured's business to procure for or on behalf of the owner such Insurance as is afforded by this Certificate.

V. It is further understood and agreed that so far as insurance is afforded by Primary Lloyd's Third Party Property Damage coverage, Underwriters agree to follow all terms and conditions of Primary Policy subject to Insuring Agreement II (b) - LIMIT OF LIABILITY.

VI. It is also understood and agreed that this Certificate is extended to follow all terms and conditions of Medical Professional Liability afforded under Underlying Comprehensive General Liability Insurance.

VII. It is hereby understood and agreed that the following is added as an additional Named Assured hereunder:

PACIFIC BUILDING MATERIALS - READYMIX COMPANY

It is further agreed that the inclusion of the above Named Assured does not increase Underwriters' liability.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF POLICY/CERTIFICATE No.

.............69700.............OF THE UNDERWRITERS AT LLOYD'S, LONDON.

(CONTRACT.............................)

EFFECTIVE DATE OF THIS ENDORSEMENT:

..................December 31, 1961.

L-111
ONNIE'S OFFICE

LANDIS ·PELLETIER & PARRISH INC.
*Managing General Agents*

By *[signature]*

LMI100179

MPF 005596

LMIPOLSTIP000321

**TRIAL EX. 152**
**Page 363**

Case 16-03127-rld    Doc 50    Filed 11/09/16

NAME OF ASSURED..................... PERMANENTE CEMENT COMPANY, ET AL..............................

TYPE OF RISK................ .... ...UMBRELLA LIABILITY COVERAGE.............................. .. ...........

It is understood and agreed that the premium and taxes for this Certificate shall be apportioned by States as follows:

|  | CALIF.(65.94%) | WASHINGTON(18.77) | OREGON(12.93) | OTHERS(2.36 |
|---|---|---|---|---|
| PREMIUM | $14,836.50 | $4,223.25 | $2,909.25 | $531.00 |
| STATE TAX | 445.10 | 84.47 | 65.46 | ----- |
| STAMPING FEE | 111.27 | 31.67 | 3.64 | ---- |
| FEDERAL TAX | 593.46 | 168.93 | 116.37 | 21.24 |
| POLICY STAMP & FEE | 1.00 | ------ | ------ | ---- |
| TOTAL PREMIUM | $15,987.33 | $4,508.32 | $3,094.72 | $552.24 |

It is hereby agreed that the above premium for this Certificate is a three year Minimum and Deposit Premium subject to adjustment with the Earned Premium to be calculated at the rate of $ .40 per $1,000.00 of the Assured's Straight Time Payroll. The Assured shall declare to Underwriters as soon as possible after each anniversary date the total amount of their Straight Time Payroll during the preceding annual period and should the Earned Premium for the said annual period exceed one-third of the Minimum and Deposit Premium then the balance shall be payable by the Assured to the Underwriters. On expiry of this Certificate a final adjustment shall be made and any difference between the total premium paid by the Assured and the Total Earned Premium hereon shall be adjusted subject to Underwriters retaining the Minimum Premium hereon for the policy period.

It is also agreed that, notwithstanding anything contained herein to the contrary, if this Certificate shall be cancelled by the Assured, the Underwriters shall be entitled to the Earned Premium for the period that this Certificate has been in force or the short rate proportion of the Minimum Premium, whichever is the greater. If this insurance shall be cancelled by the Underwriters they shall be entitled to the Earned Premium for the period that this insurance has been in force or pro rata of the Minimum Premium, whichever is the greater.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF POLICY/CERTIFICATE No.

...............LL 69700...........OF THE UNDERWRITERS AT LLOYD'S, LONDON.

(CONTRACT...........................................)

EFFECTIVE DATE OF THIS ENDORSEMENT:

...................December 31st.., 1961

L-111
ORMIE 3 OFFSET

LANDIS PELLETIER & PARRISH INC.
*Managing General Agents*

By............................................

LM100175

MPF 005592

LMIPOLSTIP000322

**TRIAL EX. 152**
**Page 364**

NAME OF ASSURED.................................PERMANENTE CEMENT COMPANY, ET AL.............. . . ............

TYPE OF RISK..........................................UMBRELLA LIABILITY COVERAGE

In consideration of a Flat Additional Premium and Taxes apportioned by States
as follows:—

| | CALIF. (65.94) | WASHINGTON (18.77) | OREGON (12.93) | OTHERS (2.36) |
|---|---|---|---|---|
| PREMIUM | $2,967.30 | $844.67 | $581.85 | $106.20 |
| STATE TAX | 89.02 | 16.89 | 13.09 | ----- |
| STAMPING FEE | 22.25 | 6.33 | .73 | ----- |
| FEDERAL TAX | 118.69 | 33.79 | 23.27 | 4.25 |
| TOTAL PREMIUM | $3,197.26 | $901.66 | $618.94 | $110.45 |

This Certificate is extended as follows:—

To indemnify the Assured against any claim or claims for breach of
professional duty which may be made against them during the period
of this Certificate by reason of any negligent acts, errors or
omissions, whenever or wherever committed or alleged to have been
committed, on the part of the Assured or any person who has been,
is now, or may hereafter during the subsistence of this Insurance
be employed by the Assured (other than Contractors or Sub-Contractors)
in the conduct of any business conducted by or on behalf of the Assured.

Provided always that the Underwriters shall not be liable for any
claim or claims unless the amount of claim exceeds the amount stated
in the said Certificate as the deductible, which stated amount shall
be deducted from each claim and borne by the Assured at their own
risk and the Underwriters shall only be liable for the excess of
such stated amount.

If during the subsistence hereof the Assured shall become aware of
any occurrence which may subsequently give rise to a claim against
them by reason of any negligent act, error or omission and shall
during the subsistence hereof give written notice to the Under-
writers of such occurrence, any claim which may subsequently be
made against the Assured arising out of that negligent act, error
or omission shall be deemed for the purpose of this Insurance to
have been made during the subsistence hereof.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF POLICY/CERTIFICATE No.

..............LL. 697.00...........OF THE UNDERWRITERS AT LLOYD'S, LONDON.

(CONTRACT..............................................)     LANDIS PELLETIER & PARRISH INC.
                                                    *Managing General Agents*

EFFECTIVE DATE OF THIS ENDORSEMENT:

..............December 31st........19 61     By.......................................................

LM100171

MPF 005588

LMIPOLSTIP000323

**TRIAL EX. 152**
**Page 365**

NAME OF ASSURED ............ PERMANENTE CEMENT COMPANY, ET AL ...............

TYPE OF RISK ................... UMBRELLA LIABILITY COVERAGE ...................

It is further understood and agreed that as respects coverage
under this Endorsement exclusion (b) of the Certificate to
which this Endorsement attaches shall not apply.

However, the Underwriters shall not be liable in respect of any
claim against the Assured which is based on or is attributable to
any failure or omission on the part of the Assured to effect or
maintain Insurance.

Underwriters' Liability in respect of the additional coverage pro-
vided by this Endorsement shall not exceed $1,000,000.00 in the
aggregate any one annual period.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF POLICY/CERTIFICATE No.

........ LL 69700 ............ OF THE UNDERWRITERS AT LLOYD'S, LONDON.

(CONTRACT ..................................... )

EFFECTIVE DATE OF THIS ENDORSEMENT:

.................. December 31st , 1961 ..

LANDIS PELLETIER & PARRISH INC.
*Managing General Agents*

By ..................................................

LMI00173

MPF 005590

LMIPOLSTIP000324

**TRIAL EX. 152**
**Page 366**

ENDORSEMENT No._____

NAME OF ASSURED_____ PERMANENTE CEMENT COMPANY, ET AL

TYPE OF RISK_____ UMBRELLA LIABILITY COVERAGE

It is understood and agreed that the Oahu Railway &
Land Company & Oahu Railway Terminal Warehousing
Company, Ltd. previously shown as additional Assureds
hereunder are hereby deleted and DILLINGHAM CORPORATION,
P.O. BOX 3468, HONOLULU, HAWAII are added as additional
Assureds as respects lease of land adjacent to Pier 32,
Honolulu, Hawaii.

It is further agreed that the inclusion of the above
additional Assureds does not increase Underwriters'
limit of liability.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF POLICY/CERTIFICATE No.   LL 69700

EFFECTIVE DATE OF THIS ENDORSEMENT:          LANDIS PELLETIER & PARRISH INC.
_____ December 5 __, 19 62      1-22-63    By_____




LMI00181

MPF 005598

LMIPOLSTIP000325

**TRIAL EX. 152**
**Page 367**

ENDORSEMENT No._____

NAME OF ASSURED_____PERMANENTE CEMENT COMPANY, ET al.

TYPE OF RISK_____UMBRELLA LIABILITY COVERAGE

It is hereby understood and agreed that the Name of the
Assured is amended to read as follows:

KAISER CEMENT & GYPSUM CORPORATION including
any Subsidiary of the Named Assured and any
other Company of which it assumes active
management, provided that new acquisition are
engaged in the same type of endeavor.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF POLICY/CERTIFICATE No.     LL 69700

EFFECTIVE DATE OF THIS ENDORSEMENT:                      LANDIS PELLETIER & PARRISH INC.

_____July 1st_____19 64     9/3/64     By_____
                                                                        64

LMI00183

MPF 005600

LMIPOLSTIP000326

**TRIAL EX. 152**
**Page 368**

Endorsement No. 1 dated 23.8.62 attaching to Policy No. 61560

effected with Lloyd's Underwriters Issued to Permanente Cement Co. Etal.

1. It is understood and agreed that the Named Assured as shown on Umbrella Policy Form is amended to read as follows:

   NAMED ASSURED: As stated in Item 1 of the Declarations forming a part hereof and wherever used, includes any subsidiary of the Named Assured and any other Company of which it assumes active management, provided that new acquisitions are engaged in the same type of endeavor.

II. It is understood and agreed that exclusion (g) of the Policy to which this endorsement attaches is amended to read as follows:

   (g) with respect to the following Watercraft:

   1. SS "PERMANENTE CEMENT"
   2. SS "PERMANENTE SILVERBOW"
   3. SS "HARRY LUNDEBERG"
   4. SS "OCEAN CARRIER"

III. a) It is understood and agreed that the United States of America (Department of the Navy) is added as an additional Assured with respect to the Named Assured's operations conducted on Cabras Island situated in Apra Harbor, Island of Guam.

   b) It is further understood and agreed that Oahu Railway & Land Company & Oahu Railway Terminal Warehousing Company, Ltd., are added as additional Assureds as respect lease of land adjacent to Pier 32, Honolulu, Hawaii in respect of the operations of Permanente Cement Company Etal, only.

   c) It is further agreed that the inclusion of the above additional Assureds does not increase Underwriters' limit of liability.

IV. It is understood and agreed that the "Definitions" as shown on Page 2 of the form attached hereto, paragraph (d) 3, is amended to read as follows:

Page 1.                                                            Continued.....

*All other terms, conditions and limitations of this policy remain unchanged.*

Confidential Subject to
Protective Order

LMI 2369

MPF 004355

LMIPOLSTIP000327

**TRIAL EX. 152**
**Page 369**

Case 16-03127-rld    Doc 50    Filed 11/09/16

Endorsement No. 1 dated................ attaching to Policy No. 61560.............

effected with Lloyds Underwriters    Issued to    Permanente Cement Co., Ltd.

"5.    With respect to any hired automobile or aircraft,
to the owner thereof or any employee of such
owner, unless the Named Assured has contracted or
during the currency of this Policy may contract
under written contract usual or incidental to such
Named Assured's business to procure for or on behalf
of the owner such insurance as is afforded by this
Policy."

V.    It is further understood and agreed that so far as Insurance
is afforded by Primary Lloyd's Third Party Property Damage
coverage, Underwriters agree to follow all terms and conditions
of Primary Policy subject to Insuring Agreement II & LIMIT OF
LIABILITY.

VI.    It is also understood and agreed that this Policy is extended
to follow all terms and conditions of Medical Professional Liab-
ility afforded under Underlying Comprehensive General Liability
Insurance.

VII.   It is hereby understood and agreed that the following is added
as an additional Named Assured hereunder:

         PACIFIC BUILDING MATERIALS & READIMIX COMPANY

         It is further agreed that the inclusion of the above Named
         Assured does not increase Underwriters' Liability.

Page 2.

*All other terms, conditions and limitations of this policy remain unchanged.*

LMI 2370

Confidential Subject to
Protective Order

MPF 004356

LMIPOLSTIP000328

**TRIAL EX. 152**
**Page 370**

Endorsement No. 2 dated 23.9.62 attaching to POLICY No. 61560
effected with Lloyd's Underwriters Issued to Permanente Cement Co. Etal.
E XN31

In consideration of a flat additional premium, included in the
Policy premium, this Policy is extended as follows:-

To indemnify the Assured against any claim or claims
for breach of professional duty which may be made
against them during the period of this Policy by
reason of any negligent acts, errors or omissions,
whenever or wherever committed or alleged to have
been committed, on the part of the Assured or any
person who has been, is now, or may hereafter during
the subsistence of this Insurance be employed by the
Assured (other than Contractors or Sub-Contractors)
in the conduct of any business conducted by or on
behalf of the Assured.

Provided always that the Underwriters shall not be
liable for any claim or claims unless the amount of
claim exceeds the amount stated in the said Policy
as the deductible, which stated amount shall be
deducted from such claim and borne by the Assured
at their own risk and the Underwriters shall only be
liable for the excess of such stated amount.

If during the subsistence hereof the Assured shall
become aware of any occurrence which may subsequently
give rise to a claim against them by reason of any
negligent act, error or omission and shall during the
subsistence hereof give written notice to the Under-
writers of such occurrence, any claim which may
subsequently be made against the Assured arising out
of that negligent act, error or omission shall be
deemed for the purpose of this Insurance to have been
made during the subsistence hereof.

It is further understood and agreed that as respects
coverage under this Endorsement exclusion (b) of the
Policy to which this Endorsement attaches shall not
apply.

However, the Underwriters shall not be liable in
respect of any claim made against the Assured which
is based on or is attributable to any failure or
omission on the part of the Assured to effect or
maintain Insurance.

Page 1,
continued.....
*All other terms, conditions and limitations of this policy remain unchanged.*

LMI 2367

Confidential Subject to
Protective Order

MPF 004353

LMIPOLSTIP000329

**TRIAL EX. 152**
**Page 371**

Endorsement No. 2 dated 23.8.62 attaching to Policy No. 61560

effected with Lloyds Underwriters Issued to Permanente Cement Co. Ltd.

Underwriters liability in respect of the additional coverage
provided by this Endorsement shall not exceed $1,000,000
in the aggregate any one annual period.

Page 2.

*All other terms, conditions and limitations of this policy remain unchanged.*

LMI 2368

Confidential Subject to
Protective Order

MPF 004354

LMIPOLSTIP000330

**TRIAL EX. 152**
**Page 372**

# Exhibit F

# Lloyd's
# Policy



Lloyd's, London

J(A)

KINS 120513

MPF 005130

LMIPOLSTIP000425

TRIAL EX. 152
Page 482



# Lloyd's Policy

**Whereas** the Assured named in the Schedule herein has paid the premium specified in the Schedule to the Underwriting Members of Lloyd's who have hereunto subscribed their Names (hereinafter called 'the Underwriters'),

**Now We the Underwriters** hereby agree to insure against loss, damage or liability to the extent and in the manner hereinafter provided.

If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

**Now know Ye** that We the Underwriters, Members of the Syndicates whose definitive numbers in the after-mentioned List of Underwriting Members of Lloyd's are set out in the attached Table, hereby bind ourselves each for his own part and not one for another, our Heirs, Executors and Administrators and in respect of his due proportion only, to pay or make good to the Assured or to the Assured's Executors or Administrators or to indemnify him or them against all such loss, damage or liability as herein provided, after such loss, damage or liability is proved and the due proportion for which each of Us, the Underwriters, is liable shall be ascertained by reference to his share, as shown in the said List, of the Amount, Percentage or Proportion of the total sum insured hereunder which is in the Table set opposite the definitive number of the Syndicate of which such Underwriter is a Member AND FURTHER THAT the List of Underwriting Members of Lloyd's referred to above shows their respective Syndicates and Shares therein, is deemed to be incorporated in and to form part of this Policy, bears the number specified in the attached Table and is available for inspection at Lloyd's Policy Signing Office by the Assured or his or their representatives and a true copy of the material parts of the said List certified by the General Manager of Lloyd's Policy Signing Office will be furnished to the Assured on application.

**In Witness** whereof the General Manager of Lloyd's Policy Signing Office has subscribed his Name on behalf of each of Us.

LLOYD'S POLICY SIGNING OFFICE.
*General Manager*

LLOYD'S
POLICY SIGNING
OFFICE
EMBOSSMENT
APPEARS HERE
ON ORIGINAL
DOCUMENT.

**J(A)** NMA 2002 (11.4.74)
Form approved by Lloyd's Underwriters' Non-Marine Association.
Printed by The Carlton Berry Co. Ltd.

KINS 120514

MPF 005131

LMIPOLSTIP000426

**TRIAL EX. 152**
**Page 483**

The Assured is requested to read this Policy and, if it is incorrect, return it immediately for alteration.

In all communications the Policy Number appearing in line one of the Schedule should be quoted.

In the event of any occurrence likely to result in a claim under this Policy, immediate notice should be given to:

KINS 120515

MPF 005132

LMIPOLSTIP000427

**TRIAL EX. 152**
**Page 484**

## Schedule

Policy or Certificate No.    834 / 58548/84    ~~Contract No.(Group)~~

The name and address of the Assured

   Kaiser Cement Corporation as set forth in the
Underlying Policy (ies)
300 Lakeside Drive
Oakland
California 94612

The risk and sum insured hereunder

This policy being for 14.0351% part of 100% of 35% insures it
pro rata proportion of the limit(s) of liability expressed
in the attached wording.

Percentages signed in the Table of Definitive Numbers of Syndicates
are percentages of 35% of the limits of liability expressed
herein.

The Premium    US$1535.16 part of US$10,938.02 part of US$ 31,251.47

The period of Insurance from    1st May 1984    to    1st April 1985
both days ~~inclusive~~ and for such further period or periods as may be mutually agreed upon
at 12.01 a.m Local Standard Time.

Dated in    LONDON    the    16TH November 1984

J or J(A)  (Schedule) NMA 2003 for attachment to NMA 2001, NMA 2002, NMA 2004 or NMA 2005

KINS 120516

MPF 005133

LMIPOLSTIP000428

**TRIAL EX. 152**
**Page 485**

INSURING AGREEMENTS:

I   COVERAGE -

The Underwriters hereby agree, subject to the limitations, terms
and conditions hereinafter mentioned, to indemnify the Assured for
all sums which the Assured shall be obligated to pay by reason of
the liability caused by or arising out of the hazards covered by
and as more fully defined in the Underlying Umbrella Policy/ies
stated in Item 2 of the Declarations.

II  LIMIT OF LIABILITY -

It is expressly agreed that liability shall attach to the
Underwriters only after the Underlying Umbrella Insurers (as
specified in Item 2 of the Declarations) have paid or have been
held liable to pay the full amount of their respective ultimate
net loss liability as follows:

$(as stated in Item 3          ultimate net loss in respect
of the Declarations)          of each occurrence, but

$(as stated in Item 4          in the aggregate for each
of the Declarations)          annual period during the
                              currency of this Policy,
                              separately in respect of each
                              hazard insured with an
                              aggregate limit in the
                              Underlying Umbrella Policy/ies

and the Underwriters shall then be liable to pay only the excess
thereof up to a further

$(as stated in Item 5          ultimate net loss in all in
of the Declarations)          respect of each occurrence -
                              subject to a limit of

$(as stated in Item 6          in the aggregate for each
of the Declarations)          annual period during the
                              currency of this Policy,
                              separately in respect of each
                              hazard insured with an
                              aggregate limit in the
                              Underlying Umbrella Policy/ies.

WDXTXOD2

- - 1 -

KINS 120522

MPF 005139

LMIPOLSTIP000429

**TRIAL EX. 152**
**Page 486**

1. **PRIOR INSURANCE AND NON CUMULATION OF LIABILITY –**

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability herein as stated in Items 5 and 6 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

2. **MAINTENANCE OF UNDERLYING UMBRELLA INSURANCE –**

This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policy/ies stated in Item 2 of the Declarations prior to the happening of an occurrence for which claim is made hereunder. Provided always that this Policy shall not apply until the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss in accordance with Insuring Agreement II. Should, however, any alteration be made in the premium for the Underlying Umbrella Policy/ies during the currency of this Policy, Underwriters reserve the right to adjust the premium hereon accordingly.

It is a condition of this Policy that the Underlying Umbrella Policy/ies shall be maintained in full effect during the currency hereof except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this Policy, or by the operation of a clause contained in said Underlying Umbrella Policy/ies similar to Condition 1 above.

3. **ASSISTANCE AND CO-OPERATION –**

The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured but Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters, in which event the Assured and Underwriters shall co-operate in all things in the defense of such claim, suit or proceeding.

WDXTX0D2

– 2 –

KINS 120523

MPF 005140

LMIPOLSTIP000430

**TRIAL EX. 152**
**Page 487**

Case 16-03127-rld    Doc 50    Filed 11/09/16

4. CANCELLATION

This Policy may be cancelled by the Named Assured or by the
Underwriters or their representatives by mailing written notice to
the other party stating when, not less than thirty (30) days
thereafter, cancellation shall be effective. The mailing of
notice as aforesaid by Underwriters or their representatives to
the Named Assured at the address shown in this Policy shall be
sufficient proof of notice, and the insurance under this Policy
shall end on the effective date and hour of cancellation stated in
the notice. Delivery of such written notice either by the Named
Assured or by Underwriters or their representatives shall be
equivalent to mailing.

If this Policy shall be cancelled by the Named Assured the
Underwriters shall retain the customary short rate proportion of
the premium for the period this Policy has been in force. If this
Policy shall be cancelled by the Underwriters the Underwriters
shall retain the pro rata proportion of the premium for the period
this Policy has been in force. Notice of cancellation by the
Underwriters shall be effective even though the Underwriters make
no payment or tender of return premium with such notice.

5. OTHER INSURANCE -

If other valid and collectible insurance with any other insurer is
available to the Assured covering a loss also covered by this
Policy, other than insurance that is specifically stated to be in
excess of this Policy, the insurance afforded by this Policy shall
be in excess of and shall not contribute with such other
insurance. Nothing herein shall be construed to make this Policy
subject to the terms, conditions and limitations of other
insurance.

6. NOTICE OF OCCURRENCE -

Whenever the Assured has information from which they may
reasonably conclude that an occurrence covered hereunder involves
injuries or damages which, in the event that the Assured should be
held liable, is likely to involve this Policy, notice shall be
sent as stated in Item 8 of the Declarations as soon as
practicable, provided, however, that failure to give notice of any
occurrence which at the time of its happening did not appear to
involve this Policy, but which, at a later date would appear to
give rise to claims hereunder, shall not prejudice such claims.

WDXTXOD2

- 3 -

KINS 120524

MPF 005141

LMIPOLSTIP000431

**TRIAL EX. 152**
**Page 488**

7. **SERVICE OF SUIT CLAUSE –**

It is agreed that in the event of the failure of Underwriters hereon to pay any amount claimed to be due hereunder, Underwriters hereon, at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made as stated in Item 9 of the Declarations, and that in any suit instituted against any one of them upon this Policy, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal. The person or firm named in Item 9 of the Declarations are authorised and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured to give a written undertaking to the Assured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this policy of insurance, and hereby designate the above-named as the person to whom the said officer is authorised to mail such process or a true copy thereof.

WDXTXOD2

– 4 –

KINS 120525

MPF 005142

LMIPOLSTIP000432

**TRIAL EX. 152**
**Page 489**

ITEM 1.  a) NAMED ASSURED: KAISER CEMENT CORPORATION AND AS MORE
            FULLY SET FORTH IN THE UNDERLYING
            UMBRELLA POLICY/IES

         b) ADDRESS OF NAMED ASSURED: 300 LAKESIDE DRIVE, OAKLAND,
            CALIFORNIA 94612

ITEM 2.  a) UNDERLYING UMBRELLA POLICY NO(S): A) 523-317273   C) 6184 4363
                                              B) XS106751     D) TEL 90037

         b) UNDERLYING UMBRELLA INSURER(S): A) INTERNATIONAL INSURANCE
                                               COMPANY
                                            B) ASSOCIATED INTERNATIONAL
                                               INSURANCE COMPANY
                                            C) GRANITE STATE INSURANCE
ITEM 3.  UNDERLYING UMBRELLA LIMITS -          COMPANY
         (Insuring Agreement II): $30,000,000 D) TRANSIT INDEMNITY COMPANY

ITEM 4.  UNDERLYING UMBRELLA AGGREGATE LIMITS
         (Insuring Agreement II): $30,000,000

ITEM 5.  LIMIT OF LIABILITY
         (Insuring Agreement II): $20,000,000

ITEM 6.  AGGREGATE LIMIT OF LIABILITY
         (Insuring Agreement.II): $20,000,000

ITEM 7.  POLICY PERIOD: 1st MAY 1984 TO 1st APRIL 1985 BOTH DAYS AT
                        12.01 A.M. LOCAL STANDARD TIME

ITEM 8.  NOTICE OF OCCURRENCE (Condition 6) to: ALEXANDER AND ALEXANDER
                                                SUITE 1700
                                                THREE EMBARCADERO CENTER
                                                SAN FRANCISCO, CALIFORNIA
                                                94111
ITEM 9.  SERVICE OF PROCESS (Condition 7) upon: MENDES AND MOUNT
                                                3 PARK AVENUE
                                                NEW YORK, NY 10016

**KINS 120526**

MPF 005143

LMIPOLSTIP000433

**TRIAL EX. 152**
**Page 490**

Definitive Numbers of Syndicates and Amount, Percentage or Proportion of the Total Sum Insured hereunder shared between the Members of those Syndicates.

| FOR LPSO USE ONLY | BROKER | LPSO NO. & DATE | | | |
|---|---|---|---|---|---|
| CPD33R 3110 2252 | 834 | 62714 | 1 | 10 | 84 |
| AMOUNT, PERCENTAGE OR PROPORTION | SYNDICATE | UNDERWRITER'S REF. | | PAGE 1 | |
| PERCENT 14.0351 | 210 | G2017777 | | | |

THE LIST OF UNDERWRITING MEMBERS
OF LLOYDS IS NUMBERED 1984/ 10.

| TOTAL LINE | NO. OF SYND. | FOR LPSO USE ONLY |
|---|---|---|
| 14.0351 | 1 | USB1. 210 |

KINS 120527

MPF 005144

LMIPOLSTIP000434

TRIAL EX. 152
Page 491

ISSUED TO:    KAISE. .EMENT CORPORATION

ISSUED BY:    CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, ENGLAND

ENDORSEMENT NUMBER:   ONE

It is hereby understood and agreed that the team "annual period" wherever
used herein shall be deemed to mean the period from May 1st 1984 to April 1st 1985.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

MC0496

KINS 120521

MPF 005138

LMIPOLSTIP000435

**TRIAL EX. 152**
**Page 492**

ATTACHING TO AND FORMING PART OF POLICY NUMBER: 834/38548/84

ISSUED TO:     KAISL.. CEMENT CORPORATION.

ISSUED BY:.    CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, ENGLAND

ENDORSEMENT NUMBER:  TWO

.Notwithstanding anything to the contrary stated elsewhere herein Condition 4
of this policy is amended to provide not less than 75 days notice of cancellation.

ALL OTHER TERMS AND CONDITONS OF THIS POLICY REMAIN UNCHANGED.

MC2374

KINS 120520

MPF 005137

LMIPOLSTIP000436

**TRIAL EX. 152**
**Page 493**

ISSUED TO:    KAISER CEMENT CORPORATION

ISSUED BY:    CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON ENGLAND

---

ENDORSEMENT NUMBER: THREE

It is hereby understood and agreed that with effect from Inception,
no coverage shall be afforded by this policy for Environmental
Impairment Liability which results in bodily injury, property damage,
impairment or diminution or interference with any environmental right protected by
law, and/or clean up costs.

Environmental impairment means damage to the environment caused by:

1.  The emission, discharge, disposal, dispersal, release, seepage,
    or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic
    chemicals, liquids or gases, waste materials or other irritants,
    contaminants or pollutants, into or upon land, the atmosphere
    of any watercourse or body of water, or

2.  The generation of odor, noises, vibrations, light, electricity,
    radiation, changes in temperature, or any other sensory phenomena
    arising out of or in the course of the Insured's operations
    provided 1 and 2 are gradual and fortuitous and neither expected
    nor intended by the Insured.

Clean up costs:    The term "clean up costs" means costs and expenses
of operations designed to remove, neutralize, or clean up any released
or escaped substance which has caused environmental impairment or
could cause environmental impairment if not removed, neutralized
or cleaned up.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

HC263031

KINS 120519

MPF 005136

LMIPOLSTIP000437

**TRIAL EX. 152**
**Page 494**

Case 16-03127-rld    Doc 50    Filed 11/09/16

ATTACHING TO AND FORM... PART OF POLICY NUMBER: 834/5B...8/84

ISSUED TO:   KAISER CEMENT CORPORATION.

ISSUED BY:   CERTAIN UNDERWRITERS AT LLOYDS OF LONDON, ENGLAND

ENDORSEMENT NUMBER:  FOUR

It is hereby understood and agreed that this policy is subject to the terms
and conditions of the attached N.M.A. Clauses, numbered 1256, 1477, and (where
applicable) 1546.

U.S.A.

RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE—LIABILITY—DIRECT
(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause—Liability—
Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the
Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by
or contributed to by or arising from ionising radiations or contamination by radioactivity from any
nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
N.M.A. 1477

Page 1 of 2.

KINS 120517

MPF 005134

LMIPOLSTIP000438

**TRIAL EX. 152**
**Page 495**

**NUCLEAR INCIDENT EXCLUSION CLAUSE—LIABILITY—DIRECT (BROAD)**
*(Approved by Lloyd's Underwriters' Non-Marine Association)*

*For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:—*

*Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),*

*not being insurances of the classifications to which the Nuclear Incident Exclusion Clause—Liability—Direct (Limited) applies.*

This policy*                                                                          does not apply:—

I.  Under any Liability Coverage, to injury, sickness, disease, death or destruction
   (a)  with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
   (b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.  Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expense incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.  Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if
   (a)  the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;
   (b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or
   (c)  the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.  As used in this endorsement:
   "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means
   (a)  any nuclear reactor,
   (b)  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,
   (c)  any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,
   (d)  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,
and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.
   With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.
It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

*NOTE:—As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
N.M.A. 1256

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Page 2 of 2

KINS 120518

MPF 005135

LMIPOLSTIP000439

**TRIAL EX. 152**
**Page 496**



PSAC
POLICY

No. 59548/84

Name ....KAISER...CEMENT...CORPORATION....

Expiry Date .1st. APRIL, 1985.

KINS-1352

P 84 1 0 1 5 0 0 0 4 8 5 4

PSAC
C.P.

MPF 005065

LMIPOLSTIP000440

**TRIAL EX. 152**
**Page 497**

In all communications please quote the
policy number appearing in the schedule
overleaf

# COMPANIES INSURANCE POLICY

KINS 120495

MPF 005112

LMIPOLSTIP000441

**TRIAL EX. 152**
**Page 498**

# PSAC POLICY

IN CONSIDERATION of the Insured named in the Schedule hereto having paid the premium stated in the said Schedule to the Insurers named herein who have hereunto subscribed their Names ("the Insurers")

THE INSURERS HEREBY SEVERALLY AGREE each for the proportion set against its own name to indemnify the Insured or the Insured's Executors and Administrators against loss, damage or liability to the extent and in the manner set forth herein. Provided that the aggregate liability of the Insurers shall not exceed the Sum Insured or other limits as are set forth in the Schedule.

If the Insured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

IN WITNESS WHEREOF the Policy Signing Manager of THE POLICY SIGNING & ACCOUNTING CENTRE LIMITED ("PSAC") has subscribed his name on behalf of each of the PSAC Companies and (where the Companies Collective Signing Agreement ("CCSA") is being implemented) on behalf of the Leading CCSA Company which is a PSAC member and authorised to sign this Policy (either itself or by delegation to PSAC) on behalf of all the other CCSA Companies.

Signed: ........................................  Policy Department
        *Policy Signing Manager*              Seal

Date as in the Schedule.

PSAC POL. 1 REVISED 9/78

KINS 120496

MPF 005113

LMIPOLSTIP000442

**TRIAL EX. 152**
**Page 499**

# THE SCHEDULE

The Insured    Kaiser Cement Corporation as set forth in the Underlying Policy(ies)
                300 Lakeside Drive -
                Oakland
                California 94612

Premium      US$9402.86 part of US$10,938.02 partof US$31,251.47

Sum Insured    As set forth herein

The Interest Insured      As set forth herein.

Hereon 85.9649% part of 100% of 35%

Percentages signed in the Schedule of Insurers are percentages of 35% of the limits
of liability expressed herein.

Insured Perils

              Excess Umbrella liability

Period of Insurance

From   1st May 1984             To    1st April 1985    both days at 12.01 a.m
                                                       Local Standard Time.
and for such further period or periods as may be mutually agreed.

~~COINSURANCE CLAUSE~~

~~It is warranted that this Policy shall run concurrently with and be subject to the same terms,~~
~~provisions, and limitations as are contained in Policy No.~~
~~issued by~~                                    ~~covering the identical subject~~
~~matter and risk.~~

KINS-1351

MPF 005064

LMIPOLSTIP000443

**TRIAL EX. 152**
**Page 500**

| The Insurers | SA/PSAC Company Number | Whether CCSA or not | AAC Proportion | Reference Numbers |
|---|---|---|---|---|
| (50%) (12 1/2%) Sovereign Marine & General Insurance Company Limited | | | | |
| ( (37 1/2%) The Tokio Marine & Fire Insurance Company (UK) Limited | | | | |
| ( (25%) Taisho Marine & Fire Insurance Company (UK) Limited | | | | |
| ( (15%) Allianz International Insurance Company Limited | | | | |
| ( (10%) Storebrand Insurance Company (UK) Limited | | | | |
| (50%) Sovereign Marine & General Insurance Company Limited "C" A/C Per Willis Faber (Underwriting Management) Limited | 80065 | | 26.58% | S716484 |
| Sovereign Marine & General Insurance Company Limited No 12 A/C Per Willis Faber (Underwriting Management) Limited | 80099 | | 7.8947% | S716484 |
| Heddington Insurance (UK) Limited Per Willis Faber (Underwriting Management) Limited | H0119 | | 5.2632% | S716484 |

KINS-1354

MPF 005067

LMIPOLSTIP000444

**TRIAL EX. 152**
**Page 501**

| The Insurers | | | PSAC Company Number | Whether QCSA or not | Propon | Reference Numbers |
|---|---|---|---|---|---|---|
| CNA Reinsurance of London Limited | | | C4009 | | 26.3158% | H353653 B76811 |
| (50% | (12 1/2% | Sovereign Marine & General Insurance Company Limited | | | | |
| | (37 1/2% | The Tokio Marine & Fire Insurance Company (UK) Limited | | | | |
| | (25% | Taisho Marine & Fire Insurance Company (UK) Limited | | | | |
| | (15% | Allianz International Company (UK) Limited | | | | |
| | (10% | Storebrand Insurance Company (UK) Limited | | | | |
| 50% | | Sovereign Marine & General Insurance Company Limited "C" A/C Per Willis Faber (Underwriting Management) Limited | 80065 | | 25.0877% | S716384 |
| Sovereign Marine & General Insurance Company Limited No. 12 A/C Per Willis Faber (Underwriting Management) Limited | | | 80099 | | 17.5439% | S716384 |
| Heddington Insurance (UK) Limited Per Willis Faber (Underwriting Management) Limited | | | 80119 | | 7.0175% | S716384 |

KINS 120497

MPF 005114

LMIPOLSTIP000445

**TRIAL EX. 152**
**Page 502**

NUCLEAR INCIDENT EXCLUSION CLAUSE—LIABILITY—DIRECT (BROAD)
*(Approved by Lloyd's Underwriters' Non-Marine Association)*
*For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:—*

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

*not being insurances of the classifications to which the Nuclear Incident Exclusion Clause—Liability— Direct (Limited) applies.*

This policy*                                                                      does not apply:—

I.   Under any Liability Coverage, to injury, sickness, disease, death or destruction
     (a)  with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
     (b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.  Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if
     (a)  the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;
     (b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or
     (c)  the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.  As used in this endorsement:
     "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means,
     (a)  any nuclear reactor,
     (b)  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,
     (c)  any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,
     (d)  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,
     and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.
     It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

*NOTE:—As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.
17/3/60
N.M.A. 1256*

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Page 2 of 2

London 16th August 1985
834/58548/84   AI/PMS

KINS 120499

MPF 005116

LMIPOLSTIP000446

**TRIAL EX. 152**
**Page 503**

ATTACHING TO AND FORMING PART OF POLICY NUMBER:   834/5~~48/84

ISSUED TO:          KAISER CEMENT CORPORATION

ISSUED BY:          CERTAIN INSURANCE COMPANIES

ENDORSEMENT NUMBER: ONE

It is hereby understood and agreed that the term "annual period"
whereever used herein shall be deemed to mean the period from May 1st 1984
to April 1st 1985.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

London 12th August 1985
834/58548/84a  AI/PMS

KINS 120502

MPF 005119

LMIPOLSTIP000447

**TRIAL EX. 152**
**Page 504**

ATTACHING TO AND FORMING PART OF POLICY NUMBER: B34/5P 48/84

ISSUED TO: KAISER CEMENT CORPORATION

ISSUED BY: CERTAIN INSURANCE COMPANIES

ENDORSEMENT NUMBER: TWO

Notwithstanding anything to the contrary stated elsewhere herein Condition 4 of this policy is amended to provide not less than 75 days notice of cancellation.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

London 12th AUGUST 1985
B34/58548/84b AI/PMS

KINS 120501

MPF 005118

LMIPOLSTIP000448

TRIAL EX. 152
Page 505

ISSUED TO:        KAISER CEMENT CORPORATION

ISSUED BY:        CERTAIN INSURANCE COMPANIES

---

ENDORSEMENT NUMBER: THREE

It is hereby understood and agreed that with effect from Inception, no coverage shall be afforded by this policy for Environmental Impairment Liability which results in bodily injury, property damage, impairment or diminution or interference with any environmental right protected by law, and/or clean up costs.

Environmental impairment means damage to the environment caused by:

1.  The emission, discharge, disposal, dispersal, release, seepage, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants, into or upon land, the atmosphere of any watercourse or body of water, or

2.  The generation of odor, noises, vibrations, light, electricity, radiation, changes in temperature, or any other sensory phenomena arising out of or in the course of the Insured's operations provided 1 and 2 are gradual and fortuitous and neither expected nor intended by the Insured.

Clean up costs:    The term "clean up costs" means costs and expenses of operations designed to remove, neutralize, or clean up any released or escaped substance which has caused environmental impairment or could cause environmental impairment if not removed, neutralized or cleaned up.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

London 12th August 1985
834/58548/84c  AI/PMS

KINS 120500

MPF 005117

LMIPOLSTIP000449

**TRIAL EX. 152**
**Page 506**

Case 16-03127-rld    Doc 50    Filed 11/09/16

ISSUED TO:        KAISER CEMENT CORPORATION

ISSUED BY:        CERTAIN INSURANCE COMPANIES

_____

ENDORSEMENT NUMBER: FOUR

It is hereby understood and agreed that this policy is subject to the terms and conditons of the attached N.M.A. Clauses, numbered 1256, 1477 and (where applicable) 1546.

#### U.S.A.
RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE—LIABILITY—DIRECT
(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause—Liability—Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
N.M.A. 1477

#### U.S.A.
4% TAX CLAUSE
(Approved by Lloyd's Underwriters' Non-Marine Association)

Notice is hereby given that the Underwriters have agreed to allow for the purpose of paying the Federal Excise Tax, 4% of the premium payable hereon to the extent such premium is subject to Federal Excise Tax.

It is understood and agreed that in the event of any return of premium becoming due hereunder the Underwriters will deduct 4% from the amount of the return and the Assured or his agent should take steps to recover the Tax from the U.S. Government.

19/3/64
N.M.A. 1546

Page 1 of 2

KINS 120498

MPF 005115

LMIPOLSTIP000450

**TRIAL EX. 152**
**Page 507**

INSURING AGREEMENTS:

I   COVERAGE -

The Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability caused by or arising out of the hazards covered by and as more fully defined in the Underlying Umbrella Policy/ies stated in Item 2 of the Declarations.

II  LIMIT OF LIABILITY -

It is expressly agreed that liability shall attach to the Underwriters only after the Underlying Umbrella Insurers (as specified in Item 2 of the Declarations) have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:

$(as stated in Item 3 of the Declarations)   ultimate net loss in respect of each occurrence, but

$(as stated in Item 4 of the Declarations)   in the aggregate for each annual period during the currency of this Policy, separately in respect of each hazard insured with an aggregate limit in the Underlying Umbrella Policy/ies

and the Underwriters shall then be liable to pay only the excess thereof up to a further

$(as stated in Item 5 of the Declarations)   ultimate net loss in all in respect of each occurrence - subject to a limit of

$(as stated in Item 6 of the Declarations)   in the aggregate for each annual period during the currency of this Policy, separately in respect of each hazard insured with an aggregate limit in the Underlying Umbrella Policy/ies.

WDXTXOD2

-   1   -

KINS 120503

MPF 005120

LMIPOLSTIP000451

**TRIAL EX. 152**
**Page 508**

1.  PRIOR INSURANCE AND NON CUMULATION OF LIABILITY –

    It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Items 5 and 6 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

2.  MAINTENANCE OF UNDERLYING UMBRELLA INSURANCE –

    This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policy/ies stated in Item 2 of the Declarations prior to the happening of an occurrence for which claim is made hereunder. Provided always that this Policy shall not apply until the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss in accordance with Insuring Agreement II. Should, however, any alteration be made in the premium for the Underlying Umbrella Policy/ies during the currency of this Policy, Underwriters reserve the right to adjust the premium herein accordingly.

    It is a condition of this Policy that the Underlying Umbrella Policy/ies shall be maintained in full effect during the currency hereof except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this Policy, or by the operation of a clause contained in said Underlying Umbrella Policy/ies similar to Condition 1 above.

3.  ASSISTANCE AND CO-OPERATION –

    The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured but Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters, in which event the Assured and Underwriters shall co-operate in all things in the defense of such claim, suit or proceeding.

WDXTX0D2

– 2 –

KINS 120504

MPF 005121

LMIPOLSTIP000452

**TRIAL EX. 152**
**Page 509**

4. CANCELLATIO. .

This Policy may be cancelled by the Named Assured or by the
Underwriters or their representatives by mailing written notice to
the other party stating when, not less than thirty (30) days
thereafter, cancellation shall be effective. The mailing of
notice as aforesaid by Underwriters or their representatives to
the Named Assured at the address shown in this Policy shall be
sufficient proof of notice, and the insurance under this Policy
shall end on the effective date and hour of cancellation stated in
the notice. Delivery of such written notice either by the Named
Assured or by Underwriters or their representatives shall be
equivalent to mailing.

If this Policy shall be cancelled by the Named Assured the
Underwriters shall retain the customary short rate proportion of
the premium for the period this Policy has been in force. If this
Policy shall be cancelled by the Underwriters the Underwriters
shall retain the pro rata proportion of the premium for the period
this Policy has been in force. Notice of cancellation by the
Underwriters shall be effective even though the Underwriters make
no payment or tender of return premium with such notice.

5. OTHER INSURANCE -

If other valid and collectible insurance with any other insurer is
available to the Assured covering a loss also covered by this
Policy, other than insurance that is specifically stated to be in
excess of this Policy, the insurance afforded by this Policy shall
be in excess of and shall not contribute with such other
insurance. Nothing herein shall be construed to make this Policy
subject to the terms, conditions and limitations of other
insurance.

6. NOTICE OF OCCURRENCE -

Whenever the Assured has information from which they may
reasonably conclude that an occurrence covered hereunder involves
injuries or damages which, in the event that the Assured should be
held liable, is likely to involve this Policy, notice shall be
sent as stated in Item 8 of the Declarations as soon as
practicable, provided, however, that failure to give notice of any
occurrence which at the time of its happening did not appear to
involve this Policy, but which, at a later date would appear to
give rise to claims hereunder, shall not prejudice such claims.

WDXTX0D2

— 3 —

KINS 120505

MPF 005122

LMIPOLSTIP000453

**TRIAL EX. 152**
**Page 510**

Case 16-03127-rld    Doc 50    Filed 11/09/16

7. SERVICE OF ... IT CLAUSE -

It is agreed that in the event of the failure of Underwriters hereon to pay any amount claimed to be due hereunder, Underwriters hereon, at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made as stated in Item 9 of the Declarations, and that in any suit instituted against any one of them upon this Policy, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal. The person or firm named in Item 9 of the Declarations are authorised and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured to give a written undertaking to the Assured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this policy of insurance, and hereby designate the above-named as the person to whom the said officer is authorised to mail such process or a true copy thereof.

WDXTXQD2

- 4 -

KINS 120506

MPF 005123

LMIPOLSTIP000454

**TRIAL EX. 152**
**Page 511**

ITEM 1.  a)  NAMED ASSURED:  KAISER CEMENT CORPORATION AND AS MORE
                             FULLY SET FORTH IN THE UNDERLYING
                             UMBRELLA POLICY/IES

         b)  ADDRESS OF NAMED ASSURED: 300 LAKESIDE DRIVE, OAKLAND,
                                       CALIFORNIA 94612

ITEM 2.  a)  UNDERLYING UMBRELLA POLICY NO(S):  A)  523-317273   C)  6184 4363
                                                B)  XS106751     D)  TEL 90037

         b)  UNDERLYING UMBRELLA INSURER(S):  A)  INTERNATIONAL INSURANCE
                                                  COMPANY
                                              B)  ASSOCIATED INTERNATIONAL
                                                  INSURANCE COMPANY
                                              C)  GRANITE STATE INSURANCE
ITEM 3.  UNDERLYING UMBRELLA LIMITS               COMPANY
         (Insuring Agreement II): $30,000,000 D)  TRANSIT INDEMNITY COMPANY

ITEM 4.  UNDERLYING UMBRELLA AGGREGATE LIMITS
         (Insuring Agreement II):  $30,000,000

ITEM 5.  LIMIT OF LIABILITY
         (Insuring Agreement II):  $20,000,000

ITEM 6.  AGGREGATE LIMIT OF LIABILITY
         (Insuring Agreement II): $20,000,000

ITEM 7.  POLICY PERIOD: 1st MAY 1984 TO 1st APRIL 1985 BOTH DAYS AT
                        12.01 A.M. LOCAL STANDARD TIME

ITEM 8.  NOTICE OF OCCURRENCE (Condition 6) to:  ALEXANDER AND ALEXANDER
                                                 SUITE 1700
                                                 THREE EMBARCADERO CENTER
                                                 SAN FRANCISCO, CALIFORNIA
                                                 94111
ITEM 9.  SERVICE OF PROCESS (Condition 7) upon:  MENDES AND MOUNT
                                                 3 PARK AVENUE
                                                 NEW YORK, NY 10016

KINS 120507

MPF 005124

LMIPOLSTIP000455

**TRIAL EX. 152**
**Page 512**

# THE SCHEDULE

The Insured    Kaiser Cement Corporation as set forth in the Underlying Policy(ies)
               300 Lakeside Drive -.
               Oakland
               California 94612

Premium        US$9402.86 part of US$10,938.02 partof US$31,251.47

Sum Insured    As set forth herein

The Interest Insured
                   As set forth herein.

Hereon 85.9649% part of 100% of 35%

Percentages signed in the Schedule of Insurers are percentages of 35% of the limits
of liability expressed herein.
Insured Perils

               Excess Umbrella liability

Period of Insurance

From   1st May 1984          To   1st April 1985    both days. at 12.01 a.m
                                                    Local Standard Time.
and for such further period or periods as may be mutually agreed.

~~COINSURANCE CLAUSE~~

~~It is warranted that this Policy shall run concurrently with and be subject to the same terms,
provisions, and limitations as are contained in Policy No.
issued by~~                                    ~~covering the identical subject
matter and risk.~~

KINS 120508

MPF 005125

LMIPOLSTIP000456

**TRIAL EX. 152**
**Page 513**

Case 16-03127-rld    Doc 50    Filed 11/09/16